## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

RICHARD WARREN McCUISTIAN )
as Administrator for the Estate of )
ANNE McCUISTIAN, Deceased )
  )
    **Plaintiff,** )
  )
**v.** )       **CASE NO. 1:15-cv-00279**
  )
LG ELECTRONICS U.S.A., INC., BRK )
BRANDS, INC., SEARS ROEBUCK & )
CO., and UNDERWRITERS )
LABORATORIES INC., )
  )
    **Defendants.** )

## DEFENDANTS' MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF KENNETH ASHCRAFT AND PAUL CASTELLANO

**COME NOW** Defendants, LG Electronics USA, Inc. ("LGEUS"), and Sears Roebuck & Co. ("Sears") (collectively "Defendants"), and move to exclude the testimony of Plaintiff's retained experts Kenneth Ashcraft and Paul Castellano. In support of their motion, Defendants state as follows:

### INTRODUCTION

This case arises out of a fire. There are two theories as to where and how this fire started. Plaintiff contends the fire started in the southwest corner of a kitchen, due to an electrical arc inside a refrigerator that was distributed by LGEUS and sold by Sears. Defendants' position is that the fire occurred halfway

across the kitchen at a stovetop, as a result of an unattended pot of cooking oil sitting upon an energized burner.   Plaintiff's experts have asserted untested causation opinions that Defendants' tests have shown to be fundamentally impossible.  One of Plaintiff's experts has asserted opinions which draw incorrect inferences from incomplete measurements, and ultimately are based on nothing more than his personal opinion.   Because both experts followed unscientific methodologies to reach their opinions, those opinions are due to be stricken before a jury is prejudiced by the junk science Plaintiff's experts intend to introduce.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Just after midnight on October 27, 2013, the home of Loyd & Anne McCuistian was reported to be on fire.  Neighbors awakened Loyd and he exited the house without physical injury, but Anne, whose bedroom was closer to the fire, could not escape the house and died of smoke inhalation.

The fire department extinguished the fire and two of its investigators examined the home.  During that investigation, they photographed a pot resting on the right rear burner of the stove.  (Exhibit 1, Report of David Smith, at 30-31.) The pot contained a metal strainer and the remains of tinfoil (or aluminum foil) that had been covering the pot.  (Exhibit 2, Report of Jean McDowell, at 7-8.)  The investigators also examined a refrigerator located in the southwest corner of the

kitchen, between two separate doorway entrances to the kitchen. The investigators suspected the point of origin to be at or near the southwest corner of the kitchen.

Within five (5) days, the McCuistian family had retained counsel who, in turn, retained Kenneth Ashcraft, and later Paul Castellano, to jointly investigate the origin and cause of the house fire. The parties engaged in significant and substantial pre-suit investigation, including multiple site and laboratory examinations of the home, its contents, and smaller artifacts from those contents.

On April 28, 2015, Plaintiff filed suit. In August of 2015, Plaintiff served expert disclosures naming both Ashcraft and Castellano as origin-and-cause experts. Plaintiff's experts were deposed in March of 2016.

This matter is set for trial in December of 2016. All Defendants filed summary-judgment motions (which remain pending) based upon completely different aspects of this case. In the event the Court rules against LGEUS and Sears on their summary-judgment motion, this motion asks the Court to exclude the testimony of Plaintiff's retained experts.

## GOVERNING LAW

### A.    Generally

Pursuant to Fed. R. Evid. 702, federal courts must act as gatekeepers and screen proffered expert evidence to ensure that it is relevant and reliable before it can be admitted. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Expert testimony is properly admitted when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548 (11th Cir. 1999); Fed .R. Evid. 702. Plaintiff bears the burden of establishing the proper foundation for the admissibility of his experts' testimony by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

While the *Daubert* inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95, 113 S.Ct. at 2797. "But conclusions and methodology are not entirely distinct from one another"; neither *Daubert* nor Rule 702 requires a trial judge "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Instead, the judge "is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (*quoting Joiner*, 522 U.S. at 146); *see also McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (noting "there is no fit

where a large analytical leap must be made between the facts and the opinion," such as proffering animal studies concerning a type of cancer in mice to establish a different cancer in humans).  The court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The main goal of the *Daubert* inquiry is to ensure that an expert employs the same level of intellectual rigor that would characterize the practice of an expert in the relevant field.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Citizens Prop. Ins. Corp. v. Simkar LLC*, 813 F. Supp. 2d 1356, 1361 (M.D. Fla. 2011).

In fire origin and cause cases, National Fire Protection Association Standard 921 (hereinafter "NFPA 921" or "921") is a peer-reviewed fire investigation guide that is considered to be the industry standard for fire investigation.  *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013).  Thus, an expert's compliance with and adherence to NFPA 921 is the definitive measure of the reliability of the expert's opinions.

## RELIEF REQUESTED AND BASIS FOR SAME

Defendants respectfully request that this Honorable Court exclude the origin and cause opinions to be offered by Plaintiff's retained experts, Ken Ashcraft and Paul Castellano, on the basis that those opinions are unreliable pursuant to *Daubert* and its progeny.

# I.     OPINIONS AS TO THE <u>CAUSE</u> OF THE FIRE ARE UNSCIENTIFIC

NFPA 921 defines a fire investigation as "[t]he process of determining the origin, cause, and development of a fire."  (Exhibit 3, Relevant Excerpts from NFPA 921, Section 3.3.67.)  The **origin** of a fire must be ascertained before the **cause** of the fire can be determined.  (Ex. 3, 18.1 & 19.1.)  Thus, in order to hold LGEUS or Sears legally responsible in this case,  the refrigerator at the center of this lawsuit would have to be determined to be both (1) at the point where the fire originated, and (2) the cause of the fire.  The most efficient way for this Court to resolve this motion, then, is to begin with the opinions of Plaintiff's experts about the second point, i.e., causation of the fire.  Because their causation opinions suffer from a fatal error in methodology, this Honorable Court may conclude with certainty that the opinions of Plaintiff's experts are wholly unreliable.

## A.     Both of Plaintiff's Retained Experts Say They Determined Cause

Kenneth Ashcraft testified that he made the determination that the refrigerator caused the fire.  (Exhibit 4, Deposition of Kenneth Ashcraft, 141.)  However, Plaintiff's other expert, and Ashcraft's colleague, Paul Castellano, testified that **he** determined the cause of the fire.  (Exhibit 5, Deposition of Paul Castellano, 143-44.)  Ashcraft ultimately admitted that he relied upon Castellano to reach his causation conclusion, and clarified that his own opinions and conclusions about the refrigerator were dependent upon Castellano's opinions.  (Exhibit 4, 143-

147.)  It follows that if Castellano's causation opinions are inadmissible, Ashcraft's are also inadmissible.

Both Ashcraft and Castellano agree that NFPA 921 is the appropriate standard for fire investigations.  (Ex. 4, 36; Ex. 5, 173-74.)  Both agree that NFPA 921 requires fire investigators to follow the scientific method.  (Ex. 4, 62; Ex. 5, 173-74.)  Both testified that they followed NFPA 921 in this investigation.  (Ex. 4, 37; Ex. 5, 173-74.)  Accordingly, a threshold question under *Daubert* is whether, *in fact*, the experts followed the scientific method laid out by NFPA 921.  *See Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 920 (11th Cir. 1998).

### B.    The Substance of Plaintiff's Experts' Causation Opinions

When the refrigerator's circuitry was inspected during a destructive lab examination, many experts noted a number of severed electrical conductors that revealed electrical arcing.  (*E.g.*, Ex. 1, 36; Ex. 5, 70; Exhibit 6, Report of John Nemeth, 12-13.)  But electrical arcing does not necessarily indicate a defect in the electrical system; Castellano conceded that the arcing in the refrigerator could have been the result of a fire that started outside of the refrigerator, "attacking" the refrigerator.  (Ex. 5, 130-31.)    During his deposition, Castellano specifically identified arcs on two conductors that he believed caused the fire.  (*Id.* at 86-87.) He admitted he could not "pinpoint which one" of the two conductors had arced first, but opined that one of those two had to have been the initial arc in the

refrigerator.   (*Id.* at 87.)   NFPA 921 required Plaintiff's experts to develop a plausible and reliable theory of causation—that is, a plausible and reliable theory to explain how the electrical arcs found in the refrigerator could have ignited combustible material inside the refrigerator that then escaped into the kitchen.  As set forth below, they have utterly failed to do so.

### C.      Principles of Electricity Pertinent to this Analysis

Evaluating   the   reliability   of   Plaintiff's   experts'   opinions   requires consideration of the basic principles of electricity.  Helpfully, NFPA 921 provides a  useful  discussion  of  those  principles.    Its  chapter  on  electricity  begins  by analogizing electricity to water flowing through plumbing:

> "In a closed circulating hydraulic system (as opposed to a fire hose delivery system where water is discharged out of the end), water flows in a loop, returning to the pump, where it is circulated again through the loop.  When the valve is closed, the flow stops everywhere in the system.  When the valve is opened, the flow resumes.  An electrical system must be a closed system, in that the current must flow in a loop or in a completed circuit.  When the switch is turned on, the circuit is completed and the current flows.  When the switch is turned off, the circuit is opened and current flow stops everywhere in the circuit."

(Ex.  3,  9.2.2.6.)    Within  an  appliance,  the  flow  of  current  requires  two  wires, commonly called positive (or hot) and neutral conductors.  The positive conductor runs from the power plug, up the power cord, into the appliance, and then into the circuit  board  which  distributes  power  to  other,  smaller  "branch"  circuits.    This "main" positive conductor is often called the "line in."  The neutral conductor then

runs from the circuit board down through the power cord to the plug, thus completing—in electrical terms, "closing"—the circuit. From the circuit board, different positive (hot) conductors carry current through various smaller "branch" circuits, powering components such as the icemaker and the door lamp. From the components—the icemaker and door lamp, for instance—neutral conductors return to the circuit board, thus closing those smaller "downstream" circuits.

This basic schematic understanding is critical to detect the fatal flaw in Plaintiff's causation theory. Castellano's opinion is that the arc which caused this fire was one that was located either on (1) the "line in" (positive/hot conductor) flowing from the power cord to the refrigerator's printed circuit board (the "PCB") or (2) the main neutral conductor coming back from the PCB to the power plug.

**D.     Plaintiff's Causation Opinions**

Plaintiff's opinion that the arc was the cause of the fire is due to be excluded because the theory it embraces is literally impossible. Numerous experts who examined the refrigerator, including Castellano, concluded that there were arcs within the refrigerator's downstream circuits dedicated to components such as the icemaker and the door lamp. (*E.g.*, Ex. 1, 36-37; Ex. 6, 12-13; Ex. 7, Report of Paul Castellano, 2.) The experts also concluded, however, that arcs on the line in and neutral conductors completely severed those conductors, immediately stopping the further flow of electricity through those circuits. (Exs. 1 & 6.) Because the

electrical arcs identified by Castellano are located on the main power circuit feeding current to the PCB, each arc he identified severed the conductor, instantly opening the main power circuit and cutting off the flow of all current to the downstream branch circuits that were dependent upon power from the PCB.  As NFPA 921 explains, "conductors downstream from the power source and the point where the conductors are severed become deenergized."  (Ex. 3, 9.10.3.3; *see also* Ex. 1, 35-39 (discussing this fatal defect in Plaintiff's experts' opinion); Ex. 6, 12-15 (same)).  If Plaintiff's theory were correct, i.e., a severing arc *in the main power circuit* started the fire, the *downstream* arcs in the dedicated subsidiary refrigerator circuits could not have occurred, for the simple reason that de-energized circuits cannot produce electrical arcs.  In contrast, the multiple "downstream" circuit arcs in the refrigerator are entirely consistent with a finding that a fire elsewhere in the kitchen *attacked* the refrigerator and caused the arcing.  (*See, e.g.*, Ex. 5, 130-31.)

Plaintiff's experts have thus offered a theory of causation which is fundamentally irreconcilable with the known facts, and impossible based on the known scientific principles regarding the flow of electricity through electric circuits.  NFPA 921 provides that "a cause hypothesis is disproved if it violates the fundamental laws of physics."  (Ex. 3, 19.6.4.2.)  Plaintiff's experts' causation theory violates the fundamental laws of physics.  This Court should exclude the causation testimony of both Ken Ashcraft and Paul Castellano as unreliable.

## E.     Failure to Test

When determining the cause of the fire, an expert also must determine whether the point of origin contains a competent ignition source. (Ex. 3, 19.1.1 & 19.4.2.)  A competent ignition source is one which will have sufficient energy and be capable of transferring that energy to the fuel long enough to raise the fuel to its ignition temperature.   (Ex. 3, 3.3.36 & 19.4.2.)   It is important to note that electrical arcs, while involving high temperatures, are not always competent ignition sources.  (*Id.* at 9.9.4.1.)  This is because an arc is extremely brief, usually a fraction of a second.  (*Id.*)  Where there is no physical evidence of an ignition source at the hypothesized point of origin—a limitation Castellano conceded—an investigator should test his hypothesis to determine whether the purported initial ignition source is competent and the theorized ignition sequence is probable.  (*Id.* at 19.4.4.3.)

Castellano's theory is that either the line in or neutral conductor was damaged during manufacture of the refrigerator.  (Ex. 5, at 91-96.)  He contends that the damage led to periodic overheating of the conductor and its insulation until the conductor  arced.  (*Id.*)  Castellano's theory presumes that within one of those two conductors, some portion of the strands of wiring[1] were damaged, and that the remaining "good" strands were unable to carry the current demanded by the

---

[1] The electrical conductors at issue are stranded wires, a bundle of smaller electrical wires.  Specifically, the line in and neutral conductors comprise 41 individual wire strands.  (Ex. 6, Report of Nemeth, at 15.)

refrigerator without overheating.  (*Id.* at 94-95.)  The experts for LGEUS, Sears, and UL all tested that theory, however, and found it meritless.  (*See* Ex. 1, 48; Ex. 6, 15-16 & 19; Exhibit 8, Report of Ronald Simmons, 3-4.)  Specifically, the defense experts radically decreased the number of strands of wiring capable of carrying current in order to see if a dramatically undersized conductor would demonstrate the overheating upon which Castellano's opinion was premised. (Exs. 6 & 8.)  None of the defense experts were able to do so, because even when running at peak energy consumption with only a fraction of the total strands carrying the load, the subject refrigerator simply does not demand enough current to cause any meaningful temperature increase in either the line in or neutral conductor.  (Exs. 6 & 8.)

Plaintiff's experts, by contrast, did not test their theory.  In fact, Castellano was largely unaware of the details needed to substantiate his opinions.  The conductors at issue were encased in standard PVC wire insulation.  (Ex. 5, 101.) But Castellano did not know the heat rating of that insulation.  (*Id.*)  In addition to the PVC insulation surrounding individual conductors, the entire rear cavity of the refrigerator had been filled with a sprayed-in thermal insulation made of polyurethane foam.  (Ex. 5, 101.)  The line in and neutral conductors, which were also encased in the thermal foam insulation, only exited the foam to enter a metal enclosure housing the PCB.  (*Id.* at 101-104.)  The relevant conductor segments

Plaintiff's experts identified as causing the fire were actually found loose *inside the metal PCB enclosure* after the fire. (*Id.* at 86.) Even then, Castellano did not know whether that arc occurred inside the PCB enclosure, inside the thermal foam insulation found just outside of that enclosure, or in transition from the enclosure to the thermal insulation. (*Id.* at 102-04.) If the conductors were completely encased in the thermal foam insulation, he agrees the arc could not have caused the fire, because there would have been no oxygen to sustain combustion. (*Id.* at 104-05.) Castellano does not know what material the PCB was made of, or whether it would sustain combustion if the arc occurred inside the enclosure. (*Id.* at 162.)

Had Plaintiff's experts tested their theory, they would know it is implausible. They did not. The most they ever did was take a piece of rigid polyurethane foam and expose it to an open flame to determine whether it would burn. (Ex. 4, 134-37 & 234-35; Ex. 5, 100-01, 132-34, & 171-72.) But this lawsuit is not about whether foam will ignite when exposed to a cigarette lighter for several seconds. Plaintiff's experts' failure to properly test their ignition theory requires that opinions as to that theory be excluded as unreliable. *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1340-41 (11th Cir. 2013) (expert did not test exemplars or cite published studies to evaluate the plausibility of his ignition theory, and he had never seen ignition occur that way before, thus his testimony on ignition was excluded, and that exclusion was affirmed on appeal).

## II.   ASHCRAFT'S ORIGIN OPINIONS ARE UNSCIENTIFIC AND UNRELIABLE

Unlike the cause determination which was purportedly shared by both of Plaintiff's experts, Ashcraft was solely responsible for determination of the point of origin.  As noted above, a flawed determination as to the origin of the fire will necessarily lead to an incorrect determination of the fire's cause.

Ashcraft's investigation failed to meet the requirements of NFPA 921. Those deficiencies relate to turning a blind eye to information that 921 requires an expert to consider, ignoring 921's guidance on the poor reliability of the insufficient information he obtained, and his ultimately falling back on an entirely non-scientific and subjective standard that he personally believed the origin was in one location, all in the face of contradictory evidence, which he failed to properly consider as required by NFPA 921 and the scientific method.   His resulting unreliable opinions on origin therefore must be excluded (which requires that his related opinions on causation also must be excluded).

### A.     Ashcraft Failed to Consider Pertinent Information

The first goal of a fire analysis is to determine the "point of origin" of a fire—the exact physical location where a heat source and a fuel interact and cause a fire.  (Ex. 3, 3.3.132 & 18.1.)   NFPA 921 identifies a methodology for determining the point of origin, which requires coordinating four sources of

relevant evidence: (1) witness statements, (2) fire patterns, (3) arc mapping, and (4) fire dynamics.  (*Id.* at 18.1.2.)

Ashcraft admits that he did not rely on (1) any witness statements, (Ex. 4, 132), or (2) arc mapping.[2]  (*Id.* at 134.)  Nor did he offer testimony regarding any relevant principles of "fire dynamics" that supported his opinion in this case. Thus, of the four types of information an investigator is required to consider pursuant to NFPA 921, Ashcraft looked to only one, fire patterns—just 25% of the information and evidence at his disposal.  And, he failed to follow the scientific method with respect to the fraction of the evidence he did consider, as detailed below.

## B.   Ashcraft Relied Entirely upon Evidence NFPA 921 Deems Unreliable Given the Known Facts of This Kitchen Fire

Fire affects surrounding materials in many ways.  Fire chars wood, causes materials like plastic to melt and/or deform, robs materials of much of their mass, oxidizes metal (giving it a "rusted" appearance), causes other materials to expand or deform, and so on.  These are broadly characterized as "fire effects."  (Ex. 3, 6.2.)  A "fire pattern," then, is the "visible or measurable physical changes or identifiable shapes formed by a fire effect or group of fire effects."  (*Id.* at 6.3.)  To use a simple example, imagine a straight board resting in a horizontal position and

---

[2] Arc mapping is a technique a fire investigator must consider in determining the point of origin of a fire.  It uses the identification of arcs in a room or an appliance to help determine where the fire originated.  It is effective because energized electrical circuits behave in a "predictable" way when exposed to a spreading fire.  (Ex. 3, 18.4.5.)

elevated a few feet above the ground.  If that board had been a single piece before the fire, and now it remains in place, but has separated into two pieces separated by a gap, the gap could be considered the "fire effect" and the edges and outline of this newly-created gap would supply the "lines of demarcation" needed to discern a "fire pattern" to interpret in making a determination of the point of origin.

A common fire pattern is one generated by a "plume" of fire.  (*Id.* at 6.3.2.1.)  While fire plumes extend in three dimensions, they tend to leave patterns on two-dimensional surfaces (such as walls or ceilings) where the fire has touched that surface.  (*Id.*)  Among plume-generated patterns, one of the most common is called the "V pattern."  (*Id.*)  Where one finds a V pattern, one is looking at the source of that fire plume, and absent other fire patterns, the bottom of the "V" is usually the point of origin of the fire.  (*Id.* at 6.3.2.1.3.)  (*See also* Ex. 3, Figures 6.3.7.1.(a), (b), & (c), illustrating and/or depicting various V patterns.)

Ashcraft purports to have reached his fire origin conclusions in this lawsuit based upon "fire patterns" (including two "V patterns"), char depth measurements, and fire damage. (Ex. 4, 63-65 & 74-75.)

Beginning with the southwest corner of the kitchen, where Ashcraft contends the fire originated, the **only** fire pattern that Mr. Ashcraft could identify was a "protected area," which is a pattern that ***rules out*** where a fire could have

originated.[3]   (Ex. 4, 90-91, 93-94.)  (*See also* Ex. 3, 6.3.4.2.)  Ashcraft identified the *exact location* where he opined that the fire first exited the refrigerator, (Ex. 4, 152), **but that area showed no fire pattern**.  (*Id.* at 152-54; *compare* Exhibit 9, Defendant's Exhibit 35 from Ashcraft Deposition *with* Exhibit 10, Defendant's Exhibit 30 from Ashcraft Deposition.)  (*See also* Ex. 1, 24-28) (discussing same).

Ashcraft also identified two V patterns.   (Ex. 4, 103-106; Exhibit 11, Defendant's Exhibit 31 from Ashcraft Deposition; Exhibit 12, Defendant's Exhibit 32 from Ashcraft Deposition.)   He testified that one V pattern followed an "incline" across both the east and west walls, such that the line of demarcation showing the fire pattern was essentially a straight diagonal line at roughly 45 degrees above horizontal, moving away from the fridge and towards the kitchen sink.  (*See* Exs. 11 & 12.)  "[T]he base of the V" in this pattern was at "the base of the wall mount of the cabinets."  (Ex. 4, 106.)  Ashcraft's placement of the base of the V at the bottom right corner of those cabinets would point to *that* location—not the refrigerator—as the point of origin of the fire.  In short, Ashcraft's own V pattern analysis places the point of origin of the fire several feet ***away from*** the refrigerator, and closer to the stove.  Ashcraft also testified to seeing a separate, "classic," "typical" V-shaped, plume-generated pattern over the stove. (Ex. 4, 175;

---

[3] A protected area results from an object preventing the products of combustion from depositing on the material that the object protects.  (Ex. 3, at 6.3.4.2.)

Exhibit 12, also depicting the V pattern over the stove.)  He agrees that this pattern is a possible indicator of a cooking fire.  (Ex. 4, 175.)

In short, Ashcraft identified only two fire patterns in the kitchen, neither of which place the fire at the refrigerator, one of which places it at the stove.  Of the four primary, reliable categories of information that must be coordinated to ensure reliability of any ultimate opinion according to NFPA 921, Ashcraft claimed to rely only upon fire patterns.  Yet his analysis of this one category of information provided him information indicating that the point of origin of the fire was ***not*** the corner where the refrigerator was located.  Ashcraft's logically contradictory statements, combined with his admissions regarding evidence pointing to a different plausible point of origin (the stove) that he could not rule out, render his origin opinions entirely speculative, unreliable, and therefore inadmissible.

## C.   Ashcraft Improperly Relied Upon Fire Effects

As discussed above, "fire effects" are different from fire patterns.  One fire effect that Ashcraft found pertinent is what is known as "char."  Wood that is burned turns black, showing the leftover carbon that remains after interaction with fire.  (Ex. 4, 3.3.28 & 6.2.4.1.)  Char, being a "fire effect," is not a fire pattern, although it is possible to discern a fire pattern from examining char.

A fire investigator may measure the "depth" of char, which is done with a measuring tool, often the same sort of gauge used to measure the depth of tread on

a tire.  (*Id.* at 18.4.2.3 & 18.4.3.2.)  Ashcraft testified he measured char depth in order to "refine" his analysis of the point of origin of the fire.  (Ex. 4, 74-75.)  And one reason he determined that the point of origin was in the southwest corner was because he found that char was "deeper and heavier" there, particularly at the upper levels where he took readings.  (*Id.* at 91.)

NFPA cautions investigators that there are four limitations on the effective use of char depth measurements.  Ashcraft exceeded each of these four limitations in an effort to place the origin of the fire at the southwest corner of the kitchen.

### 1.    *When to Measure for Char Depth*

First, char depth is only an appropriate data point to measure and consider "[w]hen fire patterns are not visually obvious."  (Ex. 3, 18.4.2.3.)  As noted above, Ashcraft clearly found fire patterns which could have placed the point of origin over the stove, or, curiously, somewhere in the middle of the kitchen, away from both the stove and the refrigerator.  *See* II.B., *supra*.  He thus had no reason to use char depth measurements to determine the point of origin of the fire.  Because he did, his opinion was determined in an unscientific way, and it should be excluded.

### 2.    *What to Use Char Depth to Determine*

Char depth readings are more reliable "for evaluating fire spread, rather than for the establishment of … intensity of heat from adjacent burning materials."  (Ex. 3, 6.2.4.5 & 18.4.3.)  Ashcraft testified that his char depth readings led him to

conclude that the southwest corner was the area of greatest damage.  (Ex. 4, 96-97.)  Moreover, Ashcraft ignored the guidance of NFPA 921, *infra*, and concluded that the area of heaviest fire damage determines the point of origin.  (Ex. 4, 162-63.)  Therefore, his opinion must be excluded, as explained below.

### 3.     Why Char Depth is a Measurement of Limited Value

NFPA 921 states that char depth is a poor measurement of intensity because it can be influenced by (1) ventilation, i.e., a ready source of oxygen that provides substantial fuel for the fire to accelerate burning; and (2) the geometry of the space, i.e., corner vs. non-corner of the room.  (Ex. 3, 6.2.4.4.1(2).)  As stated above, the refrigerator was located in a corner between two doorways that provided access to the kitchen, providing two large sources of ventilation.,  NFPA 921 explains that "[w]ood can exhibit deeper charring when adjacent to a ventilation source or an opening where hot fire gases can escape."  (*Id.* at 18.4.3(3).)  In fact, "[v]entilation … during a fire has a significant impact … on the extent of observable burn damage….  Ventilation-controlled fires tend to burn more intensely near open windows or other vents, thereby producing greater damage."  (*Id.* at 18.4.1.4.)

In addition, both char and fire damage can be impacted by the location of the fire under investigation.  Fire that burns in a corner burns hotter than the same fire outside of a corner:

> "When a burning fuel package is positioned away from a wall,
> air is free to flow into the plume from all directions….  If the fuel

> package is placed … in a corner, … air entrainment into the plume
> can be restricted [and] the flame and thermal plumes will bend toward
> the restricting surface(s)."

(*Id.* at 5.6.4.6.1.)  "When the same fuel package is placed in a corner … there will also be an increase in the absolute temperature of the upper layer when compared with the same fire positioned away from the corners."  (*Id.* at 5.6.4.6.5.)  Thus, fires located in corners will both inflict more damage on a wall because of the bending of the flames towards the walls, and the heat applied to the upper layer of the room will also be more intense than if the fire were burning out in the open.

Ashcraft acknowledged that the char in the southwest corner was probably deeper because the fire had easy access to ventilation from the two adjoining doors. (Ex. 4, 127.)  He offered no explanation as to how he could still follow the scientific method by relying upon char depth measurements in an area that immediately adjoined two open sources of ventilation **and** was located in a corner. In fact, Ashcraft was **unaware** that fires in a corner burn at a hotter temperature than do fires in a more open space.  (*Id.* at 126-27.)  Ashcraft's opinion is partially based upon his ignorance of fire science, and he failed to offer any reason that the effects of ventilation should be discounted in favor of a finding that the fire originated at the southwest corner.  Ashcraft's heavy reliance upon evidence which NFPA 921 deems limited, and his reliance upon unscientific premises that are rejected by 921, render his opinions inadmissible.

### 4.   *Char Depth Measurements are Inherently Subjective*

Measuring char is an intrinsically subjective exercise, as it requires applying a consistent amount of pressure in using the measuring device, (Ex. 3, 18.4.3.2), application of the measuring device to the inside of char blisters instead of crevices between them, (*Id.* at 18.4.3.3), and the investigator must take account of wood that is missing because it was completely consumed in the fire.  (*Id.* at 18.4.3.4.)

In perhaps one of the more glaring violations of 921, Ashcraft produced during a chart that reflected his measurements of char depth.   (Exhibit 13, Defendant's Exhibit 26 from Ashcraft Deposition.)  That chart ***does not measure*** char depth at the upper level over the stove.  Ashcraft even admitted that he stopped measuring char depth over the stove area—where, again, he had admitted seeing a "classic" V pattern reflecting a possible area of origin.  (Ex. 4, 98 & 175.) Thus, when Ashcraft testified that the char depth was "deeper and heavier" in the southwest corner, he was comparing the char at that location to all parts of the kitchen ***except*** the area over the stove.  Ashcraft's char depth diagram omits critical data regarding the only alternative theory of origin.  His opinion is due to be excluded because he literally left out the only competing data point pertaining to char depth, contrary to the first principles required by the scientific method.

## C.     Ashcraft's Point of Origin is Purely Subjective

Fire effects, such as char, are often referred to in a colloquial sense as "fire damage."  NFPA 921 cautions investigators that the area with the greatest "fire damage" might not necessarily be the area of origin, much less the point of origin.  (Ex. 3, 18.4.1.3.)  Greater damage in one place than in another may be the result of all sorts of differences in fire or fuel conditions.  (*Id.*)  In particular, as discussed above, "[v]entilation … during a fire has a significant impact … on the extent of observable burn damage…."  (*Id.* at 18.4.1.4.)  Thus, an analysis that focuses upon "damage" will not necessarily lead to an accurate determination of the point of origin.

Ashcraft's testimony frequently sounded the common refrain that he observed more damage in certain areas than he did over the stove.  For instance, Ashcraft acknowledged the fire pattern over the stove, admitting that he had to consider it as a potential point of origin and rule it out.  (Ex. 4, 111-12.)  He explains that he ruled out the stove because as the kitchen was "cleaned up" over the course of the investigation, it became "apparent" that "the damage was more severe in the south section of the room."  (*Id.* at 112.)  He opined that "[t]he damage present clearly shows heavier damage in the south section of the room." (*Id.* at 116.)  He reiterated: "I'm still seeing more heavily concentrated damage in the south section."  (*Id.*)

When Ashcraft was pressed on how he gauged that this was the area of most damage, he said that char depth was one factor.  (*Id.* at 128-29.)  But he also said that part of his determination was "visual."  (*Id.*)  When asked what he could see that visually confirmed the degree of damage, he simply answered: "The degree of damage.  The higher degree of damage in this area, versus the other areas of the room."  (*Id.*)  And therein lies the circularity of Ashcraft's argument.  Time and again, Ashcraft testified that one area was more damaged than another, not because of an approved scientific measurement or because of a definable difference overcoming 921's cautions, but because that's just what he subjectively saw. When the Supreme Court expressed concern over opinion evidence "connected to existing data only by the *ipse dixit* of the expert," *Joiner*, *supra*, they were thinking of just this situation.  Ashcraft's opinions as to fire damage are arbitrary and without scientific merit.  He failed to follow the scientific method, and instead simply supported his ultimate conclusions on nothing more than his own gut.

### D.    Ashcraft's Origin Opinions are Due to be Excluded

Ken Ashcraft relied upon only 25% of the information available to him in reaching his conclusions about the point of origin of this fire.  He demonstrated ignorance of numerous principles of fire investigation that are part of NFPA 921. When pushed for a fire pattern, Ashcraft created a pattern that literally placed the point of origin in a novel, third location.  Ignoring NFPA 921's cautions, he

attributed too much weight, and the wrong kind of weight, to inherently limited and unreliable (in the face of admittedly plausible, contradictory evidence) methods of measurement such as char depth.  In short, Ashcraft developed an opinion of the point of origin of this fire which was not based upon the scientific method prescribed by NFPA 921, and which is therefore not reliable.  It is nothing more than junk science, unreliable and unhelpful to the jury.

## CONCLUSION

The opinions of Paul Castellano and Ken Ashcraft as to the cause of the fire are due to be excluded.  Those witnesses have proposed an electrical failure that is impossible in the face of available evidence, they advance a novel theory of ignition that they have not tested, and their theory has been proven false.

The opinions of Ken Ashcraft as to the place of origin of the fire within the kitchen are likewise unreliable.  Ashcraft has no scientific basis undergirding his opinions, but instead has offered self-contradictory opinions that ignore NFPA 921's guidance.  There is no connection between sound science and Ashcraft's opinions, save for his own *ipse dixit* declarations that he is correct.

Accordingly, Castellano's and Ashcraft's  cause and origin opinions are due to be excluded in their entirety as unreliable.

Respectfully submitted, this the 15th day of August, 2016,

> *s/ Jonathan M. Hooks*
> JAMES B. CARLSON (ASB-7129-S78J)
> JONATHAN M. HOOKS (ASB-0866-36H)
> *Attorneys for LE Electronics USA, Inc. and*
> *Sears, Roebuck and Co.*

**OF COUNSEL:**
CHRISTIAN & SMALL LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama  35203
205-795-6588-Main
205-328-7234-fax
jbcarlson@csattorneys.com
jmhooks@csattorneys.com

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 15th day of August, 2016, served a copy of the foregoing by via electronic service and/or U.S. Mail upon all counsel of record.

> *s/ Jonathan M. Hooks*
> OF COUNSEL