# EXHIBIT 4

Kenneth Ashcraft

```
1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                   SOUTHERN DIVISION

4

5   RICHARD WARREN McCUISTIAN, as

    Administrator for the Estate

6   of ANNE McCUISTIAN, deceased

         Plaintiff

7

8   v.                       CASE NO: 1:15-cv-00279

9   LG ELECTRONICS, U.S.A.,

    INC., BRK BRANDS, INC.,

10  SEARS ROEBUCK & CO.,

    UNDERWRITERS LABORATORIES,

11  INC. PITTWAY CORPORATION and

    HONEYWELL INTERNATIONAL, INC.,

12       Defendants

13

14               DEPOSITION OF:

15              KENNETH ASHCRAFT

16

17

18

19

20

21

22

23

24
```

Kenneth Ashcraft

```
 1              S T I P U L A T I O N S

 2          IT IS STIPULATED AND AGREED, by and

 3   between the parties through their respective

 4   counsel, that the deposition of:

 5                  KENNETH ASHCRAFT

 6   may be taken before Lisa Bailey, Notary Public,

 7   State at Large, at 3334 Ross Clark Circle, Dothan,

 8   Alabama on March 22, 2016 commencing at

 9   approximately 9:00 a.m.

10      IT IS FURTHER STIPULATED AND AGREED that

11   the signature to and reading of the deposition by

12   the witness is waived, the deposition to have

13   same force and effect as if full compliance had

14   been had with all laws and rules of Court relating

15   to the taking of depositions.

16       IT IS FURTHER STIPULATED AND AGREED that it

17   shall not be necessary for any objections to be

18   made by counsel to any questions, except as to

19   form or leading questions, and that counsel for

20   the parties may make objections and assign grounds

21   at the time of the trial, or at the time said

22   deposition is offered in evidence, or prior

23   thereto.

24                  * * * * *
```

Kenneth Ashcraft

```
1           A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    JOSEPH DAN TALMADGE, JR., ESQUIRE

5    Morris, Cary, Andrews

6    Talmadge & Driggers

7    3334 Ross Clark Circle

8    Dothan, Alabama  36303

9    dtalmadge@mcatlaw.com

10

11   FOR DEFENDANT LG ELECTRONICS & SEARS, ROEBUCK &

12   CO.:

13   JONATHAN M. HOOKS, ESQUIRE

14   Christian & Small, LLP

15   505 North 20th Street

16   Suite 1800

17   Birmingham, Alabama  35203

18   jmhooks@csattorneys.com

19

20   FOR DEFENDANT BRK BRANDS, INC.:
     ROBERT C. "CHRIS" KING, ESQUIRE

21   The King Law Firm, P.C.

22   36 W. Claiborne Street

23   Monroeville, Alabama  36460

24   rcking@frontiernet.net
```

```
 1   FOR DEFENDANT HONEYWELL INTERNATIONAL, INC.:

 2   JEANNINE L. LEE, ESQUIRE

 3   Stinson Leonard Street, LLP

 4   150 South Fifth Street

 5   Suite 2300

 6   Minneapolis, Minnesota  55402

 7   jeannine.lee@stinson.com

 8

 9   FOR DEFENDANT UNDERWRITERS LABORATORIES, INC.:

10   JOHN F. OLINDE, ESQUIRE

11   Chaffe McCall, LLP

12   2300 Energy Centre

13   1100 Poydras Street

14   New Orleans, Louisiana  70163

15   olinde@chaffe.com

16

17   ALSO PRESENT:

18   DAVID SMITH, Smith & Associates

19

20

21

22

23

24
```

Kenneth Ashcraft

```
1                    EXAMINATION INDEX

2

3    KENNETH ASHCRAFT

4         BY MR. HOOKS                        7

5         BY MR. KING                       181

6         BY MR. OLINDE                     230

7         BY MS. LEE                        240

8         RE BY MR. KING                    242

9         RE BY MR. HOOKS                   247

10        RE BY MR. OLINDE                  249

11

12                     EXHIBIT INDEX

13                                           MAR

14   Defendant's

15      17   Notice of Deposition            11

16      18   CV - Ashcraft                   13

17      19   Testimony list                  13

18      20   Evidence Transfer               48

19      21   Diagram                         66

20      22   Diagram copy                    67

21      23   Measurements/layout of kitchen  68

22      24   Char Depth Sequence             69

23      25   Drawing - measurements          71

24      26   Drawing - measurements          73
```

Kenneth Ashcraft

| 1 | 27 | Photograph | 84 |
|---|----|-----------|-----|
| 2 | 28 | Photograph | 85 |
| 3 | 29 | Photograph | 86 |
| 4 | 30 | Photograph | 88 |
| 5 | 31 | Photograph | 102 |
| 6 | | | |
| 7 | 32 | Photograph | 111 |
| 8 | 33 | Photograph - pre-fire | 117 |
| 9 | 34 | Photograph | 119 |
| 10 | 35 | Photograph | 153 |
| 11 | 36 | Photograph | 173 |
| 12 | 37 | Photograph | 174 |
| 13 | 38 | Expert Disclosures | 181 |
| 14 | 39 | Photograph | 191 |
| 15 | 40 | Photograph | 191 |
| 16 | 41 | Photograph | 191 |
| 17 | 42 | Photograph | 191 |
| 18 | 43 | Diagram by Ashcraft | 196 |
| 19 | 44 | Handwritten notes | 200 |
| 20 | 45 | Handwritten notes | 200 |
| 21 | 46 | Copy of files | 250 |
| 22 | 47 | Jump Drive | 250 |
| 23 | | | |
| 24 | | | |

Kenneth Ashcraft

```
 1           I, Lisa Bailey, a court reporter of

 2    Birmingham, Alabama, and a Notary Public for the

 3    State of Alabama at large, acting as commissioner,

 4    certify that on March 22, 2016 pursuant to

 5    Rules of Civil Procedure and the foregoing

 6    stipulation of counsel, there came before me in

 7    Dothan, Alabama, KENNETH ASHCRAFT, witness in the

 8    above cause, for oral examination, whereupon the

 9    following proceedings were had:

10                     KENNETH ASHCRAFT,

11    being duly sworn, was examined and testified as

12    follows:

13                     EXAMINATION

14    BY MR. HOOKS:

15        Q.    Good morning, Mr. Ashcraft.

16        A.    Good morning.

17        Q.    Did you bring your file with you this

18    morning?

19        A.    I have it.

20        Q.    Let me go ahead and --

21              MR. TALMADGE:  Do we have usual

22        stipulations?

23              MR. HOOKS:  Yeah.

24        Q.    You're handing me a paper file and a
```

Kenneth Ashcraft

```
1    flash drive?

2        A.    Yeah.

3        Q.    What's on this?

4        A.    Everything that's on the hard file plus

5    whatever else is in my electronic file.

6        Q.    Okay.

7              MR. HOOKS:  So, Dan, did Joey share with

8        you my letter I sent a couple weeks ago

9        requesting hard stuff?

10             MR. TALMADGE:  No.

11       Q.    Two in a row.

12             MR. TALMADGE:  If there's anything that

13       you want to look at on that disk not printed,

14       we can do that.  The only time we cannot do

15       that is from 10:00 to 11:00 when my secretary

16       is at therapy.  Other than that, she's

17       available to be your secretary or anybody

18       else's.

19             MR. HOOKS:  I guess let's do it this

20       way.

21   BY MR. HOOKS:

22       Q.    Can I use this in my computer?  It's not

23   locked or anything with a password?

24       A.    No.
```

Kenneth Ashcraft

1      Q.     Do you have an objection to me doing

2   that?

3             MR. TALMADGE:  No.

4             THE WITNESS:  No.  It may erase your

5      computer.

6      Q.     Well, you know, if you've planted a

7   virus then kudos to you.  We have a folder entitled

8   Char Depth, a Char Depth Sequence and a Char

9   Pattern?

10     A.     Correct.

11     Q.     Docs from Joey Morris, which include

12  autopsy files, disclosures, discovery, and what

13  looks like a bunch of the deposition transcripts?

14     A.     Correct.

15     Q.     And maybe you did put a virus on my

16  computer.

17            Okay.  There we go.  You have drawings

18  on here.  You have e-mails.  A lot of e-mails,

19  evidence files, expert disclosures, invoices,

20  information on an LG fridge.  You've got a

21  Miscellaneous Files, Photo Files, Smoke Alarm

22  Files.

23            And then in paper, what do you have?

24  You've got some miscellaneous handwritten notes,

```
 1   sign-in sheet, fire department report, your expert

 2   report, and chain of custody form, or multiple

 3   chain of custody forms.  Sorry.

 4       A.    Yes.

 5       Q.    Okay.  We'll look at this on a break and

 6   figure out what we need.

 7            MR. KING:  John, do you mind if I get a

 8       copy --

 9            MR. HOOKS:  I was thinking about doing

10       that.  I think I'll do it at a break.  I'll

11       need a copy of the whole thing before we are

12       out of here today.

13            THE WITNESS:  It will probably take 15

14       minutes or so.

15            MS. LEE:  Kenny, is there some way you

16       can provide that electronically?

17            THE WITNESS:  Do you use Share File or

18       Drop Box or anything?

19            MR. TALMADGE:  What I was going to

20       propose and I have called my assistant to copy

21       on our hard drive, and she was just going to

22       make everybody that wanted one, one of these.

23            MR. KING:  Great then.  I don't need to

24       worry about it.
```

1          MR. HOOKS:  Do you want to go ahead and

2      do that then?

3          MR. TALMADGE:  Yeah, we can go --

4          MR. HOOKS:  Let's get that process

5      started so everybody has a copy to read.

6          MR. TALMADGE:  How many do we need?  Is

7      every lawyer a different party?

8          MR. KING:  Yeah.  Four.

9          MR. HOOKS:  Dan, do you have -- I'm

10     sorry, before you leave, do you have a copy of

11     the deposition notice for Mr. Ashcraft?

12         MR. TALMADGE:  I've got it but it's all

13     highlighted up.

14         MR. KING:  I think I've got the one I

15     tried to hand you yesterday.

16         MR. HOOKS:  Perfect.

17             (Off the record.)

18          (Defendant's Exhibit Number 17

19             was marked for identification.)

20  BY MR. HOOKS:

21     Q.   Mr. Ashcraft, I'm showing you what I've

22  marked as Defendant's Exhibit 17 to this

23  deposition.  So you know and so the record is clear

24  we're keeping the exhibits in sequential order from

Kenneth Ashcraft

```
1    yesterday.  So 1 through 16 were exhibits to

2    Mr. Castellano's deposition.

3              MR. TALMADGE:  She's already saved this

4         on her hard drive.  I don't need this right

5         now to make the copies.  She's working on

6         making copies.  If anybody wants this in the

7         meantime, I will put it in front of the

8         witness.

9    Q.    Do you know if there's a -- if you have

10   your CV in here, Kenny?

11   A.    It's not going to be in the hard file.

12   I don't have a copy in there.

13   Q.    That's fine.  We'll get a copy in a few

14   minutes, or I'll wait on Chris to pull it out.

15             MR. KING:  I think -- I'm not sure if I

16        have it.  It's --

17             MR. OLINDE:  It's a copy of that.

18             MR. KING:  I've got it in PDF if you

19        want me to e-mail it to you.

20             MR. HOOKS:  I was just going to make it

21        an exhibit.  If everybody has got it, that's

22        fine.  Of all the things I printed I failed to

23        print those two.

24   BY MR. HOOKS:
```

Kenneth Ashcraft

```
1        Q.    While we're waiting, Mr. Ashcraft, has

2   your CV changed in any way since August of 2015?

3        A.    I'm sure there's some more classes or

4   things like that, but nothing significant.

5                (Defendant's Exhibit Number 18

6                   was marked for identification.)

7        Q.    Okay.  I'll kindly hand you the copy

8   from Mr. Olinde.  Let me show you what I've marked

9   as Defendant's Exhibit 18.  Is that the CV that's

10  essentially correct in every material way?

11       A.    I believe so, yes.

12               (Defendant's Exhibit Number 19

13                  was marked for identification.)

14       Q.    Okay.  I'm now showing you what I had

15  marked as Defendant's Exhibit 3 {sic} which is the

16  list of deposition testimony we were provided in

17  August.  Is that still up to date, accurate, and

18  contains all the depositions you've given?

19       A.    Yes.

20                    (Off the record.)

21  BY MR. HOOKS:

22       Q.    So, Mr. Ashcraft, I see six cases on

23  here, four of which are in Alabama, two of which

24  are in Florida.  Question for you:  On the two
```

Kenneth Ashcraft

1  Florida cases, I see one is called Watts versus

2  Snyder's Refrigeration and Bodiford Electric.  Do

3  you know -- it says Leon County.  I will tell you,

4  I looked in Leon County and didn't find this case.

5  Do you know if it's in state court or federal

6  court?

7      A.    Should have been state court, I

8  believe.  I'm not sure.  I may have the name wrong.

9      Q.    Okay.

10     A.    It was an insurance case.  I don't

11  recall the carrier.

12     Q.    Okay.  Was it Auto Owners?

13     A.    Yes.

14     Q.    And what was the -- what were your

15  opinions in that case?

16     A.    I don't recall the specifics of it.

17     Q.    It says you were the defense expert if

18  that helps any.

19     A.    We were representing one of the

20  contractors.  I don't recall -- I'll have to look

21  up the notice.

22     Q.    And then there's a case called Rasky

23  versus Myddleton Parker Builders, also in Leon

24  County.  Do you recall if that was in state court

Kenneth Ashcraft

```
 1    or federal court?

 2         A.    I don't recall.  It should have been

 3    state court, I guess.

 4         Q.    You were -- again, you were working for

 5    Auto Owners there?

 6         A.    I believe so.

 7         Q.    Those two cases being in the same county

 8    within a couple months of each other, were they in

 9    any way related?

10         A.    No.

11         Q.    No?

12         A.    Same carrier and probably same client.

13         Q.    Sure.  So you haven't been deposed in

14    any lawsuit since that list was created?

15         A.    No.

16         Q.    Now, you've -- if you've given six

17    depositions, have you ever testified in a

18    deposition outside of the context of being an

19    expert?

20         A.    No.

21         Q.    Are you on any medications or suffering

22    from any condition that would keep you from

23    providing truthful testimony?

24         A.    No.
```

Kenneth Ashcraft

```
 1        Q.    All right.  Lets's go over for a minute
 2   your biography.  So your title according to this --
 3   first of all, you work for who?
 4        A.    GHD Engineering.
 5        Q.    And that was previously known as?
 6        A.    CRA and HSA.
 7        Q.    Okay.  And CRA is Conestoga-Rovers and
 8   Associates?
 9        A.    Correct.
10        Q.    What was HSA, if you remember?
11        A.    Something -- A is Albergo {phonetic}, A
12   is Albergo.  Scott and Albergo, and I don't
13   remember the H.
14        Q.    Okay.  And so your CV lists you as a
15   senior forensic fire consultant.  What does that
16   mean?
17        A.    I manage three other part-time
18   investigators in Florida and Alabama as -- in the
19   fire investigation field.
20        Q.    Beyond a managerial responsibility, does
21   it imply anything else about your job duties or
22   title?
23        A.    Not particularly.
24        Q.    It says you were named associate in
```

Kenneth Ashcraft

```
1    2014.  So how is that different from senior

2    forensic fire consultant?

3        A.    An associate is a stakeholder in the

4    company.

5        Q.    Okay.  So it's kind of like in the

6    lawyer world, it would be equivalent to a partner

7    or shareholder?

8        A.    I suppose.  I'm not familiar --

9        Q.    But it means you own a share of the

10   business?

11       A.    Correct.

12       Q.    Does it mean you have to buy in, or is

13   it a share allocated to you?

14       A.    A little of both.  Reduced rate shares

15   but a buy-in.

16       Q.    I understand.  And you -- I guess going

17   back to 2009 that's your time with both GHD, and

18   CRA and HSA, right?  So when you started it was HSA

19   in 2009?

20       A.    Yes.  Same company just different names.

21       Q.    And then concurrent with your time at

22   what's now GHD, I see that you have been since 1984

23   the chief of the -- or you worked at least for the

24   Escambia County, Florida Fire and Rescue?
```

Kenneth Ashcraft

1      A.    It was more of a -- I started out as a

2  volunteer in Molino.  It was absorbed by Escambia

3  County.  I retired as chief of the department which

4  is not an employment, as much as it is a stipend

5  paid type arrangement.

6      Q.    I understand.  So you started out in

7  Molino which is a volunteer fire department?

8      A.    In '84, correct.

9      Q.    So what year did you -- so Molino and

10 Escambia are totally different?

11     A.    Molino is a small town within Escambia

12 County.

13     Q.    Okay.  So at some point you were

14 elevated into the Escambia County Department?

15     A.    They created a county fire department

16 which absorbed --

17     Q.    I see.

18     A.    -- the smaller department.  So under one

19 umbrella.

20     Q.    The county fire department, is it

21 volunteer or is it mixed?

22     A.    It's a combination.  I've had an all

23 volunteer station and a paid -- combination paid.

24 I had a daytime paid crew and nights and weekend

Kenneth Ashcraft

1    volunteer.

2        Q.    Okay.  And what year did you become

3    chief of Escambia?

4        A.    I don't recall the year I was chief.  I

5    retired last year.  So I was chief for ten years so

6    --

7        Q.    About 2005 then maybe?

8        A.    Yeah, approximately.

9        Q.    And then I also see that in addition to

10   that from '93 to 2012 you worked at Monsanto?

11       A.    Very -- under various names, Monsanto,

12   Solution, Seminis Chemical, Pensacola.

13       Q.    Was that like a -- it says a chemical --

14   was it a chemical emergency response team of some

15   sort?

16       A.    Correct.

17       Q.    And it says you were deputy chief.  When

18   were you named deputy chief of that?

19       A.    I would have to look back.

20       Q.    And then it also says you were a

21   firefighter for various municipalities within

22   Florida back to '87, correct?

23       A.    Correct.

24       Q.    And then going to the text of your bio,

Kenneth Ashcraft

1    it says that you have been -- you have been

2    responsible for determining the cause and origin of

3    hundreds of fires through the years; is that

4    correct?

5        A.    Yes.

6        Q.    About how many hundreds at this point?

7        A.    Probably in the 5, 4 or 500 range.

8        Q.    Were you responsible for the cause and

9    origin determinations when you were at Monsanto?

10       A.    We did participate in investigations,

11   yes.

12       Q.    Well, now wait a minute.  If you

13   participated in investigations, were you

14   responsible for making a cause-and-origin

15   determination while you were there?

16       A.    Not the primary but participated.

17       Q.    You participated.  Okay.  How about

18   Escambia County?

19       A.    As a role of the senior fire officer

20   just preliminary -- basically the preliminary

21   investigation is to determine if we need to bring

22   in a state fire marshal or I can relay information

23   to the state fire marshal.  In Florida it pretty

24   much depends on the engine officer or the senior

Kenneth Ashcraft

1    officer in the area to notify the state fire

2    marshal.

3        Q.    So is the state fire marshal the one

4    that actually makes the official cause and origin

5    determination?

6        A.    Yes.

7        Q.    And so as a senior fire officer you are

8    -- I'm not trying to put words in your mouth.  Are

9    you essentially sort of elevating the matter to his

10   attention to make him make a decision like that?

11       A.    Yes.  We do a preliminary information

12   gathering and pass it on to him, either by phone or

13   in person, and they decide whether they're coming

14   out or not and we go from there.  We would help

15   them or assist them in their investigation when

16   they arrived on the scene.

17       Q.    And how about Molino?  Did you make any

18   cause and origin determinations there?

19       A.    Same.

20       Q.    Same story?

21       A.    Molino and Escambia is the same.

22       Q.    So in terms of actual cause-and-origin

23   determinations, is it fair to say that those have

24   all come while you've been at GHD and its

Kenneth Ashcraft

```
 1    predecessor entities?

 2        A.    Correct.

 3        Q.    Okay.  So let's take a look at your

 4    educational background now.  I see Fire Science and

 5    Emergency Management at Pensacola Junior College.

 6    Is that like a degree program?

 7        A.    It was a degree program.  They no longer

 8    have that program.

 9        Q.    Did you graduate?

10        A.    No.

11        Q.    How come?

12        A.    I just never completed the requirements

13    for the associate's degree.

14        Q.    How many classes did you take that were

15    specific to the degree?

16        A.    I'm not sure, more than what's

17    required.  My deficiency was in the general

18    classes.  I didn't finish those.

19        Q.    Okay.

20        A.    The exact number I'm not sure.

21        Q.    Right.  Were there classes there

22    specific to fire investigation?

23        A.    Yes.

24        Q.    And fire analysis?
```

Kenneth Ashcraft

```
1        A.    Yes.

2        Q.    And about what year was that, by the

3   way?  When did you start and when did you leave?

4        A.    I started college credit courses in '86,

5   '87 and am still taking college credit courses off

6   and on.

7        Q.    Okay.  Fire Science and Administration

8   at Saint Petersburg College.  Same question, is

9   that a degree program?

10        A.    That is a degree program.

11        Q.    Did you graduate?

12        A.    No.

13        Q.    Why not?

14        A.    I just haven't completed the

15   requirements for the general courses.

16        Q.    Okay.  And how many classes did you take

17   at Saint Petersburg?

18        A.    Three or four.

19        Q.    Were they fire courses?

20        A.    Yes, all fire.

21        Q.    Do you recall what they -- were they

22   specific to fire investigation?

23        A.    I don't recall specific course work

24   names.
```

Kenneth Ashcraft

```
 1        Q.    Okay.  Did they relate to maybe fire

 2    analysis of any type?

 3        A.    I'd have to go back and look.

 4        Q.    Okay.  And when was that?

 5        A.    Probably 2012, '11, and '12.

 6        Q.    Okay.  Relatively recently?

 7        A.    Yes.

 8        Q.    Florida Bureau of Fire Standards and

 9    Training at Florida State Fire College.  Is that a

10    degree program?

11        A.    It's a certification program.

12        Q.    Okay.  So what do you have to do to get

13    certified?

14        A.    When I -- my minimum standards were I

15    believe 180 or 240 hours for professional

16    firefighter.

17        Q.    Okay.  And that was what that led to,

18    was a professional fire fighting certificate or

19    designation?

20        A.    Correct.

21        Q.    So it wasn't for fire investigation,

22    though, was it?

23        A.    Not particularly.

24        Q.    And you said not particularly.  Were
```

Kenneth Ashcraft

1   there courses or training on fire investigation,

2   fire analysis there?

3       A.    Yes.  That's part of the minimum

4   standards curriculum.

5       Q.    Okay.  Industrial fire fighting at Texas

6   A&M, what's that?

7       A.    Basically an Industrial Fire School at

8   Texas A&M, participated in several of those as a

9   student and instructor with the Industrial Fire

10  fighting at Monsanto.

11      Q.    Okay.  So it was a certification program

12  then?

13      A.    It's -- I received a certificate for the

14  hours completed, but it's not a certificate --

15      Q.    I've got you.  Okay.

16      A.    It may be.  I don't know.  It's been a

17  while.

18      Q.    And it was basically to be somehow

19  designated as capable for industrial fire fighting?

20      A.    Correct.

21      Q.    Sort of thing you would need at

22  Monsanto?

23      A.    Correct.

24      Q.    And when did you get that certification?

Kenneth Ashcraft

```
1        A.    I participated in several in the '90s.

2        Q.    Okay.

3        A.    Early 2000s.

4        Q.    That's fine.  Certified -- I skipped one

5   or two.  Certified Hazardous Materials Response

6   Incident Commander.  That is a mouthful.  So what

7   is that?

8        A.    That just means I was trained at the

9   hazmat response incident command level.

10       Q.    Okay.  And what kind of -- I mean, what

11  kind of person teaches that class, a hazmat type

12  official or what?

13       A.    The incident commander designation came

14  from the Transportation and Safety in Colorado.  I

15  can't think of the name of it right now.

16       Q.    So when did you attend that training or

17  get trained under that?

18       A.    That would have been in the '90s or

19  2000s.

20       Q.    And that's something you would use at

21  Monsanto?

22       A.    Yes.

23       Q.    Certified fire service instructor,

24  retired.  Was this just to teach firefighters?
```

Kenneth Ashcraft

1      A.      It was a certification to teach Florida

2  fire courses.

3      Q.      Okay.  Would that relate to fire

4  investigations?

5      A.      It could.  I mean, it just covers the

6  gamut of -- back then you could teach any class you

7  had taken.

8      Q.      And then private investigator in Florida

9  and Alabama.  That's just Magnum PI stuff, right?

10      A.      Right.

11      Q.      More in keeping with aiding lawyers and

12  serving subpoenas and factual investigations and

13  stuff like that?

14      A.      I don't serve subpoenas.

15      Q.      Okay.  Generally investigating things?

16      A.      Related to fire investigation.

17      Q.      Always related to fire?

18      A.      Yes.

19      Q.      Okay.  So you don't do just PI work?

20      A.      No.

21      Q.      In the general sense -- so a private

22  investigator in Florida and Alabama can do fire

23  investigations by virtue of the PI license?

24      A.      Correct.

Kenneth Ashcraft

```
1        Q.    I skipped one, which was the certified

2    fire and explosion investigator.  So what is that?

3        A.    That's the National Association of Fire

4    Investigator certification for fire investigator,

5    fire explosion investigator.

6        Q.    And what does that require in terms of

7    becoming a CFEI?

8        A.    Application and proof of education and

9    training and work history and then a test.

10        Q.    Okay.  And how much -- like, is there

11    course work involved?

12        A.    To make the application, no.

13        Q.    No.  I mean, to take the test?

14        A.    There's not a --

15        Q.    Do you receive --

16        A.    There's not a course that is required by

17    NAFI --

18        Q.    Okay.

19        A.    -- to take the test.

20        Q.    Okay.  So what does the test, test you

21    on?

22        A.    Pretty much the requirements of 1033,

23    the --

24        Q.    Okay.  And now help me understand the
```

Kenneth Ashcraft

```
 1   difference between a CFEI and a CFI, certified fire
 2   inspector.
 3        A.    A certified fire inspector?
 4        Q.    I think that's right.  Maybe it's --
 5   maybe it is an investigator.  But CFI.
 6        A.    CFEI versus CFI are two different
 7   authorities --
 8        Q.    Okay.
 9        A.    -- who give the test.  So you've got the
10   NAFI and IAAI.
11        Q.    Is the test the same?
12        A.    I have not taken the CFI test yet.
13        Q.    Okay.  Are you -- have you applied to
14   take one?
15        A.    I have not applied yet.  I've made the
16   qualifications.  I just haven't taken the test yet.
17        Q.    When you say you've made the
18   qualifications, what does that mean?
19        A.    It's a point system based on your
20   knowledge, experience, and training and work
21   history and the -- it requires a certain number of
22   points, and I've surpassed the points but I just
23   haven't taken the time to take the test.
24        Q.    Okay.  And so what -- if you were to
```

```
 1   apply to be a CFI having the points, what would you

 2   have to do in order to become a CFI?

 3        A.    Pass the exam.

 4        Q.    Is there course work associated with the

 5   CFI?

 6        A.    I don't believe there's a specific

 7   course you have to take.  There are recommended

 8   courses.

 9        Q.    Okay.  Do you know if the tests are in

10   any way the same or if one is more involved than

11   the other?

12        A.    What I've been told is the CFI test is

13   much more stringent and harder than the CFEI test

14   and definitely the procedure to obtain that is a

15   little bit more difficult.

16        Q.    All right.  And so you said that the

17   CFEI is offered by the National Association of Fire

18   Investigators, NAFI?

19        A.    Correct.

20        Q.    And you're a member of that?

21        A.    Yes.

22        Q.    All right.  So the certification from

23   NAFI means that they consider you to be qualified

24   to investigate fires, right?
```

1    A.    Yes.

2    Q.    And that would be to make

3    cause-and-origin determinations?

4    A.    Yes.

5    Q.    So you said something about the

6    qualifications.  You said something about 1033.  So

7    what is 1033?

8    A.    It's the NFPA standard set forth as the

9    qualifications required to be a fire investigator.

10    Q.    Okay.  And so does 1033 apply to you as

11    a CFEI?

12    A.    Yes.

13    Q.    And I sort of asked this.  Let me come

14    at it from a slightly different angle.  So how does

15    -- what exactly does it mean to be a certified fire

16    and explosion investigator?

17    A.    It means that you have the education,

18    training, knowledge, work history to -- and

19    completed course work to be an origin and cause

20    investigator, to determine the origin and cause of

21    fires.

22    Q.    Okay.  And when you talk about

23    determining origin causes, is that something unique

24    to your profession as a fire investigator?

Kenneth Ashcraft

1      A.     Yeah, I suppose.

2      Q.     It qualifies you to make a

3   cause-and-origin determination, doesn't it?

4      A.     Yes.

5      Q.     Okay.  Can somebody who's not qualified

6   as a CFEI or CFI make a cause-and-origin

7   determination?

8      A.     Yes.

9      Q.     How come?

10      A.     Various states have certification

11   programs that designate fire investigators based on

12   their state curriculum.  These are more national

13   level type certifications that are not restricted

14   to a certain state but are recognized by the

15   industry.

16      Q.     Okay.  So, for instance, in Alabama is

17   there a state certification program that allows

18   somebody to be entitled to make a cause-and-origin

19   determination on a fire?

20      A.     I believe they do have a certificate

21   program.

22      Q.     Do you know what it's called?

23      A.     Fire investigator.  I know they have the

24   courses fire investigator I and II.

Kenneth Ashcraft

1      Q.     So absent that, absent a state program,

2   and absent a designation of a CFEI or CFI, what

3   else would allow somebody to make an

4   origin-and-cause determination?

5      A.     Can you repeat that.

6      Q.     Absent a state program or absent one of

7   these designations, CFEI or CFI, if you're missing

8   those what would allow someone to make a

9   determination of origin or cause?

10     A.     Knowledge, experience, training.  I

11   mean, it's -- the certification doesn't allow you

12   to -- I mean, it gives you credibility in the

13   industry, but it doesn't allow you to -- based on

14   what you're asking me.

15     Q.     Okay.  So if you can have knowledge and

16   training and education and all this other stuff --

17   I'm just trying to get a sense of why there are

18   these entities out there that make these

19   designations of who meets 1033.

20     A.     Everybody -- each state has their --

21   like, Florida has a curriculum of five or six

22   classes to become a fire investigator and then

23   another three or four classes to be a fire

24   investigator II.  It's each entity's interpretation

Kenneth Ashcraft

1   of 1033 to get a person to that level.

2       Q.    Yeah.  What I'm asking is why are all

3   those designations at the state level or

4   multi-state level if somebody can just say they

5   have the experience and education and the like to

6   do it?

7       A.    I would like to see them all come

8   together and have one entity making the designation

9   and the standards set by NFPA.

10      Q.    Okay.  Do you consider someone missing

11  one of those designations to be qualified to make a

12  determination about cause and origin?

13      A.    That's very possible.

14      Q.    That they're qualified?

15      A.    Depends on their background and

16  qualifications and education.

17      Q.    Okay.  So 1033, if my passing

18  familiarity means anything, has a bunch of topics

19  where a fire investigator has to have an up-to-date

20  basic knowledge beyond high school level; is that

21  right?

22      A.    Yes, 16 topics.

23      Q.    Do you know those topics off the top of

24  your head?

Kenneth Ashcraft

1      A.     Some of them.

2      Q.     Do your best.  Tell me, what can you

3   remember?

4      A.     Fire science, fire dynamics, fire

5   investigation, fire analysis, thermodynamics,

6   thermometry, fire chemistry.  I believe hazardous

7   materials is in there.  There's -- that's all I

8   remember off the top of my head.

9      Q.     The only one I wasn't familiar with is

10  thermometry, what's that?

11     A.     The study of temperature.

12     Q.     Okay.  And does it require you to know

13  anything about electricity?

14     A.     Yes.

15     Q.     Or electrical systems?

16     A.     Yes, that is one of the requirements.

17     Q.     Okay.  And so do you -- do you consider

18  yourself to have a working knowledge beyond the

19  high school level in all of those categories?

20     A.     Yes.

21     Q.     Is there a place I could look to get an

22  idea on each of those topics, like, what they mean,

23  how the terms are defined?

24     A.     There's a section of 1033 that offers

Kenneth Ashcraft

```
 1    definitions of those topics.

 2        Q.    All right.

 3        A.    And the dictionary.

 4        Q.    Okay.  Is the 1033 -- I looked around

 5    and didn't see it.  I saw something similar in

 6    921.  I didn't see it in 1033.  Is there something

 7    in 921 about those definitions and how they're

 8    defined?

 9        A.    I'm sure there are some of those

10    definitions in 921, but I believe it refers back to

11    1033 if I'm not mistaken.

12        Q.    And how do 1033 or 921 work together, or

13    first of all, do they work together?

14        A.    There's -- 921 is a guide for fire and

15    explosion investigations, basically setting a

16    guideline to investigators in performing

17    investigations.

18        Q.    Okay.

19        A.    1033 is a standard that dictates the

20    qualifications of the investigators.

21        Q.    And does 1033 embrace 921 in terms of a

22    source of knowledge to be familiar with?

23        A.    They're -- they work together.  You need

24    to be fully aware and knowledgeable of both --
```

Kenneth Ashcraft

1      Q.    Okay.

2      A.    -- standards.

3      Q.    All right.

4      A.    The guide and the standard.

5      Q.    And do you follow NFPA 921 in your

6   investigations?

7      A.    Yes.

8      Q.    And did you follow it in this particular

9   lawsuit?

10     A.    Yes.

11     Q.    Okay.

12           Are you okay?  Need a break?

13     A.    Okay.

14     Q.    All right.  International Association of

15   Arson Investigators.  What is that?

16     A.    That is the entity who manages the CFI

17   program.

18     Q.    Okay.  So you're a member of that,

19   right?

20     A.    Correct.

21     Q.    And that's -- if you were to apply for a

22   CFI, you would be asking them to give you that

23   designation?

24     A.    Correct.  The IAAI had -- gives the CFI

Kenneth Ashcraft

1   designation.

2      Q.    Okay.  I see you're a member of the

3   Alabama and Florida Associations of Arson

4   Investigators.  So what are those?

5      A.    Basically subchapters of the IAAI.

6      Q.    All right.  And do you have to do

7   anything to join those organizations?

8      A.    I believe Alabama has a vote, and you're

9   voted in.

10     Q.    Okay.

11     A.    Just be a member of the IAAI and be in

12   the industry.

13     Q.    Pay a fee and sign up?

14     A.    Correct.

15     Q.    And get approved?

16     A.    Correct.  No test.

17     Q.    All right.  Florida Advisory Commission

18   on Arson Prevention, what is that?

19     A.    FACAP, it's an organization of industry

20   professionals, insurance professionals who have

21   joined forces to combat arson in the State of

22   Florida.

23     Q.    And how do you become a member of that

24   group?

Kenneth Ashcraft

1    A.    Same thing.

2    Q.    No test?

3    A.    No test.

4    Q.    Just pay a fee?

5    A.    Yeah.

6    Q.    Is there anything else in your

7    background that I need to know to qualify you to

8    perform a fire investigation?

9    A.    It's pretty much all there.

10   Q.    Anything else in your background that I

11   need to know to determine your qualifications

12   regarding cause-and-origin determinations?

13   A.    It's pretty much all there.

14   Q.    All right.  So when you perform a fire

15   investigation, let's talk about how that's done.

16   Do you typically work alone?  Do you usually use a

17   partner of some sort?

18   A.    Depends on the scope of the

19   investigation.  I have worked solo and I've worked

20   with multiple others.

21   Q.    When do you usually bring somebody else

22   in?

23   A.    Large scale projects or in a case where

24   I have -- I bring in people for large scale

1    projects or training type scenarios.

2        Q.    Okay.  So to jump ahead a little bit in

3    this case you brought in Paul Castellano.  And what

4    was your reason for doing that?

5        A.    My initial investigation indicated a

6    fire in the kitchen area.  So there's numerous

7    appliances, electrical applications in a kitchen.

8    So we involve an electrical engineer and an expert

9    in the field of electrical forensics.

10       Q.    And so let's talk about your history

11   with fridge fires.  How many have you worked on as

12   an investigator?

13       A.    An exact number I'm not sure.  Less than

14   ten.  Probably around four or five, I'm not sure.

15       Q.    And that's since 2009?

16       A.    Yeah.

17       Q.    Okay.  How about electrical fires?

18       A.    Electrical is a higher number, exact

19   number I'm not sure.

20       Q.    Well, you said you've done -- I thought

21   you said 4 to 500 cause and origins, right?  So of

22   that, ballpark roughly electrical fires?

23       A.    150.

24       Q.    150 or so?

Kenneth Ashcraft

```
1        A.    Or so, yeah.

2        Q.    How about cooking fires?

3        A.    How many have I done?

4        Q.    Uh-huh.

5        A.    150, 200, ballpark.

6        Q.    All right.  And as part of investigating

7   a cooking fire, for instance, do you have any

8   experience in looking at -- making a determination

9   of cause and origin based on burn patterns?

10       A.    Yes.

11       Q.    Okay.

12       A.    All fires, not just kitchen fires.

13       Q.    Right.  And what would -- help me

14   understand some of the burn patterns for a cooking

15   fire.  What would it look like?

16       A.    An isolated cooking fire will have

17   localized damage to the stovetop area.

18       Q.    Okay.  What else?  Like burn patterns,

19   though?

20       A.    Burn patterns, like I said, isolated and

21   emanating near or at the stovetop.

22       Q.    Okay.  Was there a pattern like I would

23   see on a wall or something?

24       A.    You could see a V pattern, V-shaped
```

Kenneth Ashcraft

 1   pattern, which was the base of the cone would be at

 2   the stovetop in some cases.

 3        Q.    All right.

 4        A.    In most cases.

 5        Q.    All right.  Let's talk about around

 6   here.  Have you ever -- other than this case have

 7   you ever investigated a fire in Dothan?

 8        A.    Yes.

 9        Q.    How many?

10        A.    Maybe a half a dozen, four.

11        Q.    Okay.  Were any of those fridge fires?

12        A.    I don't believe so

13        Q.    Any of those electrical fires?

14        A.    I don't recall specifically.

15        Q.    Any of those cooking fires that you know

16   of?

17        A.    I don't believe so.

18        Q.    Okay.  Have you ever worked with anybody

19   in the Dothan Fire Department?

20        A.    Yes.  As far as not worked with but they

21   were involved in an investigation where I was

22   brought in.

23        Q.    Right.  Do you know anybody who's still

24   with Dothan Fire today that you've dealt with in

Kenneth Ashcraft

```
1   the past?

2       A.    Poole.

3       Q.    Is that a last name?

4       A.    Yes.

5       Q.    What's his first name, if you remember?

6       A.    Robert, Ruben.

7       Q.    Okay.

8       A.    He's a fire investigator with Dothan.

9       Q.    Anyone else?

10      A.    Shiver.

11      Q.    Mike Shiver?

12      A.    I thought it was Mark.  I had one other

13  fire with him, I believe.

14      Q.    Okay.  Anybody else?

15      A.    There was another one that I don't

16  recall his name.

17      Q.    Garret Crowe?

18      A.    I don't --

19      Q.    Okay.  Do you know anybody who's no

20  longer with Dothan Fire with whom you worked

21  closely in the past?

22      A.    Not that I'm aware of.

23      Q.    Let's talk about this suit a little bit

24  more specifically.  When were you first brought
```

Kenneth Ashcraft

```
 1    into this case?

 2         A.    I believe it was November, December of

 3    2013.

 4         Q.    Okay.  And who contacted you?

 5         A.    I believe it was Joey Morris.

 6         Q.    Okay.

 7         A.    I don't recall if it was he who made the

 8    first contact.

 9         Q.    Sure.  Do you know Todd Register, the

10    state fire marshal's office?

11         A.    Yes.

12         Q.    Have you worked with him before in past

13    cases?

14         A.    He's been involved in cases I was called

15    in on.

16         Q.    Do you know him personally?

17         A.    Not very well.

18         Q.    You've met him?

19         A.    Yeah, I've met him.

20         Q.    Sorry about that.

21               Scope of your assignment, what did Joey

22    ask you to do?

23         A.    There was a -- he advised that there was

24    a fatal fire in Dothan he wanted us to look into
```

Kenneth Ashcraft

1    investigating.

2        Q.    All right.  And over the course of this

3    case did the scope of your investigation ever

4    change?

5        A.    The scope?

6        Q.    Yeah.  Like what he asked you to do --

7    did he ask you -- obviously he's asked you to serve

8    as a testifying expert in this case?

9        A.    Right.

10       Q.    Other than the fact that your role has

11   continued has he ever asked you to do more than you

12   originally signed up to do?

13       A.    In the -- I'm not sure exactly when but

14   the smoke alarm was brought into question.  He

15   asked me to locate and see if there was a smoke

16   alarm in the building.  So it went from strictly

17   origin and cause to locating and identifying a

18   smoke alarm.

19       Q.    And when did you locate that smoke

20   alarm?

21       A.    I believe it was in April of '14.

22       Q.    Okay.  So when you got the call from

23   Mr. Morris did he provide you with any kind of

24   documents or paperwork or other things to use to

Kenneth Ashcraft

```
 1    prepare before you showed up on site?

 2        A.    I don't recall if he may have sent a

 3    fire report.  I'm not sure.

 4        Q.    Did you ever receive photographs taken

 5    by the Dothan Fire Department?

 6        A.    No.

 7        Q.    To this day you haven't received or

 8    reviewed them?

 9        A.    The actual full color photos --

10        Q.    Right.

11        A.    -- from the Dothan Fire Department?

12        Q.    Right.

13        A.    No.

14        Q.    You've never seen them?

15        A.    No, there was a report with some photos

16    in it that I've seen, but they're black and white

17    and grainy.

18        Q.    Okay.  Now, I've gone through some of

19    the documents, and I've seen a place where the

20    Dothan Fire -- I'm sorry, I believe it was the

21    Dothan Police Department turned over the

22    refrigerator to you in the chain of custody in the

23    documents.  Do you remember that occurring?

24        A.    Yes.
```

Kenneth Ashcraft

1      Q.     And was that something that you had

2   reached out to Dothan to ask them about, or how did

3   that process come about?

4      A.     I don't recall the exact sequence of

5   events.  One of my first visits we went in and

6   inspected the refrigerator at the police

7   department, and they wanted to release it and get

8   it out of their storage.  And we relocated it back

9   to the McCuistian house.

10      Q.     And when you say you inspected it, what

11   did that entail?

12      A.     Just photographs.

13      Q.     Okay.

14      A.     Just identifying --

15      Q.     Nothing destructive, you didn't touch it

16   in any meaningful way?

17      A.     No.

18      Q.     And what was its condition when the

19   Dothan Fire Department released it to you?

20      A.     Fire damaged.

21      Q.     I mean, was it wrapped up?  Was it in a

22   box?  How was it contained?

23      A.     Wrapped in plastic.

24      Q.     Around the entire thing?

Kenneth Ashcraft

```
 1        A.    Yes.

 2        Q.    And things like the door and other parts

 3   that had been found separated from it at the time

 4   of the fire, were they attached?  Were they

 5   separate?  Where were they?

 6        A.    I believe they were wrapped into the

 7   package as well.

 8        Q.    Okay.  And so what day -- do you recall

 9   what day that was that you received that fridge?

10        A.    Not the specific day.

11              (Defendant's Exhibit Number 20

12                 was marked for identification.)

13        Q.    Okay.  I want to show you what I've

14   marked as Exhibit 20.  Do you recognize that?

15        A.    It's an evidence transfer from Dothan

16   Police to me.

17        Q.    And what's the date on that?

18        A.    12/2/13.

19        Q.    And is that the date you received it

20   from them?

21        A.    Yes.

22        Q.    Okay.  And what date was the

23   investigation that I and others attended in Dothan

24   at the site?  Do you recall that date?
```

Kenneth Ashcraft

1        A.      Not specifically.

2        Q.      Okay.  Well, it was December 11, 2013.

3    Does that ring a bell?

4        A.      Sounds familiar.

5        Q.      Okay.  What did you do with the fridge

6    between the time that Dothan released it to you and

7    the time of the fire -- I mean, the time of the

8    site investigation?  Excuse me.

9        A.      I don't recall how we transported it,

10   but if it was my vehicle or their vehicle we

11   transported it straight from there to the

12   McCuistian residence and put it back inside.

13       Q.      And was it -- what was the status of the

14   property?  Was it boarded up?  How was it secured,

15   the property?

16       A.      The front door may have been boarded.  I

17   believe there was a board across the back door.

18   The side carport door was locked, lockable.

19       Q.      Okay.  So before you -- it was in the

20   home from around the 2nd to around the 11th, right?

21       A.      From the date it was received by me on

22   the 2nd until we removed it in the joint exam it

23   was in the residence.

24       Q.      All right.  What other preparation did

Kenneth Ashcraft

1    you -- well, when you -- did you take the fridge to

2    the home the same day you received it?

3         A.    Yes.

4         Q.    And so was that your first time to enter

5    the home when you received it?

6         A.    I don't recall if I may have been there

7    prior -- the day before.

8         Q.    Okay.

9         A.    I don't recall.  My pictures will tell

10   the dates.

11        Q.    When did you -- so you may have been

12   there the day before.  Would that have been your

13   first time to go into the house?

14        A.    Yes, I believe so.

15        Q.    And what did you do while you were in

16   the house that first time?

17        A.    When I approach an investigation, I do

18   an exterior survey of damage, and then I move to

19   the interior to do a survey of the damage.

20        Q.    Did you photograph the scene?

21        A.    Always.  Yes.

22        Q.    Did you touch or manipulate anything

23   inside the house?

24        A.    No.

1      Q.     Okay.  Did you place the refrigerator

2   back in the place where the refrigerator had

3   previously sat, or did you leave it somewhere else

4   in the house?

5      A.     I believe we -- yes, we left it in the

6   living room.

7      Q.     Okay.  So did you at that time begin to

8   document and analyze burn patterns in the house?

9      A.     Yes.

10      Q.     Okay.  Did you reach any conclusions

11   that day?

12      A.     One of -- I don't remember if it was

13   that day but one of my -- during my initial visits

14   I developed a hypothesis that the kitchen was the

15   room of origin.

16      Q.     Didn't get any further than that at that

17   time, though?

18      A.     I don't believe so.  The pictures and

19   notes will show what happened on what day.

20      Q.     Your pictures and notes, if any spoke

21   to, it would be a more accurate reflection of what

22   you did?

23      A.     Photos, yes, definitely.  I take lots of

24   photos.

Kenneth Ashcraft

1      Q.     Okay.  Did you do anything else to

2    prepare to work on that site or to visit that site

3    other than what we've already discussed?

4      A.     May have looked up property records or

5    things like that but --

6      Q.     Did you speak with anyone, fire marshal,

7    firefighters?

8      A.     Yeah, I had to -- I believe Joey made me

9    aware that the refrigerator was being held by the

10   fire department or I found out when I called the

11   fire department.  Typically I'll call to make sure

12   a scene has been released and I can go in and out

13   without interfering with an investigation.

14     Q.     Did you speak to anyone at the fire

15   department about the fire?

16     A.     Yes, I'm not sure exactly who I spoke to

17   first.

18     Q.     Did you speak with Mike Shiver?

19     A.     At some point, yes.

20     Q.     Do you remember when that was?

21     A.     Not the specific day.

22     Q.     Do you remember if y'all discussed the

23   nature of the fire, possible causes, possible areas

24   of origin and things like that?

```
 1        A.    Not initially.  I believe that was the

 2   first time Shiver and I had -- were on the same

 3   case or same fire.  So I didn't know him on a level

 4   to call him outside of a work arrangement and

 5   discuss any -- we didn't discuss the particulars of

 6   the case, no, except for what was in the report.

 7        Q.    Okay.

 8        A.    In the fire report.

 9        Q.    So that would be the -- like one of the

10   fire reports from the Dothan Fire Department?

11        A.    Yes.

12        Q.    So at what point did y'all discuss that?

13        A.    I don't know if it was probably the day

14   this refrigerator was picked up, and he would

15   explain why he picked that up and not anything

16   else.

17        Q.    Right.  That's where I was headed next.

18        A.    That's what I'm -- yeah.

19        Q.    What did he say regarding that

20   refrigerator and why he took that into evidence?

21        A.    He felt like it was going to be a

22   potential point of origin for the fire in his

23   investigation.

24        Q.    Okay.  Did he feel like it was going to
```

Kenneth Ashcraft

1  be the cause of the fire?

2      A.    He didn't say it was the cause of the

3  fire.  He said he believed it had potential to be a

4  cause of the fire.  And evidently enough so they

5  collected it and transported it versus anything

6  else.

7      Q.    Okay.  And you said you haven't reviewed

8  the photographs taken by the Dothan Fire

9  Department?

10     A.    Not the -- not that I recall.

11     Q.    By the way, we're coming up on an hour.

12  As you know from other depositions this is not an

13  endurance test.  If you need to break for the

14  restroom or anything else, by all means tell me and

15  we're happy to take one.

16          MR. HOOKS:  And same for everyone here.

17          MR. TALMADGE:  Do you want to take one

18     now?  We've been going an hour.

19          MR. HOOKS:  That's up to you.

20          THE WITNESS:  That's fine.

21              (Off the record.)

22  BY MR. HOOKS:

23     Q.    Mr. Ashcraft, at some point before

24  December 11th 2013 it's my understanding that a

Kenneth Ashcraft

 1   gentleman named Ronnie Blankenship who is employed

 2   by Renquist came to the house.  Do you have any

 3   knowledge about that?

 4       A.    I wasn't aware when he was there.  I

 5   don't recall when I found out he was there.

 6       Q.    Did -- so you -- is it safe to say you

 7   weren't the one that let him into the house?

 8       A.    Correct.

 9       Q.    Do you know who did?

10       A.    No.

11       Q.    Do you remember why he was there?

12       A.    If I remember correctly he was

13   representing the dishwasher repair service.  I'm

14   not sure.

15       Q.    Do you know what he did while he was on

16   the property?

17       A.    No.

18       Q.    You said you made entry in the home to

19   take a look at it probably I think you said

20   December 1st 2013?

21       A.    Somewhere in there.

22       Q.    Either at the same time or another day

23   you deposited the refrigerator inside the home.

24   Did you make any other visits to the house before

Kenneth Ashcraft

1    the site inspection on December 11th?

2        A.    I don't believe so.  I'm not -- I don't

3    recall a specific date for the joint exam.

4        Q.    Well, if you don't recall a specific

5    date, I'm trying to see if there was another time.

6        A.    It would be in my photos dated.  My

7    photos are dated.

8        Q.    Okay.

9        A.    So if there is a date between --

10       Q.    So I see December 1, 2013.

11       A.    Okay.

12       Q.    Followed by December 11, 2013.

13       A.    Okay.

14       Q.    So it doesn't appear that you did from

15   what's here.

16       A.    Okay.  If I was there, there is some

17   sort of photo record.

18       Q.    Okay.  So did you do any inspection or

19   investigation of the refrigerator on December 11,

20   2013?

21       A.    That was our joint exam day?  We

22   unwrapped it I believe that day to inspect and to

23   try and determine a model number.

24       Q.    Okay.  And was there any destructive

Kenneth Ashcraft

```
 1   work done that day?

 2       A.    Not that I recall, no.

 3       Q.    Okay.  So what -- do you recall what

 4   happened on the 11th of December?

 5       A.    It was a joint exam to document -- for

 6   all parties to document the site and collect

 7   evidence.

 8       Q.    Okay.  And then the parties returned

 9   another month and a half or so later, right?

10       A.    Whatever date is on there, but I don't

11   recall specifically.

12       Q.    Near the end of January?

13       A.    Yes.

14       Q.    Does that ring a bell?

15       A.    Yes.

16       Q.    We all --

17       A.    That rings a bell.

18       Q.    We never will forget that week since

19   that was when the major snowstorm hit and we all

20   ended up stranded.

21       A.    I recall that.

22       Q.    And at the next exam you had brought in

23   Paul Castellano?

24       A.    Yes.
```

Kenneth Ashcraft

1      Q.     Okay.  So when did you reach out to

2   Mr. Castellano to bring him into the case?

3      A.     To bring him into the case?

4      Q.     Well, to ask him to help you, first of

5   all.

6      A.     Would have been after our joint exam.

7      Q.     Okay.  And was that -- was January 28th

8   the first day that he got access to see the

9   property?

10     A.     Yes, or whenever that joint exam was.

11     Q.     And then did you and Mr. Castellano

12  circle back on that matter again before the lab

13  exam in March of 2014?

14     A.     I'm sure we discussed some items between

15  then and the lab exam, yeah.

16     Q.     Had you reached any conclusions as of

17  March of 2014?

18     A.     No.

19     Q.     Had he?

20     A.     No.

21     Q.     So you attended the lab exam on March

22  2014, and that lasted two days, right?

23     A.     Yes.

24     Q.     Okay.  And after the lab exam had you

Kenneth Ashcraft

1   reached any conclusions?

2       A.    We were still collecting data at that

3   point.  But I believe that did indicate potential

4   ignition sources, revealed potential ignition

5   sources.

6       Q.    What all potential ignition sources did

7   it reveal?

8       A.    In the room?

9       Q.    In the kitchen, yes.

10      A.    There were -- looking at the room of

11  origin there were appliances -- I believe we

12  collected the stove, the dishwasher, some

13  appliances, the refrigerator, some wiring

14  components during the lab exam that were arced,

15  discovered in some -- several of those items.

16      Q.    Do you remember which ones?

17      A.    There was a specific arc found in the

18  stove.  There was a specific arc I believe found in

19  the -- I believe the light fixtures if I'm not

20  mistaken -- there were -- I don't recall if there

21  was any arc on the circuits that we collected.

22  There were arcs found within the refrigerator.

23      Q.    And did you attend the lab exam in Vista

24  Engineering in Birmingham in July 2014?

Kenneth Ashcraft

1       A.     Yes.

2       Q.     Okay.  And by the time that July had

3   rolled around, had you reached any opinions or

4   conclusions?

5       A.     Conclusions, no.

6       Q.     Had you formulated any opinions as to

7   cause and origin?

8       A.     Hypothesis, yes.

9       Q.     But no opinions?

10      A.     No conclusion at that time, no.

11      Q.     Okay.  Other than what we just

12  discussed, the joint site exams, the lab exams,

13  that were done in the engineering and lab exam in

14  Vista Engineering, did you do any other work in

15  order to formulate opinions or prepare a report?

16      A.     Yes, there was research, reviewing the

17  data that had been collected.

18      Q.     Had you spoken to any witnesses about

19  the case at that point?

20      A.     Witnesses, I spoke to a couple of

21  neighbors and Gary Laroux early in the

22  investigation or -- I don't recall -- it was a

23  neighbor.

24      Q.     You don't remember the -- would it be in

Kenneth Ashcraft

```
1   your notes?

2       A.    It's in the report.  I just don't recall

3   his name.

4       Q.    That's all right.

5       A.    I believe he was the first person I made

6   contact with.

7       Q.    Was it Darren Mason?

8       A.    Sounds familiar.

9       Q.    At what point in this investigation did

10  you formulate an opinion as to cause and origin?

11      A.    I don't recall an exact time frame, but

12  after we had, you know, completed the lab exam we

13  had completed all the data collection I thought was

14  relevant, then I put that together and formulated

15  the conclusion, a final hypothesis.

16      Q.    Can you give me a way that we could

17  determine when that was?

18      A.    I can't give you an exact date or time

19  frame.  I don't form a conclusion until I have all

20  the data I can get.

21      Q.    So would that have included the lab exam

22  at Vista Engineering, for instance?

23      A.    Yes.

24      Q.    Okay.  Did you reach a decision as to
```

Kenneth Ashcraft

1    the point of origin or did you reach -- formulate

2    an opinion about the point of origin before you

3    formulated an opinion about the cause of the fire?

4        A.   Yes.

5        Q.   Do you remember when you formulated your

6    opinion about the point of origin?

7        A.   Point of origin typically -- well, point

8    of origin has to come first so it -- I don't know

9    exactly the date.  But my theories were based on

10   burn patterns that I observed early on that they

11   were in the southwest or southeast -- I get

12   confused on -- I'll have to look at the drawing to

13   be sure.  But in the corner where the refrigerator

14   would have sat was my area of origin.

15       Q.   When did you reach that determination?

16       A.   I don't recall exactly.

17       Q.   Was it after all the lab exams or

18   before?

19       A.   I don't recall where at in the

20   sequence.  Probably --

21       Q.   Let's do it this way.  So 921 requires

22   you to follow the scientific method, right?

23       A.   Yes.

24       Q.   And that requires you to formulate

Kenneth Ashcraft

1   hypotheses and test them?

2       A.    Yes.

3       Q.    So when you first went to the site in

4   December of 2013 before the joint site exam, you

5   examined and reviewed and photographed the location

6   then, right?

7       A.    Repeat the question.

8       Q.    When you went in early December 2013 to

9   the site, you looked at the site and photographed

10  it and analyzed it, correct?

11      A.    Began my analysis, correct.

12      Q.    Sure.  Did you start with a working

13  hypothesis when you first went to the scene?

14      A.    My original hypothesis is we had a

15  kitchen fire.  The room of origin was the kitchen.

16      Q.    Okay.

17      A.    That was my first step after reviewing

18  the damage and --

19      Q.    So you hadn't gone any further than just

20  room of origin?

21      A.    Right.

22      Q.    Okay.  So when we appeared for the joint

23  site exam several days later, did you change or

24  alter or improve or flesh out the hypothesis in any

Kenneth Ashcraft

 1   way?

 2        A.    Once we collected, cleaned the room of

 3   origin, the burn patterns and damage became a

 4   little clearer which started pulling me towards the

 5   refrigerator corner as the area of origin.

 6        Q.    All right.  And was that based on burn

 7   patterns?

 8        A.    Yes.

 9        Q.    Okay.  And when we returned to the site

10   on -- in January of 2014, did you continue to

11   pursue that hypothesis?

12        A.    Well, actually January is when we

13   started collecting the bulk of the evidence.

14        Q.    I'm sorry.  It was December 11th is when

15   we first had the site inspection.

16        A.    The cold day.

17        Q.    Right.  Yes.

18        A.    And when we removed the items, and

19   that's when my area of origin became more focused.

20        Q.    Okay.

21        A.    Than just the room.

22        Q.    And that's when you focused in on the

23   area where the refrigerator was?

24        A.    Began to, yes.

Kenneth Ashcraft

1    Q.    And that was based on burn patterns?

2    A.    Yes.

3    Q.    Any other factors at that time?

4    A.    Burn patterns, smoke patterns, damage to

5    the --

6    Q.    What is a smoke pattern?

7    A.    Lines of demarcation, not just burn

8    damage but the smoke, soot damage, soot deposits.

9    Q.    Okay.  So then we all returned in late

10   January -- or right before the snow arrived.  And

11   we made a -- another joint site visit this time to

12   remove some wire and things like that.  So did your

13   hypothesis change at that time?

14   A.    I don't recall specifically if it

15   altered -- the focus became more and more in my

16   mind based on fire damage and smoke damage the area

17   of origin was in the corner with the refrigerator.

18   Q.    All right.

19   A.    At some point in time, yeah, I started

20   to look at the char depth and the wall.

21   Q.    Okay.  This is a good time to -- I've

22   got a whole host of photographs here.  Before I

23   start marking them, I would like you to take a look

24   at them and try to give me an idea of which one of

Kenneth Ashcraft

```
 1    these we should review in what order.  Because I

 2    don't know how to make heads or tails of them yet.

 3         A.    This is one of the preliminary drawings

 4    that I had hired a new person, Tim Crowe, and he

 5    was just there to learn our procedure as far as

 6    documenting the scene.  And he drew this.  He and I

 7    both worked on this drawing.

 8         Q.    So this is a preliminary document from

 9    when, what date?

10         A.    I don't know the exact date.

11         Q.    Would it have been before the joint site

12    inspection on December 11th?

13         A.    Yes.

14         Q.    So is there anything here -- I see -- I

15    see numbers.  Apparently maybe he's calculating

16    square footage.  Is that what he's trying to do?

17         A.    I believe that's photos, photo sequence.

18         Q.    Okay.  So this shows the sequence of the

19    photos that were taken?

20         A.    Yes.

21         Q.    Okay.

22         A.    His -- I mean, that -- he was basically

23    just showing me what he -- how he did things.

24              (Defendant's Exhibit Number 21
```

Kenneth Ashcraft

```
 1                     was marked for identification.)

 2      Q.    Okay.  So I'm going to mark this

 3   document as Defendant's 21, and we'll so that --

 4   are you pretty sure this is from the December 1

 5   visit before the joint site exam?

 6      A.    I believe so.

 7      Q.    Okay.  That's fine.  Is there anything

 8   else that I need to know about this document other

 9   than the fact it sort of lays out the house and

10   identifies photographs?

11      A.    It's just a layout of the rooms and --

12   correct.

13      Q.    Okay.  Next document that would be

14   useful for me.

15              MR. OLINDE:  Can we see that one?

16              MR. HOOKS:  Of course.

17      A.    This would have been after I put the

18   drawing into the computer, and this would have been

19   measurements that I took at some point.  I don't

20   know what day.

21              (Defendant's Exhibit Number 22

22                was marked for identification.)

23      Q.    So I want to mark this document as

24   Defendant's 22.  And do you know the date of this
```

1    drawing?

2        A.    No.

3        Q.    Is it fair to say it would have been one

4    of the first couple of visits, though?

5        A.    It would have been after the first visit

6    because I drew the floor plan.

7        Q.    So this was the floor plan of the house

8    with basically measurements.  Is there anything on

9    here that I need to understand besides basically

10   measurements?  Is there any fire analysis on this

11   page?

12       A.    No.

13       Q.    Let's move to the next document.

14       A.    This would be a rough measurement of the

15   dimensions and layout of the kitchen.

16            (Defendant's Exhibit Number 23

17              was marked for identification.)

18       Q.    Okay.  Let me mark this Defendant's 23.

19   So this is the kitchen layout itself, right?

20       A.    Yes.  Just a rough.

21       Q.    Okay.

22       A.    This is --

23       Q.    Hang on.  Let's take it one at a time

24   here.  You've identified a window, what looks like

Kenneth Ashcraft

1    two sinks, stove, dishwasher, and a table.  Nothing

2    else is actually identified.  Is there any

3    significance to what you've designated here?

4        A.    No, just relative position.

5        Q.    All right.  Next one.

6            MR. KING:  Go off the record.

7                (Off the record.)

8    BY MR. HOOKS:

9        Q.    Please go ahead.

10       A.    The next one has char depth sequence.

11   Basically during my investigation I took a series

12   of char depth readings in the kitchen area, and

13   this was helping me kind of refine my theory

14   hypothesis about the south -- let me get my

15   bearings straight here -- southwest corner of the

16   kitchen.

17       Q.    Okay.

18       A.    So this was basically the sequence I

19   went around the room.

20       Q.    Let me see this for a moment.

21            (Defendant's Exhibit Number 24

22               was marked for identification.)

23       Q.    So the document you've just been

24   referencing is what I'm going to mark as

Kenneth Ashcraft

```
 1    Defendant's Exhibit 24.  It says Char Depth

 2    Sequence.  And has numbers 1, 2, 3, 4, 5, 6 and 7,

 3    8, 9.  If I can ask real quick -- the way that this

 4    is depicted is --

 5         A.    This next document --

 6         Q.    How --

 7         A.    This next document is a better depiction

 8    of how it was accomplished.

 9         Q.    Well, my question is at this point on

10    this document is that it -- it doesn't depict the

11    stove in relation to where it is in the room.  Is

12    there a reason for that?

13         A.    Just not enough paper.  There wasn't a

14    good -- this is a better representation.

15         Q.    Okay.

16         A.    Looks like it started something and

17    switched to this.

18         Q.    So this char depth sequence, what do I

19    need to learn from this, if anything?

20         A.    Just I went counter-clockwise.  I mean,

21    that's not really indicative of much else.

22         Q.    So 1, 2, 3, 4, 5, 6, 7, 8, 9, what do

23    those numbers represent?

24         A.    I think that was the -- I'm not sure
```

Kenneth Ashcraft

1   exactly where I was headed with that.  This is the

2   document I relied upon the next time.

3        Q.    Okay.  So 1 through 9 do not have any

4   significance in terms of char depth?

5        A.    No.

6        Q.    Or burn pattern or anything like that?

7        A.    No, it's just sequence.  It's just

8   showing I went counter-clockwise.

9        Q.    This shows where you -- almost where you

10  --

11       A.    Planned --

12       Q.    Where you walked the room basically?

13       A.    Right.

14       Q.    Okay.  So I don't need to rely on that

15  for anything?

16       A.    No.

17       Q.    Okay.

18       A.    You've got two, you've got the original

19  and -- you've got two.

20            (Defendant's Exhibit Number 25

21              was marked for identification.)

22       Q.    So this is the document I'm marking as

23  Defendant's Exhibit 25, and this is one that you

24  say I should rely on more; is that right?

Kenneth Ashcraft

```
 1      A.    Yes.

 2      Q.    Okay.  Now, again there are numbers

 3   here.  What do these numbers represent?

 4            Do you need a minute?

 5      A.    Yeah, part of these are my hard file and

 6   part are copies.  So I want to make sure we're on

 7   the same page.

 8      Q.    Okay.  So there are copies -- this is

 9   something I got out of your --

10      A.    My hard file.

11      Q.    Yes.

12            MR. TALMADGE:  Did we say we don't need

13       to put stickers on the hard file?

14            MR. HOOKS:  I plan to make whatever in

15       the hard file -- whatever we don't look at

16       today I plan to make part of the supplemental

17       exhibit file.  So I plan to get it all.  I

18       don't know that it matters to me.  If we've

19       got a hard copy and this is exactly the same

20       thing, I'm happy to mark it.  This is

21       different.  There's at least one measurement

22       on here that's different, that's missing.

23            THE WITNESS:  Looks like it's dropped.

24      Q.    Yeah.  I tell you what, we'll do --
```

Kenneth Ashcraft

```
1       A.     Pencil it in, in the bottom?

2       Q.     No, we're going to -- I wish.

3              MR. OLINDE:  Can I pencil something?

4              MR. HOOKS:  Just made all my lawsuits a

5       lot easier.

6       A.     I brought my pen.

7       Q.     Perfect.

8              (Defendant's Exhibit Number 26

9                 was marked for identification.)

10      Q.     I'm going to show you, Mr. Ashcraft,

11      what is marked as Defendant's 25 which we've been

12      discussing and 26 which appears to be a more

13      original version.  Would you agree that 26 is the

14      more comprehensive of the two documents?

15      A.     Yes.

16      Q.     Do you see any discrepancies or

17      differences other than the fact that 26 has more on

18      it than 25?

19      A.     That's the -- it's just a misplaced

20      copy.

21      Q.     Okay.  Like the copier missed a line or

22      something at the bottom?

23      A.     Correct.

24      Q.     You agree with that?
```

Kenneth Ashcraft

```
1        A.    Yes.

2        Q.    Let's work off of 26 then for a moment.

3   Let me see it just a second, and then I'll hand it

4   back to you.  We'll get through this.

5              So this appears to be a depiction of the

6   kitchen.  At the bottom there's an L and H.  Is

7   that length and height or something else?

8        A.    Lower and higher.

9        Q.    Lower and higher.  Okay.  And then there

10  are numbers on this document that range from

11  something, like, five up to about maybe 16 or 18?

12       A.    Yes.

13       Q.    So what are these numbers?  What do

14  these numbers represent?

15       A.    Basically I took a series of char depth

16  readings at this lower level of five to five and a

17  half feet and whatever that height says, eight,

18  eight and a half feet.

19       Q.    Okay.

20       A.    And the numbers closer to the solid

21  lines are the lower numbers.  The numbers above

22  that are the higher numbers.

23       Q.    Okay.

24       A.    And char depth is just one of the tools
```

1    I use to refine my theory that the area of origin

2    was in the southwest corner.

3        Q.    Okay.  Very good.  I'm going to come

4    back to that in just a moment.  I want to get some

5    preliminaries out of the way so we do this in the

6    most efficient way I can.

7            Real quick, so we're really getting into

8    your determinations and your opinions now so I want

9    to ask this.  Is there anything that you feel you

10   still need to do to finalize your opinions?

11       A.    I'm comfortable where I am now unless

12   other information becomes available.

13       Q.    Well, what other information would

14   become available that would cause you to change

15   your opinion?

16       A.    I don't know at this time.  If there's

17   evidence produced in this process, then I would

18   review that and consider it.

19       Q.    Okay.

20       A.    I don't believe it will necessarily

21   change my opinion.

22       Q.    Has plaintiff's counsel asked you if you

23   need to do anything further to finalize your

24   opinion?

Kenneth Ashcraft

```
 1       A.    I'm sorry?

 2       Q.    Has plaintiff's counsel asked you if

 3  there's anything you want to do to finalize your

 4  opinion?

 5       A.    There's nothing -- they've asked if I

 6  needed to do any more work.  But I don't feel

 7  there's anything I need to do now.

 8       Q.    So you told them I'm done, I've done my

 9  analysis?

10       A.    I have formed a conclusion but pending

11  further information I'm -- my conclusions were

12  this.

13       Q.    Okay.  All right.  One more thing.  So

14  we've been talking the -- a whole lot of

15  questioning here about your hypotheses throughout

16  this case.  I want to talk a minute about something

17  in 1033 which is called confirmation bias.  Can you

18  explain to me what confirmation bias is?

19       A.    There's a confirmation bias in a -- I

20  believe there's an expectation bias.  Basically a

21  predetermined conclusion -- and I can't remember

22  exactly which one is which.  One is a predetermined

23  conclusion and the other is a -- the same facts

24  could fit a different theory.
```

Kenneth Ashcraft

1       Q.     Okay.  So in the case of the

2   predetermined conclusion, how would that work in a

3   fire case?

4       A.     Somebody walks into an investigation

5   with a predetermined conclusion in their mind or

6   predetermined outcome in their mind and works

7   towards that end.

8       Q.     Okay.  And then the other one you

9   mentioned was what now?

10      A.     I believe it's confirmation and

11  expectation -- I don't remember the wording

12  specifically.

13      Q.     Okay.

14      A.     But it's where the facts of the case may

15  also fit another conclusion.

16      Q.     Okay.  And so how does 1033 recommend

17  that you avoid confirmation bias or expectation

18  bias?

19      A.     It's discouraged.  It's not the proper

20  way to do an investigation at all.  Avoid at all

21  costs.

22      Q.     Right.  So how do you avoid it?

23      A.     By not drawing a predetermined

24  conclusion, by performing my investigation from

Kenneth Ashcraft

```
 1   point A to point Z and not start at D.

 2        Q.    Okay.  So in the context of a fire

 3   investigation when you formulate an initial

 4   hypothesis, when you first walk on the scene of a

 5   fire or are -- or a fire that's been put out, what

 6   are you trying to do in order to make sure you

 7   don't succumb to confirmation bias?

 8        A.    I go in with an open mind as much as

 9   possible.  Everything is on the table from A to Z,

10   potential causes, potential -- you know, points of

11   origin, could be interior, could be exterior, could

12   be anything from weather, accidental, electrical.

13        Q.    Sure.

14        A.    Kitchen fire.  Could be anything.  I

15   just know I didn't do it.

16        Q.    Sure.  So you walk in, though, and you

17   begin an investigation and it's got to happen,

18   right, that you form an initial hypothesis?  You

19   look around the room and you say, you know what, my

20   first instinct is that it started here or here or

21   whatever, right?

22        A.    You start that process, yes, when you

23   pull in the driveway.

24        Q.    Right.  So we'll say you get done with
```

Kenneth Ashcraft

1   the first day of a scene inspection.  And your mind

2   is telling you -- your initial analysis says I

3   think it's this, whatever that may be.  What do you

4   do -- what does NFPA 1033 tell you to do in order

5   to not succumb to confirmation bias?  You've got an

6   initial hypothesis.  What do you do with that?

7       A.    You test your hypothesis.  Once you

8   collect the data and you analyze it and you start

9   making mental decisions, is this possible, is that

10  possible.

11      Q.    Okay.

12      A.    Is this a potential ignition source?  Is

13  this?

14      Q.    Okay.  And what do you try to do when

15  you test it?  What are you trying to accomplish

16  there?

17      A.    To determine if it's a possible -- a

18  competent or -- or just a possible cause.  Is this

19  scenario possible.

20      Q.    So are you looking to see if you can

21  make the facts fit that initial hypothesis?

22      A.    No, that would be backwards.

23      Q.    All right.  Are you trying to disprove

24  the hypothesis then?

Kenneth Ashcraft

1       A.    Yes.  You always are working to disprove

2   your own hypothesis.  You're testing the theory.

3       Q.    All right.  Okay.  We'll come back to

4   this.

5             So when you start a fire investigation,

6   what types of information are you trying to use to

7   determine point of origin?

8       A.    In determining the point of origin I

9   work in a from-least-damage-to-most-damage path.

10  Basically I want to do -- I want to identify the

11  least damaged areas and refine it down to the most

12  damaged area.  And once I get a sense of what area

13  of the home or section or part is fire damaged,

14  then that reduces the investigation area for fire

15  damage.  Then you refine that to a room of origin

16  if there is a single room of origin.  And then you

17  refine that to an area of origin.  And then you do

18  your best to get it down to the smallest point of

19  origin you can.

20      Q.    Okay.  All right.  As we said earlier we

21  have already made the report that was conducted and

22  prepared by you and Mr. Castellano as an exhibit to

23  his deposition, and I'm going to provide that to

24  you now.

Kenneth Ashcraft

```
1              So I'm showing you what I've marked as

2     Defendant's Exhibit 3 again from Mr. Castellano's

3     deposition.  Do you recognize that report?

4          A.    Yes.

5          Q.    And who created it?

6          A.    It was jointly between Paul Castellano

7     and myself.

8          Q.    When you say it was jointly prepared,

9     how exactly does that work?

10         A.    I prepared the first section including

11    the photographs and attached the incident report.

12    And then Paul's section basically picked up in --

13    with the photographs and the summary, electrical

14    summary, that are behind the fire department

15    report.

16         Q.    Okay.  And which came first, his report

17    or your report?

18         A.    Mine.

19         Q.    Yours came first and then he

20    supplemented?

21         A.    Correct.

22         Q.    Okay.  So how did you reach your

23    determinations regarding the electrical portions?

24         A.    Basically --
```

Kenneth Ashcraft

```
1       Q.     Did you do that or did he?

2       A.     Repeat.

3       Q.     Your report contains a summary of all

4    findings, both those related to burn patterns as

5    well as those which were related to the electrical

6    causes.  Who -- how did that work between the two

7    of you?

8       A.     You distracted me.  I'm going to have to

9    get you to repeat that again.

10      Q.     Sure.  I'm going to sit down first.  So

11   this report contains both findings relating to your

12   investigation of burn patterns, fire damage, and

13   things like that.  And it also contains some

14   conclusions regarding electrical forensic

15   determinations?

16      A.     Right.

17      Q.     How did you prepare the electrical

18   portions if it was your report?

19      A.     The only -- I did not prepare the

20   electrical portion or summary or photographs.  That

21   was Paul Castellano.

22      Q.     Right.  And your report, though,

23   references a lot of the same language as in his

24   electrical summary?
```

1      A.    My conclusion is the failure of the

2  refrigeration -- the refrigerator's electrical

3  system was the ignition source of the fire.  His is

4  a more detailed explanation of how that process

5  occurred.

6      Q.    Okay.  So the determination as to cause

7  was yours and then his details that?

8      A.    It was ours.  He verified that there

9  were potential ignition sources within the

10  refrigerator.  He explained to me basically how

11  that would have happened.  My investigation

12  concluded that an electrical failure was the cause

13  of the fire.

14      Q.    Okay.  So on your report under Summary

15  of Findings, I want you to start with the second

16  bullet there which of course repeats what you

17  already told us this morning, point of fire origin

18  you determined to be the refrigerator in the

19  southeast corner of the kitchen.  And this

20  conclusion you say is supported by burn patterns

21  and fire damage in the area of the fire origin; is

22  that right?

23      A.    There's some -- I have both southeast

24  and southwest in the report.  It was an error that

Kenneth Ashcraft

```
 1    was missed.

 2         Q.    Which one is correct?

 3         A.    It was the southwest corner of the room,

 4    the building faces west.  The refrigerator was

 5    located in the southwest corner.  So the second

 6    bullet -- and what is your question?

 7         Q.    I was just reading it.  That was your

 8    opinion, right?

 9         A.    Yes.

10         Q.    Okay.  So you say that this conclusion

11    is supported by two things, burn pattern and fire

12    damage.  So I would like to start with -- before I

13    do this right here, again, is Defendant's Exhibit

14    26 that you provided me.  You call this a char

15    depth chart; is that right?

16         A.    Yes.

17         Q.    So would this be something that would

18    show a burn pattern, something that would show fire

19    damage or something else?

20         A.    Both.

21         Q.    Both.  It shows -- let's start then with

22    pictures, and we'll move to -- we'll move to that.

23              (Defendant's Exhibit Number 27

24                was marked for identification.)
```

Kenneth Ashcraft

1        Q.     I'm showing you what I've marked as

2    Defendant's Exhibit 27.  This is a photograph taken

3    by the Dothan Fire Department when they arrived on

4    the scene that night.  Does that depict the area

5    with the fridge included?

6        A.     Yes, this would be in the kitchen facing

7    south.

8        Q.     Okay.  But the refrigerator is in the

9    way of seeing things like fire patterns, right?

10       A.     I mean, it -- yeah, it obstructs some

11   view of the southwest corner.

12              (Defendant's Exhibit Number 28

13                was marked for identification.)

14       Q.     Sure.  I'm going to provide you a

15   picture without the refrigerator in it.  This is

16   what I marked as Defendant's Exhibit 28.  That's an

17   area without the fridge, correct?

18       A.     Correct.

19       Q.     And that's still kind of zoomed out.  So

20   what I'm going to do, I'm going to show you another

21   picture here.  And this is more zoomed in.  This is

22   without the refrigerator.  This is taken by the

23   Dothan Fire Department when they arrived on the

24   scene.

Kenneth Ashcraft

```
 1                 (Defendant's Exhibit Number 29

 2                  was marked for identification.)

 3      Q.    That's Defendant's Exhibit 29.  Do you

 4  agree that that's the southwest corner of the

 5  kitchen?

 6      A.    Yes.

 7      Q.    Okay.  And can you see clearly in that

 8  photograph burn patterns and the appearance of that

 9  area as it looked when you visited the home?

10      A.    Yes.

11      Q.    Okay.  Would you please -- I'm going to

12  hand you a red China marker.  If you would please

13  take that and outline for me the burn pattern that

14  you see on that photograph.

15      A.    There are burn patterns.

16      Q.    Burn patterns in -- specifically in the

17  area of origin.  If we need another photograph to

18  look at other patterns, we can.  But I'm looking at

19  that corner itself where that refrigerator was

20  placed.

21      A.    Right.  There's char patterns throughout

22  the room.  The wavy lines will just be char

23  patterns.

24      Q.    Okay.
```

1      A.     There are patterns in the wall including

2   a burned-through hole and a switch and a broken

3   board.  And the board is laying here.

4      Q.     Uh-huh.

5      A.     There are -- there's a protected area

6   where the refrigerator was sitting.  And that will

7   be an arc at the base of the middle of the photo.

8   And like I said, the wavy lines are char patterns.

9      Q.     Okay.  All right.  I -- we need to cover

10   this a little better.  What is a burn pattern?

11      A.     A burn pattern is the effect of fire on

12   combustible materials.

13          MR. KING:  I don't mean to bother you.

14      I'm trying to see what you're drawing.  Is

15      that okay?  If I'm bothering you, I'll move.

16          THE WITNESS:  You're distracting me.  We

17      can pass it around.

18          MR. KING:  No, I'll move.

19      Q.     So when you say it's an effect -- what

20   was your -- what was your definition again?

21      A.     Fire damage is the effects of the

22   combustion process on materials.

23      Q.     Okay.

24      A.     Char patterns, smoke, soot deposits,

Kenneth Ashcraft

1    lots of different things.

2        Q.    Okay.  All right.  So when I asked you

3    to draw me a burn pattern, though, you're aware

4    that there is a term in NFPA that describes how to

5    identify burn patterns, right?

6        A.    Yes.

7        Q.    Okay.  And typically -- we already

8    talked about this earlier with cooking fires.  When

9    you describe a burn pattern, what are you -- what

10   are you trying to mark and show?

11       A.    There are all types of burn patterns.

12   There's saddle burns.  There's V-shaped burn

13   patterns.  There's all different --

14       Q.    And what I'm trying to determine is I

15   want to see the burn pattern that helped you to

16   determine that this was the area of origin of this

17   fire.  I'll tell you what I'm going to do.

18       A.    It's all inclusive.

19       Q.    Okay.  I'll tell you what I'm going to

20   do.  I'm going to give you --

21       A.    There's no --

22             (Defendant's Exhibit Number 30

23                was marked for identification.)

24       Q.    I'm going to give you what I -- if it's

Kenneth Ashcraft

```
 1   not a duplicate, it's darn close to it.  I'm

 2   marking this Defendant's Exhibit 30.  This timing

 3   -- and I see what you've drawn.  And I appreciate

 4   that.  What I'm trying to find out, though, is I'd

 5   like you to draw for me the burn pattern, the

 6   specific burn pattern, or patterns, that you used

 7   in this case to determine the area of origin from

 8   this fire.

 9        A.    That's going to take multiple pictures.

10        Q.    Okay.  I've got lots of pictures.  I'm

11   looking primarily to see if you have a pattern that

12   would show me, for instance, the propagation of

13   this fire.

14        A.    Okay.  Then we need a picture of this

15   room --

16        Q.    In this area --

17        A.    These are all included in my

18   interpretation of the burn patterns.  But now we

19   also need to see a view of the room facing north.

20        Q.    Okay.  Let's -- I just want to stick

21   with one place at a time.  Okay?

22        A.    And we did.  That's what I showed you

23   here.  These are all -- these are all identifiable

24   burn patterns.
```

Kenneth Ashcraft

1      Q.      All right.  Let's do it this way then.

2    Back to Defendant's Exhibit 29, you have drawn sort

3    of a horseshoe looking shape at the bottom of this

4    photograph, which you said was something like a

5    protection -- what did you call it?

6      A.      It appears to be a protected area where

7    the refrigerator was at the time of the fire.

8      Q.      Okay.  Does that pattern that you've

9    marked in any way indicate to you anything about

10   this fire?

11     A.      It tells me that the fire did not

12   originate at the base of the refrigerator or at the

13   base of the wall.

14     Q.      Okay.  So it does not show the fire?  It

15   shows areas that don't indicate a point of origin,

16   right?

17           MR. TALMADGE:  Object to the form.

18     Q.      Is that incorrect?

19     A.      Repeat the question.

20     Q.      The area that you called a protection

21   pattern or whatever you called it --

22     A.      Protected area.

23     Q.      Protected area shows you where a fire

24   did not originate, correct?

1       A.      It is an indicator that the fire did not

2   originate below in that southwest corner.

3       Q.      Okay.  On the ceiling you have marked

4   two -- I'm going to call them "squigglies."  I've

5   got two what I'm going to call squigglies or three

6   on the wall that you said were char patterns; is

7   that right?  Is that the right word or smoke, or

8   what did you say?

9       A.      Those are char patterns.

10      Q.      Char patterns.

11      A.      And not meant just to be restricted to

12  the squigglies as you call them.

13      Q.      That's fine.

14      A.      It's all-inclusive, just like I said.

15      Q.      Okay.  And what do those tell you about

16  the area of origin of this fire?

17      A.      If you look at this and in the whole

18  context of the room, the char to me appeared to be

19  deeper and heavier in this section of the room.

20      Q.      Okay.  And is that the ones on the

21  ceiling or the ones on the wall?

22      A.      All-inclusive.

23      Q.      All-inclusive.  Okay.  You've got a

24  circle with an arrow pointing up.

Kenneth Ashcraft

1    A.    That's a -- the circle is indicating the

2    burn-through near the wall switch.

3    Q.    Okay.

4    A.    The arrow is indicating a board that's

5    missing and then there's another arrow facing down

6    on the board that was reported -- that was in that

7    location.

8    Q.    So your -- the circle around or near the

9    electrical switch you said that was burn-through?

10   A.    Correct.  The wall was burned through to

11   the interior cavity in that location.

12   Q.    And does that indicate anything about

13   where the fire originated?

14   A.    It's a burn pattern.  It doesn't

15   necessarily indicate where the fire originated.  It

16   could be a leftover smoldering spot that the fire

17   department got to last.

18   Q.    Or if there was sufficient air flowing

19   around that wall switch, you could have air flowing

20   through that could cause that burn, right?

21   A.    That's --

22   Q.    So that doesn't indicate a point of

23   origin for a fire, does it?

24   A.    In itself, no.

Kenneth Ashcraft

```
 1        Q.    And you have a board which is missing

 2   and you showed us where it was and where it is

 3   now.  Does that board have anything to do with

 4   demonstrating the area of origin in this fire?

 5        A.    Not in itself.

 6        Q.    Okay.  So the thing that you identified

 7   that you're relying upon to identify area of origin

 8   as you've marked it in this photograph is -- are

 9   the areas that are char patterns, correct?

10             MR. TALMADGE:  Object to the form.

11        Q.    Is that what you called them, char

12   depth?

13        A.    Repeat the question.

14        Q.    The things which I have so humorously

15   called squigglies in that photograph --

16        A.    Yes.

17        Q.    Because the protected area does not

18   indicate the area of origin of the fire, does it?

19   Does it indicate an area of origin?

20        A.    A protected area would in -- typically

21   is excluded as the point of origin.

22        Q.    Okay.

23        A.    I can tell you that the fire did not

24   start in this outlet based on this burn pattern
```

Kenneth Ashcraft

1   because it's relatively undamaged versus the upper

2   section of the room.

3       Q.    Okay.  So we agree then, I think.  But

4   that doesn't show the area of origin of the fire.

5   It shows the area the fire did not originate?

6       A.    Correct.

7       Q.    Okay.  The circled area of burn-through

8   doesn't indicate the area of origin, correct?

9       A.    You're talking area of origin?

10      Q.    The point of origin.

11      A.    The area of origin to me is the

12  southwest --

13      Q.    Yeah.  I'm asking what in that

14  photograph shows it?  And I'm trying to repeat what

15  I think you said, which was that the circle

16  depicting the burn-through does not in itself

17  indicate that this was an area of origin, correct?

18      A.    Correct.

19      Q.    Okay.  And the board, again, which we've

20  shown, doesn't indicate the area of origin, right?

21      A.    By -- yes.

22      Q.    By itself?

23      A.    Yes.

24      Q.    Because we can't even see what that

Kenneth Ashcraft

1    board looks like from that photograph, correct?

2        A.    Right.

3        Q.    So you have these other squigglies on

4    the ceiling and the wall.  And what do you call

5    those?

6        A.    That is char pattern.

7        Q.    Char pattern.  And I know the squigglies

8    are not specifically --

9        A.    Points.

10       Q.    -- points.  They are there showing the

11   general area.

12       A.    We would have to color in this whole

13   picture.

14       Q.    Right.

15       A.    So now you have one piece of my

16   hypothesis, and that is backwards from what I --

17   what you want to work, from least damage to most

18   damage.

19       Q.    Okay.  Let's take this photo and start

20   with this.  You're talking about a -- again, one

21   more time, a char pattern or char depth.  What did

22   you call it?

23       A.    This would be char.

24              (Defendant's Exhibit Number 30

```
 1                      was marked for identification.)

 2      Q.    I want you on this -- this is

 3   Defendant's Exhibit 30.  This is a different

 4   photograph.  I would like you to show me excluding

 5   the protected area, excluding the burn-through,

 6   excluding the board, I would like you to show me on

 7   this photograph the patterns you see that indicate

 8   that the southwest corner of the refrigerator --

 9   excuse me, southwest corner of the kitchen is the

10   area of origin of this fire.

11              MR. TALMADGE:  Object to the form.

12      A.    I need more pictures.  If you want to

13   start --

14      Q.    What do you need?

15      A.    I need a picture facing north.

16      Q.    Where --

17      A.    To show you the area of least damage to

18   most damage.  The room is extremely small.  It's

19   hard to get good vantage points.  This is a good

20   picture of what I've reduced to the area of origin,

21   but there's other evidence in the room that helped

22   me reach that point.

23      Q.    All right.

24      A.    So what I've told you so far is the char
```

1    patterns, the -- there are numerous patterns.

2        Q.    The NFPA 921 defines a fire pattern or

3    burn pattern as the visible or measurable physical

4    changes or identifiable shapes formed by a fire

5    effect or group of fire effects.  What I want to

6    see in this photograph is what visible or

7    measurable physical changes or identifiable shapes

8    were formed by a fire in this area.

9             MR. TALMADGE:  Object to the form.

10       A.    That's what I was -- I told you this.

11   This is why I done a char depth sequence.  The char

12   depth is a burn pattern.  It is a -- what was your

13   definition -- visible effect of --

14       Q.    Do we agree on 26?  We agreed on 26.

15       A.    The patterns are better visible from a

16   different vantage point.

17       Q.    All right.  Well, I want to stick with

18   this area for a moment.  You've got a char depth

19   sequence here, correct?  That's Defendant's Exhibit

20   26.

21       A.    Yes.

22       Q.    Don't mark anything else.  So you've

23   given me these numbers.  I've got numbers right

24   here by the -- close to the lines that you've

Kenneth Ashcraft

```
1    drawn.  And you say those are from the lower area

2    of the kitchen, and you've got these numbers that

3    are sort of spaced away from the line at the outer

4    perimeter of this photo, this drawing.  And you say

5    they represent the effects of the higher level,

6    correct?

7         A.    Correct.

8         Q.    Now, how did you measure these numbers?

9         A.    I used a standard tire depth gauge.

10        Q.    Okay.

11        A.    And I proceeded from this --

12   approximately this point around the room, around

13   the upper level of the room to -- which is not

14   visible in this picture, but I stopped over the

15   stove area.

16        Q.    But if you're using a tire -- you said a

17   tire depth, like to measure the depth of a tire

18   tread, right?

19        A.    Correct.

20        Q.    And so how exactly do you measure it

21   using -- you're talking about wood.  So it's an

22   impenetrable surface, not like you jam holes in

23   something.  How do you do it?  I'm sorry.  I'm a

24   novice.  How do you do this?
```

Kenneth Ashcraft

```
1        A.      You place the flat portion against the

2    surface of the char.  You try to be as consistent

3    as possible, and you press the gauge into the

4    char.  And where it stops gives you a reading on

5    the shaft which is a tool to help establish a char

6    depth.

7        Q.      Okay.

8        A.      So these are readings from the measuring

9    shaft of the tire depth gauge in the kitchen area.

10       Q.      When did you do this?

11       A.      During -- I believe -- started -- I

12   would have to look at the pictures to give you the

13   dates.  I started during one of our lab exams I

14   believe.

15       Q.      Okay.

16       A.      And I don't know when I finished up and

17   actually made this drawing.  I would have to go

18   back and look.

19       Q.      And, again, I apologize because I am a

20   novice at this.  But do you -- are you physically

21   inserting this measurement into the wood somehow?

22   I'm trying to figure out how you're getting this

23   measurement of depth.

24       A.      Yes.  Just like I described to you.  You
```

Kenneth Ashcraft

```
 1   place the flat surface of the gauge against the

 2   surface of the char.  And you try to remain as

 3   consistent as possible on your pressure, and you

 4   push the gauge into the wood, the charred wood, to

 5   establish a char depth.

 6        Q.    Okay.  And did you take any photographs

 7   of yourself doing this?

 8        A.    Yes.

 9        Q.    And they're in the file?

10        A.    Yes.

11        Q.    So if I looked on -- would this be on

12   the December 11, 2013 visit or would this be

13   January 28th?

14        A.    I couldn't tell you.  We would have to

15   just look through them.

16             MR. HOOKS:  Ready to take a break.

17                  (Off the record.)

18             MR. TALMADGE:  So what we're doing is

19        substituting the original of Defendant's

20        Exhibits 21, 22, 23, and 26 for color copies.

21        And I'm putting the color copies on the pile,

22        and I have the originals that will go back in

23        the expert's file.  And he will retain those

24        if there's ever an issue about it later.
```

Kenneth Ashcraft

1   BY MR. HOOKS:

2       Q.    Mr. Ashcraft, when we took a break we

3   were trying to go through some fire patterns.  And

4   you had said that it would be easier for you to

5   show me your analysis if we found you some

6   different photographs.  So I pulled what I hope are

7   helpful photographs.  And if they are not, by all

8   means let me know and we'll go through and see what

9   we need to do.  First, before I mark it, you said

10  something about the north side of the kitchen.  Is

11  this what you would like?

12      A.    Yeah, there's a cleaner picture but this

13  will work.

14      Q.    If you know where to find a cleaner

15  picture, that would be great.  I just -- what would

16  you like to see specifically?

17      A.    There are photos after the evidence has

18  all been collected, the room is -- all the

19  appliances and things and floor is clean, and you

20  actually have a better view of the pattern.

21      Q.    Well, if there's a photo that you think

22  you could find, I'm happy to have it printed.

23      A.    If I can use this -- I think there is a

24  good picture in here and then we can work with that

1    one.

2         Q.    Okay.

3         A.    These are black and white.  In my report

4    it's number 14, view of kitchen facing north.

5    That's probably a little better than --

6         Q.    So you're okay with using this one?

7         A.    Yeah.

8              (Defendant's Exhibit Number 31

9                was marked for identification.)

10        Q.    I'll mark it as Defendant's Exhibit 31.

11   And it is a shot of the kitchen facing north

12   towards the window and the kitchen sink?

13        A.    Correct.

14        Q.    Okay.  So does this help you to do your

15   analysis, show your analysis?

16        A.    It helps, yes.

17        Q.    All right.  Well, go ahead and show me

18   what you'd like to -- burn patterns, fire patterns,

19   char, whatever you think would --

20        A.    All right.  This is an overview of the

21   kitchen facing north.  You have, again, have a

22   wooden ceiling so you have a char pattern in the

23   ceiling.  And this photo and my interpretation of

24   the patterns in the ceiling were that the char was

Kenneth Ashcraft

1    heavier in the southwest corner.

2        Q.    Okay.

3        A.    As you're looking at this photo from

4    this direction, you have a significant char pattern

5    on this end of the cabinet and this end of the

6    cabinet, and I'll put one in the ceiling as well.

7        Q.    Well, now you're -- I apologize.  We're

8    back to squigglies a little bit here.  I know

9    you're indicating areas.  Is the char pattern a 921

10   term?

11       A.    Depth of char, the effects of the fire

12   as fire damage.  This is what I -- one of the

13   things we look at.

14       Q.    Okay.

15       A.    I'm not sure if it specifically has a

16   definition in 921, but 921 does address char.

17       Q.    Let me say this before we get going any

18   further.  And I appreciate you trying to show me

19   areas.  But what I'm truly interested in today is

20   patterns.  So if you see char patterns I'd like you

21   to mark char patterns.  It really doesn't help me

22   much for you to simply squiggly an area and say

23   there's char in this area.

24       A.    This is a pattern.  Now I'm showing you

Kenneth Ashcraft

1    the transition from this area to the first photo

2    29.

3         Q.    All right.

4         A.    This char pattern in the ceiling in the

5    north section of the room is less intense, less

6    damaged than the char pattern in the ceiling in the

7    southwest corner.

8         Q.    Okay.  So show me the pattern.

9         A.    So there's a relation between --

10        Q.    Okay.

11        A.    Now, you've got -- actually got a

12   pattern -- I think one of the -- one of the things

13   you want to see, a pattern, is a V pattern.  Now in

14   this --

15        Q.    There's lots of patterns.

16        A.    Well, there's lots of patterns,

17   correct.  But here you can see on the east wall

18   there's a recognizable pattern coming from this

19   direction of the room from the south direction.

20        Q.    I'm sorry.  Turn that -- I can't see --

21   so you're seeing that coming from -- looks like the

22   bottom right side of the cabinet to the right of

23   the microwave and dishwasher?

24        A.    Right.

1     Q.    Going up towards the far left side which

2   appears to be almost all the way to the far north

3   kitchen wall?

4     A.    Right.

5     Q.    Okay.  You see a pattern there, right?

6   That's why you've marked it?

7     A.    There is a pattern evident in the west

8   wall as well kind of moving low to the -- from the

9   south to higher in the north.

10    Q.    Again, flip it over and let me take a

11  look and see.  So now we're on the cabinet that is

12  across the doorway from the refrigerator.  Moving

13  again sort of up and towards the wall that holds

14  the kitchen window?

15    A.    The west wall going towards the north,

16  yes.

17    Q.    Okay.  So what -- using a term that I

18  would find in 921, what would you call this

19  pattern?

20    A.    It's part of a V pattern where you've

21  got an incline from this level to this level

22  showing that the fire was a little lower and more

23  intense on this level.  The damage is greater

24  towards the south than the north.

Kenneth Ashcraft

```
 1      Q.    Okay.  All right.  So now this looks

 2   like -- what would you call that, an inverse V

 3   pattern?  Looks like the V is actually coming from

 4   top to bottom, right?

 5      A.    The base of the V that I'm illustrating

 6   here is at basically the base of the wall mount of

 7   the cabinets.

 8      Q.    Right.

 9      A.    Towards the north.

10      Q.    Okay.  And, also, towards the -- is it

11   also going toward the ceiling?  I know we're not

12   dealing with a 3D object here.  I'm trying to get a

13   sense of whether it's going flat across the room or

14   it's going at an angle?

15      A.    It's going at an angle.  You've got --

16      Q.    Approaching the ceiling of the north

17   wall?

18      A.    Correct.

19      Q.    Okay.  I've got you.  Is there anything

20   else in that photograph that --

21      A.    You've got -- the north cabinets under

22   the sink have much less fire damage than the face

23   of the west wall cabinet facing the refrigerator.

24      Q.    Okay.
```

Kenneth Ashcraft

1      A.      So what do you want there?

2      Q.      Is there a pattern?

3      A.      This is fire -- interpretable fire

4   damage.  This is less damage than this damage.

5      Q.      Okay.

6      A.      So there's not really a pattern, like I

7   said about the char.  It's not a pattern.  It's a

8   --

9      Q.      Okay.  Don't mark anything for now, and

10  we'll come back to it if we need to make additional

11  marking.  I'm trying to get a sense of the scope of

12  your opinions.

13     A.      Okay.  So these patterns show me the

14  area of origin is towards the south side of the

15  room.

16     Q.      Okay.

17     A.      So now we go -- here is picture number

18  17.

19     Q.      Hold on, a quick question for you.  So

20  the south side of the room would be more towards

21  the hallway and the refrigerator and the table?

22     A.      Yes.

23     Q.      Than it would be the kitchen window and

24  areas like that, right?

Kenneth Ashcraft

```
 1        A.     Yes.

 2        Q.     All right.  What photograph -- what

 3   would you like to see next?

 4        A.     Rotating around the room clockwise,

 5   number 17 in my report is a view of the kitchen

 6   facing northeast.

 7        Q.     14?

 8        A.     We're on --

 9        Q.     Is that what you want to see -- no, no,

10   no.  We were on 14 and now you want to go to what?

11        A.     17.

12        Q.     Okay.  Would this work?

13        A.     That would work.

14               (Defendant's Exhibit Number 32

15                 was marked for identification.)

16        Q.     So I'm showing you what I've marked as

17   Defendant's 32 which is depicting the area of the

18   stove, dishwasher, microwave, cabinets, and other

19   things like that?

20        A.     Right.

21        Q.     So show me what you see in this

22   photograph.

23        A.     Here you've got a little bit of a

24   conflicting pattern because you've got the partial
```

Kenneth Ashcraft

```
1    V going in this direction, but you've also got an

2    isolated V pattern in -- above the stove.

3         Q.    Okay.

4         A.    So this was something that I considered

5    during my thought process to reach an area of

6    origin.  There is a -- there is a burn pattern over

7    the stove area.

8         Q.    Okay.  And what pattern is that under

9    NFPA 921?

10        A.    That would be considered a V shape

11   pattern.

12        Q.    Okay.  So now you've also got this other

13   pattern you see here, and I'm just going to grab it

14   from you for a moment and see if I can -- so you've

15   got another pattern going from -- I think you

16   previously drew this in the last --

17        A.    Yes.

18        Q.    -- another view?  This is the same one,

19   right?

20        A.    Another view along the east wall.

21        Q.    Okay.  So this just shows it going from

22   the bottom of the cabinet up towards the top left

23   of the north -- no, the --

24        A.    Higher towards the north wall.
```

1       Q.      Yeah, towards the north wall along the

2    east wall?

3       A.      Correct.

4       Q.      Okay.  And kind of across the V pattern

5    that you're also showing was a slightly more curved

6    illustration of it directly above the stove,

7    correct?

8       A.      Correct.

9       Q.      All right.  Is there anything else in

10   that photo that you see?

11      A.      You can see there's a lower, lower area

12   of burn towards the south of the room so versus --

13   the south versus the north, you've got a lower burn

14   area towards the south versus the north.

15      Q.      A lower area of burn?

16      A.      Correct.  Like I described in the other

17   photo with the cabinet face versus the north end of

18   the cabinets.

19      Q.      Okay.  All right.  So let me stop.

20   We've got two photographs.  Before we go any

21   further I'd like to go back to Defendant's Exhibit

22   31, and I would like to ask you if you are able to

23   identify or tell me why the -- why do you see this

24   pattern, if you can explain it.

Kenneth Ashcraft

```
 1              MR. TALMADGE:  Object to the form.

 2       Q.    I'm sorry.  That is not very good.  So

 3  you're given me an inverse V or that's what I would

 4  call it, right?  It's these two lines on

 5  Defendant's Exhibit 31 that you've already shown me

 6  going up from basically the bottom of the cabinets

 7  towards the ceiling?

 8       A.    We can call it an incline pattern.

 9       Q.    That's fine.

10       A.    A better way to describe it with the

11  lower end of the incline being the south section of

12  the room.

13       Q.    Right.  That's fine.  So can you tell me

14  what this -- how you interpret that pattern?  What

15  does it mean to you?

16       A.    When I look into this room I see the

17  damage is noticeably less to the north of the room.

18       Q.    Okay.

19       A.    There's a higher level of damage to the

20  south section of this room.

21              (Defendant's Exhibit Number 32

22                was marked for identification.)

23       Q.    Okay.  All right.  And moving to

24  Defendant's Exhibit 32, take a look at that.  And,
```

Kenneth Ashcraft

1    again, what does that tell you?

2         A.    This tells me that I have two burn

3    patterns to consider.

4         Q.    Okay.

5         A.    I have a V pattern over the stove, and I

6    have a pattern emanating in my opinion from the

7    south section of the room.

8         Q.    Okay.

9         A.    In my opinion the damage from the south

10   section of the room is greater than the V pattern

11   in -- above the stove.  And I believe that the

12   south section of the room is more probably -- more

13   the area of origin versus the V pattern over the

14   stove.  But I do have to consider this as a

15   potential point of origin and rule that out.

16        Q.    Okay.  And so let's talk about that.  So

17   how did you -- how did you rule that out?

18        A.    Over the process of the investigation

19   the -- the damage in the room as we cleaned more

20   and more out of it and as we cleaned it up more and

21   more it became more and more apparent that the

22   damage was more severe in the south section of the

23   room.

24        Q.    Okay.

Kenneth Ashcraft

1      A.    The -- I questioned I believe Mr. Laroux

2  about the cooking, if anybody had been cooking, if

3  anybody had used the stove.  And he said that no

4  one had cooked that evening.  So there was no

5  reason for -- well, I was beginning to believe --

6  or understand or learn that this was likely not a

7  cooking fire.

8      Q.    Because of the fact that Mr. Laroux said

9  no one had cooked that evening?

10     A.    That's one of the pieces of that puzzle

11 and the damage, as I said, I still feel was more

12 concentrated in the south section of the room.  If

13 I questioned him and he told me, yeah, I cooked

14 something an hour before the fire, then that would

15 be something that I would need to look at further

16 and explain why there's more damage to the south

17 section versus over the stove.

18     Q.    Okay.  Was there anything else that you

19 learned from Mr. Laroux regarding cooking?

20     A.    I don't believe he could recall if they

21 had cooked earlier that day.  His typical -- his

22 typical cooking activities would occur at around

23 lunchtime, and then they would eat the leftovers

24 for dinner, if I remember correctly.

Kenneth Ashcraft

1        Q.    Okay.  And did he say anything else

2   about that -- that related to cooking?

3        A.    I believe in -- I don't recall if it was

4   in an interview or a deposition or later

5   conversations he described the pot being on the

6   stove that had tinfoil on it that probably had

7   grease from a previous cooking event.

8        Q.    Like cooking oil or something?

9        A.    Yes.

10       Q.    And did he tell you where that was

11   located on the stove?

12       A.    No.

13       Q.    Okay.  Have you worked a cooking fire

14   that involved a pot of oil on the stove?

15       A.    Yes.

16       Q.    And did it -- was it covered in some

17   way?

18       A.    Typically a covered pot won't ignite.  I

19   mean, I don't know that --

20       Q.    But if it's covered with tinfoil, if

21   there was a hole in the tinfoil or something?

22       A.    Yeah, that could produce flammable or

23   vapors that would ignite.

24       Q.    Okay.  And would it affect whether a --

Kenneth Ashcraft

```
 1   would it affect your analysis if it was determined

 2   that the eye under that burner was on at the time

 3   of the fire?

 4       A.    If --

 5       Q.    Hypothetically.

 6       A.    One more time.

 7       Q.    Hypothetically if a burner were on

 8   underneath the cooking pot full of oil with a

 9   tinfoil cover on it, would that affect your

10   determination of maybe where the fire originated?

11       A.    Okay.  Not originated.

12       Q.    Why not?

13       A.    Because the point of origin has to be

14   determined irrelevant of the cause, the ignition

15   sources.  You have to determine the point of origin

16   before you can fully develop a hypothesis on

17   ignition sources.

18       Q.    Okay.  But you already said you had to

19   consider this burn pattern?

20       A.    I had to consider the burn pattern,

21   correct.

22       Q.    You said the reason you didn't consider

23   it was because Mr. Laroux said they hadn't cooked

24   that evening?
```

Kenneth Ashcraft

1     A.    That's part of the reason, not the

2  entire --

3     Q.    Okay.  What are the other reasons you

4  ruled it out?

5     A.    The damage present clearly shows heavier

6  damage in the south section of the room.  I believe

7  this is potentially a fire of the cooking oil

8  post-ignition like a flashover you -- pretty much

9  everything in the room is off gas and giving off

10  vapors and will become ignited.  So when -- and

11  this room did flashover at least for a short period

12  of time based on the degrees of damage I'm seeing.

13  So based on the fact that I'm still seeing more

14  heavily concentrated damage in the south section,

15  I believe this is a secondary fire.

16     Q.    Okay.

17     A.    Secondary fuel.

18     Q.    All right.  Do you know what that area

19  of the kitchen looked like before the fire?

20     A.    Later in the investigation I got a few

21  pictures of the kitchen.  I don't remember exactly

22  -- exactly when I received them or what the view

23  was.  But it led me to believe that the cabinets

24  were all the way to the ceiling instead of cut off

1   with a void space between the cabinet and the

2   ceiling.

3       Q.    Would that include right here above the

4   stove?

5       A.    Yes, I believe right here you see the

6   cabinet actually extending to the ceiling if I'm

7   not mistaken.  I believe that's what that is.

8                (Defendant's Exhibit Number 33

9                   was marked for identification.)

10      Q.    I'll mark this as Defendant's 33.  I'm

11  showing that to you.  Does that help you see a

12  little better?

13      A.    Yeah.  I think I only saw this recently.

14      Q.    Okay.

15      A.    But yes.

16      Q.    Do you see that?

17      A.    Yes.

18      Q.    And you see above the stove there are

19  cabinets that extend as far as the picture goes up?

20      A.    Yes.

21      Q.    Above the vent hood there's either

22  fascia board or cabinet or something right there?

23      A.    Yes.

24      Q.    Would you agree with that?

Kenneth Ashcraft

1     A.    Yes.

2     Q.    So where -- where are those cabinets in

3  this photograph?

4     A.    The cabinet doors are burned away.

5  There are shelving, there's visible shelving in the

6  photograph so the cabinets are here.  This would be

7  this door here.

8     Q.    Okay.  So there's -- you see the

9  cabinets above the vent hood, don't you?

10    A.    Yes.

11    Q.    In the pre-fire picture, 33?

12    A.    Yes.

13    Q.    In 32 where are those cabinets?

14    A.    The shelving is in this photograph.

15  Again, like the rest of it the doors are burned

16  away or fallen off.

17    Q.    I'm asking about the cabinets that go

18  right there above the actual stove and above the

19  vent hood.  Do you see the cabinets anymore?

20    A.    No, that's where the V shape burn

21  pattern is located above the stove.

22    Q.    And the cabinets are -- they're consumed

23  by fire?

24    A.    Yes.

1        Q.    Okay.  So let me make sure I'm clear.

2   So this -- is this wood completely burned away

3   within the V pattern that you showed me on 32?

4        A.    There's a section of shelving, yes,

5   that's burned away.

6        Q.    Okay.  How about the wood, the main wood

7   of the wall, do you see it burned away as well?

8        A.    I'd have to get a 3D view or side view

9   to remember exactly what this looked like.  But,

10  yeah, I do see the -- there's a V pattern and some

11  of the wood is consumed.

12                (Defendant's Exhibit Number 34

13                  was marked for identification.)

14       Q.    I'm showing you Defendant's Exhibit 34.

15  Do you recognize that?

16       A.    Looks like a view of the stove top in

17  place with a pot on the right front burner.

18       Q.    Okay.  And describe for me the actual

19  stove area where the controls are -- would be.

20       A.    It's -- the controls are on the back

21  elevated face of the -- in the control panel area.

22  The damage appears to be more severe on the right

23  side of the stove progressing less severely to the

24  left.

Kenneth Ashcraft

```
1       Q.    Okay.  And where is all -- what kind of

2    metal is on this stove, on the control area, right

3    here along this control area?  What kind of metal

4    is that?  Do you know?

5       A.    What kind of metal?

6       Q.    Yeah.  What kind of material is it?

7       A.    It's light gauge metal.

8       Q.    What kind of metal?

9       A.    Steel.

10      Q.    Is it steel?

11      A.    Light gauge steel or -- there's several

12   components here.  What are you referring to?

13      Q.    I'm talking about mainly the housing in

14   which all the controls and the control panel are

15   contained and to which control knobs and the like

16   would attach.

17      A.    It's light gauge metal.  I don't know

18   the specific alloy.  It's just a lightweight steel.

19      Q.    Steel.  Okay.  And what -- where is it

20   on the right side?  Where is all the light gauge

21   metal on the right side of that photograph where

22   the burner would attach and things like that?

23      A.    It's been melted away.

24      Q.    What temperature would that kind of
```

Kenneth Ashcraft

```
 1   stuff melt at?

 2        A.    19, 2,000, 2100, I would have to look it

 3   up to be sure.

 4        Q.    You're speaking of degrees, right?

 5        A.    Fahrenheit, correct.

 6        Q.    And what do you think caused that metal

 7   to melt?

 8        A.    Heat.

 9        Q.    From what?

10        A.    A fire.

11        Q.    What kind of fire?  Would a regular wood

12   fire be enough -- be able to produce enough heat to

13   do that?

14        A.    Yes, a flashover the room temperatures

15   can reach 1800, 2,000 degrees, in that range.

16        Q.    Okay.  Do you think y'all were at

17   flashover stage at this point?

18              MR. TALMADGE:  Object to the form.

19        A.    What it appears to me is that the fire

20   originated in the south section and progressed as

21   this picture is oriented from south to north and

22   affected and melted the stove control panel on the

23   south side.

24        Q.    What did, the fire?
```

1       A.      The advancing fire, correct.

2       Q.      So in what -- you've previously said

3  that you think that the oil may have ignited and

4  burned?

5       A.      Secondary to the original fire in the

6  south section of the room.

7       Q.      And what I'm asking you to tell me is in

8  your opinion as the fire progressed which came

9  first, the melting of this aluminum or the ignition

10 of the oil?  Does the question make sense?

11      A.      You'll have to repeat that one.

12      Q.      I'm asking you about the progression of

13 this fire.  You said it started over there in the

14 south corner and moved this way.  I suppose what

15 you're saying is that it moved downwards towards

16 the stove, right, or the heat moved down towards

17 the stove, correct?

18      A.      The fire progression was from the south

19 section to the stove which heated this metal and

20 caused it to melt.  This vegetable oil I believe --

21 or cooking oil that I believe was on the stove

22 would have been a part of this melting event.  So

23 yes, this -- I believe the cooking oil contributed

24 to the melting of this section of the stove, but I

Kenneth Ashcraft

```
 1   also -- but I also believe that the fire progressed

 2   from that direction.  Would this have melted to

 3   this degree without the oil here, I can't say

 4   specifically right now.

 5        Q.   Okay.  And where else in this room --

 6   you've spoken several times about the fact that

 7   you're working from areas of least damage to most

 8   damage?

 9        A.   Uh-huh.

10        Q.   Where else do we see damage on this

11   order?

12             MR. TALMADGE:  Object to the form.

13        A.   You'll have to restate that one for me.

14        Q.   Where else do you see damage that's this

15   bad?

16        A.   In the south section, southwest corner

17   of this room.

18        Q.   Okay.

19        A.   Which takes us back to the pictures.

20        Q.   Okay.  So what would you like to look at

21   next?

22             MR. TALMADGE:  Object to the form.

23        A.   That's up to you.

24        Q.   What would enable you to show me the
```

Kenneth Ashcraft

1    analysis that you made to determine the cause and

2    origin of this fire?

3        A.    This report brings me -- a picture --

4    that's the patterns in the room that brought me to

5    my conclusion that the point of origin was in the

6    southwest section of this room.

7        Q.    So is there anything else -- any other

8    photograph that you could -- that you want to look

9    at to show me how you reached this determination?

10       A.    That'll do.

11       Q.    So when you looked at Defendant's

12   Exhibit 32, you had no trouble drawing for me a

13   fire pattern or burn pattern?

14       A.    Correct.

15       Q.    You looked at Defendant's Exhibit 31.

16   You had no trouble drawing for me a fire pattern

17   going up again towards the north wall.  What I

18   would like for you to do for me now -- I tell you

19   what we'll do is we will move back to Defendant's

20   Exhibit 30 which I think is still a clean copy.

21   Can you show me on this photograph, which you say

22   is the area of the most intense fire, a fire

23   pattern that you see in that photograph?

24            MR. TALMADGE:  Object to the form.

Kenneth Ashcraft

```
 1        A.    It's the same drawings I made before.

 2   It's all inclusive.  It's two -- a photo to show

 3   you all the patterns that I showed you on the

 4   picture.

 5        Q.    Do I need to show you a zoomed out

 6   version of the picture?  Would that help you?

 7        A.    No, it's the same.

 8        Q.    The same markings.  They're all

 9   patterns, char patterns.  It's protected area.

10   It's burn-through.  I mean, there's all kinds --

11   it's the same picture -- drawing the same picture.

12   Same things over and over again.

13             So within the scope of that photograph,

14   Defendant's Exhibit 30, you don't see another fire

15   pattern you could show to me besides the one you've

16   drawn in other places in the room?

17        A.    There are patterns in this entire

18   picture.

19        Q.    Okay.

20        A.    I've already shown you on the other

21   drawing it's the exact same depiction.

22        Q.    Okay.

23        A.    The char pattern, the protected area.

24   The wall damage, the ceiling damage, the door
```

Kenneth Ashcraft

1   casing damage.  I mean, it's going to be the same

2   thing.

3        Q.    Okay.  So do you see an area in this

4   photograph where there is the most char or soot or

5   anything like that that you could show me, the most

6   intense damage, let's do it that way.  Defendant's

7   Exhibit 30, can you show me where the greatest fire

8   damage is in this room?

9        A.    (Indicating.)

10       Q.    Okay.

11       A.    That's a rough representation.

12       Q.    Okay.  And within the room what's the

13  basis that you've used to determine that this is

14  the area of greatest fire damage?  Would this be

15  the tire gauge thing, the char --

16       A.    The initial inspection of the entire

17  room.

18       Q.    Okay.

19       A.    And all -- the highest level of damage

20  going back to this area and then, yes, the char

21  depth did help me refine that and -- as my final

22  hypothesis.

23       Q.    Now, so you're pinpointing it -- is it

24  fair to say that it's sort of most concentrated in

Kenneth Ashcraft

```
 1   this corner of the room?
 2       A.   Yes.
 3       Q.   Okay.  Do fires burn hotter in the
 4   corner of a room?
 5       A.   The corner does not necessarily make it
 6   a hotter fire.  So, no, the corner does not make
 7   it ...
 8       Q.   So this is a corner that's surrounded on
 9   both sides by open doors.  Do you think that the
10   ventilation had any role in this?
11       A.   Yes.
12       Q.   What --
13       A.   I considered it.
14       Q.   What role?
15       A.   Fire searching for oxygen.  The first
16   available path to oxygen would have been through
17   entry doors.  So you have -- once the fire is
18   ignited it will travel towards those openings,
19   which in the char depth, if you'll look at that, it
20   kind of gives you a higher number at the door which
21   again accounts for ventilation opening char.
22       Q.   Is that it?
23       A.   Yes.
24       Q.   Okay.  So you've got higher char numbers
```

Kenneth Ashcraft

```
 1    at the higher locations and lower char numbers at

 2    the lower locations; is that right?

 3         A.    Yes.

 4         Q.    Okay.  So let me make sure I understand

 5    one thing which is -- just to circle back again.

 6    So we've got this area which you contend was the

 7    area of greatest fire damage?

 8         A.    Yes.

 9         Q.    This is Defendant's Exhibit 30?

10         A.    Yes.

11         Q.    This is the area for the refrigerator?

12         A.    Yes.

13         Q.    We've got -- let's see.

14         A.    A rough representation.

15         Q.    How does the ceiling look right there?

16    Is it intact?

17         A.    Not intact.  There is a location I

18    believe where a fluorescent light was located.

19         Q.    Right.  I'm talking within your circle.

20         A.    The ceiling, yes, it's intact.

21         Q.    Okay.  So I guess let me ask it this

22    way.  This is a better question.  You've described

23    already that you used char depth to determine

24    damage, right?
```

Kenneth Ashcraft

```
 1        A.     As part of my -- that's not the sole

 2   factor.

 3        Q.     Right.  So the other factor that sounds

 4   like you're using is just visual, right?

 5        A.     Visual.

 6        Q.     And what are you looking for when you do

 7   your visual inspection?  I mean, what -- again

 8   other than measuring char which you said you did,

 9   what else in this photograph shows you that this is

10   the area of greatest damage?

11        A.     The degree of damage.  The higher degree

12   of damage in this area, versus the other areas of

13   the room.

14        Q.     Okay.  So when you compare against

15   Defendant's Exhibit 32 where you've got a classic V

16   pattern over a stove with a pot of cooking oil and

17   you've got -- you know, what you said already is an

18   area where the wood -- where numerous cabinets have

19   been completely consumed.  How is it that this is

20   not more damage than this?

21               MR. TALMADGE:  Object to the form.

22        A.     The lower and higher degree of damage is

23   to the south of the V pattern at the end of the

24   cabinets.
```

Kenneth Ashcraft

```
1          Q.     Okay.

2          A.     This is the higher degree and lower

3    degree of damage.  If the fire had originated on

4    the stove, then you would have expected a more

5    consistent V-shaped pattern and more damage to this

6    left side cabinet next to the stove.  But you've

7    got lower burn to the end of the cabinets to, what,

8    three feet from the stovetop.  That's not a --

9    that's not consistent with fire propagation

10   originating on the stovetop.

11         Q.     I apologize.  You said it and you were

12   clear.  I just didn't follow it.  Say it again,

13   please.

14         A.     The damage is more severe on the south

15   end of the cabinets than the V pattern at the

16   stovetop.

17         Q.     Why is that something you wouldn't

18   expect?

19                MR. TALMADGE:  Object to the form.

20         A.     You would have to say that one again.

21         Q.     Why is that not indicative of a fire

22   point of origin?

23         A.     It is indicative of a fire point of

24   origin in the south section of the room.
```

Kenneth Ashcraft

```
 1        Q.     We're not talking about --

 2        A.     It is contradictory to the fire point of

 3   origin on the stovetop.

 4        Q.     Okay.  Your report says you made your

 5   determination on the basis of burn patterns and

 6   fire damage.  Is there anything else that you

 7   considered in making your determination of point of

 8   origin or cause, any other factors?

 9        A.     Witness statements of Gary Laroux and

10   Mr. McCuistian who both indicated the fire

11   originated in the kitchen.

12        Q.     Okay.  But in terms of determining the

13   point of origin and cause, what did you consider?

14        A.     Point of origin is what we've already

15   covered.

16        Q.     Okay.

17        A.     And now that I've determined my point of

18   origin, now we start working on cause.

19        Q.     Well, I'm trying to figure out, first of

20   all, point of origin.  Besides fire patterns and

21   fire damage, is there anything else that factored

22   into your consideration of --

23        A.     The degree of damage, yes.  The degree

24   of damage and the patterns on the refrigerator.
```

Kenneth Ashcraft

```
 1        Q.    Were there any witness statements that

 2   were relevant to your determination of cause and

 3   origin -- point of origin?

 4        A.    Yes, Gary Laroux who saw the flickering

 5   lights and eventually saw fire exiting the doorway

 6   in the kitchen.  Mr. McCuistian who saw fire coming

 7   down the hallway from the area of the kitchen.

 8        Q.    How did those -- how did those

 9   statements affect your determination of point of

10   origin after it was already determined to be in the

11   kitchen?

12        A.    It just supported my area, my room of

13   origin.

14        Q.    Okay.  But specific to the corner that

15   you've identified it in, were there any witness

16   statements useful to you to do that?

17        A.    Not to get down to that degree of

18   certainty, no.

19        Q.    Okay.  Are you aware of what the fuel

20   loads were in this room?

21        A.    Yes, the fuel loads.

22        Q.    What were they?

23        A.    All combustible materials.

24        Q.    Okay.  Pretty much the entire room is
```

Kenneth Ashcraft

```
1    full of combustible material, right?

2       A.    Exactly.

3       Q.    Was there anywhere that there was an

4    increased fuel load?

5       A.    The cabinets, the refrigerator is an

6    increased fuel load, the table and chairs are

7    increased fuel load in a cell.  Painted surfaces

8    increases your fuel load.

9       Q.    Uh-huh.

10      A.    The lack of Sheetrock doesn't increase

11   your fuel load, but you have exposed wood surfaces

12   throughout this room.  So this is a higher than

13   normal fuel load versus a modern built house with

14   Sheetrock.

15      Q.    What was the most intense fuel load in

16   the room?

17      A.    I would probably say the foam insulation

18   in the refrigerator.

19      Q.    Was the most intense fuel load in the

20   room?

21      A.    That's hard to say the most intense fuel

22   load.  You've got a -- you've got an all-wood

23   painted surface room.  So the disproportionate,

24   yes, would be the foam in the refrigerator versus
```

Kenneth Ashcraft

```
1    the rest of the room.  The table is also a large

2    fuel source because it's smaller pieces of wood

3    which will burn, readily burn.

4         Q.    What was the smaller pieces of wood?

5         A.    It's not a wall.

6         Q.    No, no, what was made up of smaller

7    pieces of wood?

8         A.    The tables.

9         Q.    The tables.  Got you.  Did you do an arc

10   map?

11        A.    No.

12        Q.    Can you tell me what kind of foam this

13   was, foam insulation it was that you're talking

14   about?

15        A.    Rigid polyurethane.

16        Q.    Okay.  And does it have a heat release

17   rate or something?

18        A.    Yes.

19        Q.    Do you know what --

20        A.    All fuels have a heat release rate.

21        Q.    What was it?

22        A.    I'm not aware of the specific heat

23   release rate of that foam.

24        Q.    What's the heat release rate of wood?
```

```
1          A.     I would have to look it up to tell you.

2          Q.     Okay.  Do you think the heat release

3     rate of the foam was higher than that of the wood?

4          A.     Yes.

5          Q.     Did you ever do any testing on that

6     foam?

7          A.     As far as heat release rate?

8          Q.     Anything.  Did you ever do any tests

9     about -- on the foam?

10         A.     Not any -- I ignited a piece of the

11    foam, yes.

12         Q.     Where did you get it?

13         A.     It was after one of our lab exams.  It

14    was all over the ground.

15         Q.     How big of a piece was it?

16         A.     It wasn't a big piece.  It was -- so it

17    wouldn't -- I didn't want to burn my finger, so I

18    guess about baseball size, tennis ball size.

19         Q.     And it was -- was it in full thickness?

20         A.     It was torn -- I mean, it was -- when we

21    were doing the destructive exam of the refrigerator

22    at Donan's lab in Birmingham, I don't -- yes, it

23    was likely full thickness.

24         Q.     Okay.  And how did you -- what did you
```

Kenneth Ashcraft

```
1    ignite it with?

2         A.    A lighter.

3         Q.    And then did Paul Castellano test it

4    too?

5         A.    He was there.  I believe this was when

6    -- you know, we were -- we were discussing the

7    confirmation of the potential ignition sources in

8    the refrigerator.  And then we started talking

9    about first fuels.

10        Q.    Okay.

11        A.    And the polyurethane foam was considered

12   a potential first fuel.

13        Q.    Okay.

14        A.    So I was basically showing him that this

15   foam is readily ignitable.

16        Q.    Were you at Dunan or were you --

17        A.    We were still at Dunan.  We were

18   cleaning up the debris from the destructive testing

19   I believe at this point.

20        Q.    And y'all just walked out the door and

21   -- I mean -- when did this happen?

22        A.    At that time day of the exam at Dunan.

23        Q.    It's a two-day exam.  Which day?

24        A.    The first day I believe was the
```

 1    destructive exam.  The second day was sifting the

 2    debris.

 3        Q.    I see, okay.  And so at the end of the

 4    day?

 5        A.    Yeah, we were cleaning up is what I

 6    recall.  I don't recall specifically what time it

 7    was or ...

 8        Q.    Okay.  So you were simply lighting it on

 9    fire to see if it would catch on fire?

10        A.    I knew it would catch on fire.  I was

11    trying to explain to Paul it was a competent first

12    fuel.

13        Q.    Okay.

14        A.    And it wasn't a -- it was just a

15    demonstration of it will catch on fire.

16        Q.    And so basically you just stuck your

17    light up to it.  How long did it take for it to

18    take off?

19        A.    Instantly.  It was an open flame

20    ignition.

21        Q.    Okay.  Now, in terms of areas of fire

22    damage, I want to understand one more thing.  I

23    apologize if this is a technical question.  But is

24    your -- when you're doing this fire damage

Kenneth Ashcraft

```
 1    analysis, is this part of your burn pattern

 2    analysis, or is this some other type of analysis?

 3    Is there a way you can classify that for me?

 4        A.    One more time.

 5        Q.    When you are looking at -- you told me

 6    that you analyzed the fire patterns and fire

 7    damage, right?

 8        A.    Yes.

 9        Q.    It sounds like two different things.  I

10    mean, what is -- how can I understand what fire

11    damage is --

12        A.    Patterns are basically industry

13    recognized effects of fire on materials.

14        Q.    Okay.

15        A.    Like I said, V patterns.

16        Q.    Okay.

17        A.    Fire grows up and out.

18        Q.    Right.

19        A.    Not affected by ventilation.  So you've

20    got a pretty standard pattern in those cases.  It's

21    not set in stone.  It is a guiding principle to

22    interpret fire point of origin.

23        Q.    Okay.  So, I mean, I guess what I'm

24    saying is I've heard of fire patterns in the sense
```

1    of movement patterns and the way it moves and

2    things like that, right?  And I've heard of

3    intensity patterns, which is like how hot something

4    got.  So when you say fire damage, is it more like

5    an intensity pattern or is it something different?

6        A.    I considered the refrigerator as an

7    extra fuel load, and I considered that -- in my

8    thought process I considered that as a contributing

9    factor to the superior damage in the south section

10   of the room.  So, yes, the heat intensity given off

11   by the refrigerator in and of itself was

12   recognized.  But putting the scenario together of

13   all the burn patterns in this room, the intensity

14   and -- I know that the heat release rate of foam is

15   higher than wood, that was all considered in my

16   point-of-origin conclusion.

17       Q.    I don't know that I'm getting the answer

18   I'm looking for.

19       A.    Okay.

20       Q.    I don't know that I'm asking the

21   question I need to ask.  How about that?

22       A.    Okay.

23       Q.    When you say fire damage, is this part

24   of your burn pattern analysis, or is this part of

```
1    some other analysis?

2        A.    It's all the same analysis.

3        Q.    It's all one analysis?

4        A.    Part of the same analysis to assess the

5    whole damage scenario and come to a point-of-origin

6    conclusion.

7        Q.    Is it part of your burn pattern

8    analysis?

9        A.    Is what part of my burn pattern

10   analysis?

11       Q.    Fire damage --

12       A.    They're all related.  Yes, but one -- it

13   is part of the other.

14       Q.    Okay.

15       A.    They are overlapping, yes.  Overlapping

16   elements.

17             MR. HOOKS:  Let's take a break.

18                  (Off the record. )

19   BY MR. HOOKS:

20       Q.    Some -- real quick, some housekeeping.

21   I asked you if you drew an arc map, and you said

22   you didn't?

23       A.    No.

24       Q.    Did Paul Castellano show you one or
```

1    provide you with one?

2        A.    No.

3        Q.    So are you -- do your opinions include

4    opinions regarding the cause of the fire as being

5    the refrigerator?

6        A.    Yes.

7        Q.    Are you prepared to discuss that in

8    depth?

9        A.    Yes.

10       Q.    So tell me your opinions about the

11   refrigerator and how this fire occurred.

12       A.    Once I got my area of origin isolated

13   and started looking at the potential ignition

14   sources in the area of origin, I found a light

15   switch, a wall outlet, and the refrigerator was

16   reportedly in this corner of the room.  And the

17   later pictures showed that.  When we called -- then

18   we called for a joint exam to get everybody

19   together and collect the evidence.  We did collect

20   the switch and the wiring.  I believe we even

21   collected that outlet at the base of the wall.  It

22   was completely -- not completely undamaged but it

23   was evident it was not the point of origin or -- in

24   that regard a -- considered a potential ignition

1    source.  And the cord for the refrigerator was

2    found intact.  The plug was intact and so it -- we

3    looked at the -- considered the wall switch, other

4    electrical wiring there, and the refrigerator as

5    potential ignition sources.

6        Q.    Okay.  So then what brought you to the

7    actual refrigerator as the point of origin?

8        A.    The fire damage to the wall outlet, the

9    wall switch, appeared to be -- although there's a

10   burned through hole, it still appeared that it

11   wasn't the point of origin.  I still felt that it

12   was a little higher.  So looking at the

13   refrigerator there's some burn patterns on the

14   backside of it that indicated that as a potential

15   point of origin.  Further examination, you know, of

16   that refrigerator confirmed my belief that the

17   refrigerator was the point of origin.  And then the

18   subsequent lab exam also indicated there was a

19   potential ignition source within the refrigerator.

20       Q.    Okay.  And what did you do -- what did

21   you pinpoint as that ignition source?

22       A.    I ruled out mechanical, the lower units

23   of the refrigerator, due to the lack of damage.  So

24   the compressor, the fan, things like that, the

Kenneth Ashcraft

```
1    power cord were ruled out.  And like I said, I feel
2    that the point of origin was actually higher than
3    that so -- and the damage to the wall, to the
4    refrigerator itself confirmed that.
5         Q.    Okay.
6         A.    I -- our examination of the refrigerator
7    indicated numerous electrical items in the body of
8    the refrigerator.  So that's when I knew I had to
9    have Paul come in to help me decipher and
10   understand the electrical system.
11        Q.    Okay.  So what conclusions did you --
12   well, did you work with Paul jointly to reach a
13   determination of cause, or did you leave that to
14   him at that stage?
15        A.    We did the exam on the refrigerator.  We
16   got together and discussed what he found.  And he
17   did indicate to me that that is a potential
18   ignition source so we started looking at other
19   items in the refrigerator, the light circuit, the
20   fan circuit.  I'm not sure what all items he
21   reviewed without looking and reading through it.
22   But the -- he did inform me that there was a
23   potential ignition source, that he felt that there
24   was a piece of harness that was damaged at some
```

1    point that would have caused a resistance heating

2    effect or heating effect to the point of failure

3    when you would have an arc point, which he did find

4    an arc point at the location near the PCB board I

5    think.

6         Q.    Okay.

7         A.    Which is higher up on the unit and I

8    don't remember the measurements, but it's towards

9    the upper section of the refrigerator.

10        Q.    Okay.  So you mentioned the point on the

11   wiring harness.  Is that the point that is the

12   point of arcing?

13        A.    Yeah, it is a point of arc.  There are

14   multiple points of arc within the refrigerator, and

15   he ruled others out for various reasons.  Again, I

16   would have to read the notes or the report again to

17   get the gist of it.  But near the PCB board is the

18   initial failure in his opinion.

19        Q.    Okay.  So you pointed to his opinion a

20   couple times now.  What I'm trying to get a sense

21   of is do you have any independent analysis on that,

22   or are you relying on Mr. Castellano's analysis?

23        A.    My -- I'm not an electrical engineer.  I

24   know that electrical failures can start fires so I

```
 1    needed a more in-depth explanation, and he provides

 2    that to me.

 3         Q.    So are you relying on his opinion, or

 4    have you reached your own independent opinion on

 5    the case on the electrical side?

 6         A.    My opinion is that an electrical failure

 7    within the refrigerator ignited the fire.

 8         Q.    Is your opinion based upon the work done

 9    by Mr. Castellano?

10         A.    Partially.

11         Q.    So describe to me what you did

12    independently of Mr. Castellano in order to reach

13    your opinion.

14         A.    I understand that the refrigerator

15    contains electrical and mechanical components that

16    can ignite a fire which are potential ignition

17    sources.  So we ruled out and -- like I said, the

18    mechanical, the lower unit of the refrigerator

19    where the compressor, the fan, the fan motor, and

20    some electrical are located.  In the upper section

21    of the refrigerator where, again, I feel that the

22    fire started higher in the refrigerator, there is

23    electrical components within the body of the

24    refrigerator.
```

Kenneth Ashcraft

1            So that's where my conclusion comes from

2    that this was an electrical failure.  He confirmed

3    that by saying that he found a point within the

4    electrical system which is a competent ignition

5    source.

6        Q.    Okay.

7        A.    It corresponds to my point of origin.

8        Q.    Okay.  That -- okay.  So you made a

9    point of origin determination that was not

10   specifically to the corner of the room where the

11   refrigerator was, but a general area on the wall.

12   And I'm trying -- I'm asking you -- and then Paul

13   Castellano found evidence of electrical arc in the

14   area where he says the fire started.  And those two

15   points basically correlated with one another?  Is

16   that what you're saying?

17       A.    Yes.  And based on the damage to the

18   interior of the refrigeration unit which again

19   shows me that the fire was internal to the

20   refrigerator.

21       Q.    Okay.

22       A.    So my point of origin, you know, was not

23   just at the back but internal to the refrigerator.

24       Q.    Okay.  So I just want to make sure.  So,

Kenneth Ashcraft

```
 1    I mean -- because we've gone over extensively with

 2    Mr. Castellano all the electrical components

 3    yesterday in his deposition.  And I'm trying to

 4    make sure and confirm that the two of you while

 5    working together did separate portions of that

 6    investigation in the sense that your -- you didn't

 7    engage in an examination specific to whether wiring

 8    arced or whether it was melted?

 9         A.    No.

10         Q.    Right?

11         A.    I did not.

12         Q.    You didn't evaluate whether the wiring

13    was necessarily a competent ignition source beyond

14    just the surface level review, right?

15         A.    Correct.

16         Q.    Okay.  Okay.  You didn't do any arc

17    mapping to try to see if that would make sense

18    electrically within the scope of the room or the

19    fridge?

20         A.    No.

21         Q.    You didn't try to get a sense of the

22    electrical condition of the room and the circuitry

23    in the room, things like that, right, you left

24    those to Mr. Castellano?
```

Kenneth Ashcraft

```
1        A.     I participated.  But, yes, he was the --

2    that was his portion of the investigation.

3        Q.     Right.  Did you analyze what kind of

4    electrical protection systems were in the

5    refrigerator?

6        A.     No.

7        Q.     Did you look to see whether the

8    circuitry was grounded, for instance?

9        A.     I recognized that there was a conversion

10   adapter from a three-prong plug, grounded plug, to

11   a two-wire nongrounded plug.

12       Q.     Okay.

13       A.     That's as far -- I observed that but

14   that's as far as my ...

15       Q.     And tell me about that.  What's that --

16   is there a name for that thing?

17       A.     I couldn't tell you the retail or the --

18       Q.     Is it sometimes called a "cheater

19   plug"?  Have you ever heard that term?

20       A.     I've never heard that term.

21       Q.     Do you know how they work?

22       A.     For houses that were built before a

23   certain period of time where there were two wire

24   circuits nongrounded versus the newer version of
```

Kenneth Ashcraft

```
 1   most -- well, I think all appliance plugs.  But

 2   this is a grounded three-prong male plug.

 3        Q.    Okay.  And when you use those adapters,

 4   is there a way to adequately ground the appliance?

 5        A.    I've -- I don't -- I couldn't tell you.

 6        Q.    Are you familiar with the grounding tab

 7   that's on those plugs?

 8        A.    Just by visually seeing it but I've --

 9   I've used the adapters before but never did

10   anything with the tab.

11        Q.    Okay.  So you don't really -- you're

12   just not familiar with the process of using one of

13   those, right?

14        A.    I'm familiar with what it accomplishes

15   but the exact book definition of how to use it, no.

16        Q.    Okay.  Well, I mean, do you know what

17   the grounding tabs to be done -- you're supposed to

18   do with it, right, do you?

19        A.    I don't exactly know.  I assume it's to

20   find a wire and ground the -- I really couldn't

21   tell you.

22        Q.    Okay.  And by not having one of -- by

23   using that adapter, the cheater plug as I've called

24   it, what effect does that have on the refrigerator?
```

Kenneth Ashcraft

```
1        A.     I really couldn't tell you.

2        Q.     Okay.  Are you aware of the status --

3   did you consider it your job to check on the fuses

4   inside the fridge to see what their status was?

5        A.     No.

6        Q.     Okay.  And you didn't really do any

7   analysis of that, did you?

8        A.     No.

9        Q.     Okay.  Did you go to the -- did you try

10  to determine which arc within the fridge was the

11  cause of the fire?

12       A.     No.

13       Q.     Okay.  In your analysis did the

14  appearance of the refrigerator, its condition, play

15  any role in determining the point of origin?

16       A.     Yes.

17       Q.     Okay.  Then I'll ask, in what way?

18       A.     Specifically the condition of the

19  interior of the refrigerator was -- there was more

20  damage than I would have expected from a fire that

21  did not originate within the refrigerator.

22       Q.     Okay.  And I guess that leads us to the

23  way that this fire began.  So do you have an

24  opinion as to the way that the fire actually began
```

Kenneth Ashcraft

```
1    and propagated throughout the fridge and then later

2    the room?

3         A.    Okay.  One more time.

4         Q.    Do you have an opinion how the fire

5    propagated throughout the room?

6         A.    Yes.

7         Q.    Starting at its point of origin and

8    moving out from there?

9         A.    Yes.

10        Q.    Would you please share that with me?

11        A.    The fire beginning in the refrigerator

12   would have -- well, the explanation that Paul gave

13   me of how he believes the failure happened, I think

14   there was a heating effect of the rigid foam that

15   started the ignition process.  So you've got a

16   heating element basically and a damaged wire

17   creating a heated area of the foam insulation.

18   Once this heating progressed to the point that it

19   becomes a failure and you get an arc in the wiring,

20   then it would readily ignite the foam insulation.

21        Q.    Okay.

22        A.    Once it started developing in the

23   refrigerator, pulling fuel and oxygen from the

24   insulation and the openings that are starting to
```

Kenneth Ashcraft

```
 1   develop in the refrigerator, then it starts to

 2   progress up and away from that point of origin.  So

 3   you had a heavy fire loaded in the kitchen and fire

 4   starting to exit the -- into the hallway and the

 5   dining area from the refrigerator.

 6       Q.    Okay.  Do you have an opinion as to --

 7   if I can ask it this way, where on the fridge did

 8   the fire -- where did the fire exit the fridge and

 9   begin to affect the rest of the room?  Did it go

10   out the back?  Did it go out the front?  How do you

11   think the fire actually propagated through the

12   fridge?

13       A.    My interpretation is that the first exit

14   point from the shell of the refrigerator was on the

15   backside where you have numerous knock-outs or

16   cutouts for different things, lights.  I'm not sure

17   if there was wiring -- but there were numerous

18   cutouts on the back of the refrigerator.  So I

19   think that's where it was, on the backside of the

20   refrigerator.

21       Q.    Within the fridge what was the first

22   fuel that ignited?

23       A.    The -- the first fuel ignited would

24   likely be the insulation on the conductors of the
```

Kenneth Ashcraft

```
 1    wiring harness and almost immediate or simultaneous

 2    ignition of the rigid foam insulation at the time

 3    of arc failure.  This heating -- the heating

 4    component of this failure was more affecting the

 5    rigid foam by degrading it.

 6        Q.    The rigid foam which would be the

 7    spray-in foam insulation or the wiring -- or the

 8    wire insulation?  You're talking about the spray-in

 9    foam, right?

10        A.    Correct.

11        Q.    All right.  So you think that the first

12    point of exit for the fire was out some of the

13    cutouts you said on the back of the fridge?

14        A.    Yes.

15                (Defendant's Exhibit Number 35

16                  was marked for identification.)

17        Q.    So I'm showing you what I have marked as

18    Defendant's Exhibit 35.  And is that -- can you

19    work from that photograph?

20        A.    Yes.

21        Q.    So with the little marker I've given you

22    if you would show me which cutout or hole,

23    whatever, that it's your opinion that the fire

24    first escaped from?
```

Kenneth Ashcraft

```
1          A.      (Indicating.)

2          Q.      You're marking the top left if you are

3     looking straight on at the back of the fridge.

4          A.      Yes.

5          Q.      And then from there can you give me any

6     more opinions about how the fire propagated to the

7     extent that you can see in that photograph?

8          A.      You have a fire I believe internal to

9     this refrigerator starting to affect the interior

10    of the freezer section.  And from what I can tell

11    the freezer section began to melt and create

12    running pools of plastics and urethane foams.  That

13    starts to eventually push out the door of the

14    freezer and you start to get drop-down fire in

15    front of the refrigerator.

16         Q.      At that point then are you saying that

17    it came out the front of the fridge and freezer?

18         A.      Yes.

19         Q.      Okay.  Enough to -- would it pop the

20    door open or melt the door off?  What would it do?

21         A.      (Indicating.)

22         Q.      Yeah, if you would show me on that

23    diagram with an X where it's your opinion that that

24    fire actually originated.
```

```
1        A.     (Indicating.)

2        Q.     Within the appliance.

3        A.     (Indicating.)

4        Q.     Can you narrow it down a little bit?

5        A.     That's -- no, not without Paul being

6   here to specifically show me where the failure was

7   located at the time of the fire.

8        Q.     Okay.  So you marked an X over the PCB

9   board?

10        A.     Near the PCB.

11        Q.     Okay.  So you'd rely on Mr. Castellano

12   to get you any further in to a targeted area,

13   right?

14        A.     Yes, if he could show me a schematic,

15   yeah, I'd need his assistance to pinpoint.

16        Q.     Have you spoken to Mr. Castellano since

17   his deposition yesterday?

18        A.     Briefly.  Yes.

19        Q.     What did y'all discuss?

20        A.     Just how it went, his impression.

21        Q.     So after -- so the fire would in your

22   opinion would start by escaping out the hole which

23   you've circled on Defendant's 35?

24        A.     I believe that would be the first point
```

Kenneth Ashcraft

 1    of the exit from the freezer.

 2         Q.    Okay.

 3         A.    How long it takes before it starts

 4    exiting through the freezer door is -- I really

 5    don't know.

 6         Q.    Okay.

 7         A.    But not long.

 8         Q.    And then after that do you -- do you

 9    contend it came out the front of the fridge, right,

10    front of the fridge and freezer?

11         A.    Yes.

12         Q.    From there where do you take the fire?

13         A.    The fire is internal to the refrigerator

14    and beginning to escape pushing -- pushing and

15    items start falling out of the freezer,

16    refrigerator items.  You start having melting of

17    plastics and consuming of combustibles.  And the

18    fire starts to expand from there throughout the

19    room and out the entries to the dining room and

20    hallway.

21         Q.    Specific to the kitchen where would it

22    go next?

23         A.    Up and out just like the pattern shows

24    you.  Up and out.

Kenneth Ashcraft

```
 1        Q.     What pattern?

 2        A.     The patterns in the entire kitchen like

 3   we discussed.  The patterns and fire damage I've

 4   drawn on the other photo.

 5        Q.     So can I see an up-and-out pattern on

 6   Defendant's 30?

 7        A.     No.

 8        Q.     Okay.

 9        A.     You see the base of the up-and-out.

10        Q.     Tell me this.  Do any of the -- does the

11   back of the fridge have any patterns that would

12   help you identify fire origin or anything else?

13        A.     There's a pattern on the -- what would

14   be facing the left side of the refrigerator that

15   once you have this material starting to drop on the

16   ground in front of the refrigerator, you start to

17   get a wraparound effect where the fire is expanding

18   into the room as well as going out the ventilation

19   door.

20        Q.     Okay.  Tell you what, we've been using a

21   little red marker.  I'm going to hand you a black

22   one.  If you could show me this wraparound pattern

23   that you see on the fridge.

24        A.     (Indicating.)
```

Kenneth Ashcraft

1      Q.      All right.  And you call that a

2    wraparound pattern?

3      A.      Basically it's where the fire is growing

4    from the front of the refrigerator, wrapping

5    around.  It's blowing up and out but also around

6    pulled by the oxygen source from the entryway.

7      Q.      Okay.

8      A.      I'm calling it a wraparound because I

9    believe that fire came from the front of this

10   refrigerator.

11     Q.      Okay.  So you -- I may be already

12   forgetting.  So I asked you where the fire would

13   go, and you said it was based on the patterns.  So

14   I'm -- if I looked at -- if we took Defendant's 32

15   and Defendant's 31 then, I'm trying to get a sense

16   is it going towards the ceiling, is it heading

17   towards the area where -- over here where the

18   kitchen table sat?  Which way are the flames and

19   the pattern of the fire going?

20     A.      (Indicating.)

21             The whole radius away from the front of

22   the refrigerator.

23     Q.      So starting at the front of the fridge

24   and going forward, right?

```
1        A.    Yes.

2        Q.    Going out basically straight like

3   marching a straight path towards the kitchen

4   window?

5        A.    Up and out.

6        Q.    To the north side of the kitchen, right?

7        A.    Up and out.

8        Q.    Up and out.  Advancing rapidly in that

9   direction?

10       A.    Yes, once you have flame ignition this

11   fire load in this refrigerator, the foam, the

12   plastic is going to make this a rapidly advancing

13   fire.

14       Q.    Okay.  Are there any other patterns you

15   see before I exhaust this?  Is there anything else

16   you see on there, on the back of the refrigerator,

17   Defendant's 35?

18       A.    This is kind of the matching protected

19   area that matches the protected area on the wall on

20   the southwest corner.

21       Q.    So for the record you had one pattern

22   running up from the bottom right towards the middle

23   top of the fridge, and now you've drawn another one

24   that's kind of an upside down U pattern to show the
```

Kenneth Ashcraft

```
1    protected area, right?

2         A.    Correct.

3         Q.    Okay.  Anything else you see on the

4    fridge?

5         A.    No.

6         Q.    Okay.  So on your origin-and-cause

7    analysis, it's the seventh bullet point says,

8    "Manual ignition, whether in other typical fire

9    causes, were considered and ruled out."  What's

10   considered manual ignition?

11        A.    The manual ignition of a fuel by an open

12   flame source.  Somebody setting a --

13        Q.    Like arson or something like that?

14        A.    Can be, yes.

15        Q.    You're using an actual flame to do it?

16        A.    Correct.

17        Q.    Okay.  Next bullet says, "Examination of

18   refrigerator revealed heavy fire damage sufficient

19   to deform the metal shelves."  Does the metal

20   shelves' deformation play into this in some way?

21        A.    Yes.

22        Q.    In what way?

23        A.    Like I said, I felt that the fire damage

24   sustained to the refrigerator, specifically the
```

Kennech Ashcraft

```
1    interior, shows that it was the point of origin.

2        Q.    Yeah, but does the actual metal shelf

3    deforming play into that?

4        A.    That's part of the -- yes, but not the

5    interior.  Yes, the deformity to the refrigerator

6    is a little more than I would have expected in this

7    fire.

8        Q.    All right.  So then you've -- then you

9    mention interior combustible components, and then

10   later you say surrounding combustible materials.

11   Now that's just -- what combustible materials are

12   you referring to?

13       A.    Read that --

14       Q.    It says, "Interior combustible

15   components were consumed or melted to the base of

16   the unit."  That's just the stuff inside the

17   fridge, right?

18       A.    Yes.  Started --

19       Q.    And then you say, "Damage to the

20   refrigerator and the surrounding combustible

21   materials indicated the refrigerator as the point

22   of fire origin."

23       A.    The degree of damage to the refrigerator

24   was of greater intensity, higher concentration at
```

Kennech Ashcraft

```
1    the refrigerator.  And the surrounding combustibles

2    as you -- as they -- as you spread out from the

3    refrigerator received less -- a lesser degree of

4    damage.

5        Q.    Right.  I'm asking what the surrounding

6    combustible materials are.

7        A.    Everything in the room.

8        Q.    So there's nothing special about that,

9    about the surrounding combustible materials?  They

10   weren't more combustible than things in the rest of

11   the room, were they?

12       A.    No.

13       Q.    Just wood?

14       A.    Right, any of the combustibles.

15       Q.    All right.  So then you -- and by the

16   way, the heavy fire damage that you said was

17   sufficient to deform the metal shelf, would you

18   expect the heaviest fire damage to be at the point

19   of origin, or would you expect it elsewhere?

20       A.    One more time.

21       Q.    You said that examination of the

22   refrigerator revealed heavy fire damage sufficient

23   to deform the metal shelves.  What I'm asking is

24   you pointed out this heavy damage.  Is that
```

Kenneth Ashcraft

```
1    something that you expect at the point of origin,

2    is the heaviest fire damage?

3         A.    Yes.

4         Q.    At the bottom of the report, you have

5    had Timothy Crowe sign this.  Who is that?

6         A.    He works with me at GHD as a fire

7    investigator.

8         Q.    Did we meet him at some point during

9    this examination, maybe during the sifting of

10   debris?  There was another gentleman that assisted

11   you.  Is that him?

12        A.    That was David Cantrell.

13        Q.    Okay.

14        A.    He's the Alabama investigator for GHD

15   that lives in Alabama.

16        Q.    Okay.  So what involvement did Timothy

17   Crowe have in this case?

18        A.    He made one site visit with me to --

19   basically we were in an orientation period to get

20   him familiar with our procedures and things.  I

21   don't recall how long he had been hired with us

22   when this happened.  He just came and showed me how

23   he did things.  And he helped me -- I used his

24   drawing as a basis to start with.  And that's all
```

1    he did.

2        Q.    Okay.

3        A.    The drawings and some pictures.

4        Q.    And is there a -- what's the purpose of

5    having him sign this report?

6        A.    Supposed to -- he's supposed to catch

7    grammar errors, procedure errors, misdirections,

8    which I have several in that report.

9        Q.    Okay.  So this is -- there's no other --

10   the point is just that he made a technical review

11   to make sure that it was spelled, punctuation, and

12   things like that, right?

13       A.    Yes.

14       Q.    Did he make any review of all the

15   photographs and sources and things like that before

16   he signed the report?

17       A.    No.

18       Q.    His signature doesn't convey any kind

19   of, I reviewed this and I agree with all the

20   details in it, or anything like that?

21       A.    No.

22       Q.    As an expert you have the fun of

23   answering some hypothetical questions at times.

24   I'm going to ask you a hypothetical or two to ask

Kenneth Ashcraft

1    to see what you say.

2        A.    I'll have hypothetical answers.

3        Q.    That's fine.  I want you to assume

4    hypothetically that this fire did start at the

5    stovetop instead of the refrigerator.

6        A.    Okay.

7        Q.    Can you tell me the difference in the

8    type of damage that you would see at the

9    refrigerator had it started at the stovetop?

10       A.    I believe your damage at the

11   refrigerator would be much less intense.

12       Q.    Okay.

13       A.    To a significant degree.

14       Q.    Why?

15       A.    Because the fire beginning on the

16   stovetop again moves up and out.  And it would

17   start pulling towards the ventilation opening at

18   the hallway and the dining room.  But it would take

19   a little bit more time to progress and bank down to

20   the level to damage the refrigerator and bring it

21   into the damage range.  So the fire is going to be

22   developing across the top of the ceiling, and it

23   starts to bank down until it can escape from the

24   ventilation openings at the hallway and dining

Kenneth Ashcraft

1  room.  And that's when you start seeing damage to

2  the refrigerator.

3      Q.    Is there any other basis for your

4  opinion that it would be a different type of

5  damage?

6      A.    Yes.  I've seen kitchen fires that

7  progressed to flashover before and the contents of

8  the refrigerator, at least the lower portion, would

9  still be intact.  You could still see the milk in

10  the refrigerator and identify it readily.  I've

11  seen several fires with even greater flashover

12  damage and less damage inside the refrigerator.

13  So, yes, that's part of my conclusion.

14      Q.    I'll take this moment to note that we

15  did find the milk when we did this examination as

16  we all well remember.  One of our -- one of the

17  investigators nearly decorated the floor.

18      A.    It wasn't identifiable until that point.

19      Q.    Was all the plastic in the freezer

20  melted?

21      A.    I'd have to look at pictures to see to

22  what degree, but I believe there's still some

23  plastic left.

24      Q.    Would it be abnormal to find arcing in a

Kenneth Ashcraft

1    refrigerator that had been attacked by fire?

2        A.    No.

3        Q.    And it is common to find arcs in

4    electrical appliances in a room that sustained fire

5    damage, right?

6        A.    Correct.

7        Q.    Mr. Ashcraft, is it part of your opinion

8    that the fridge had some sort of defect?

9        A.    Yes.

10       Q.    What was that defect?

11       A.    An abnormal electrical condition which

12   led to an ignition of the refrigerator's materials.

13       Q.    And how do you think that defect

14   occurred?

15       A.    I wouldn't know.

16       Q.    Do you have any evidence indicating it

17   was a defect that was brought about by its

18   manufacturer?

19       A.    My understanding this is a sealed unit.

20   So it's not like it's open to the public or easily

21   manipulated, and there was no report of any work

22   being done on the unit.

23       Q.    So is that a yes or a no?

24       A.    Repeat the question.

```
 1        Q.     Is it your opinion that this was a

 2   manufacturing defect?

 3        A.     Yes.

 4        Q.     Okay.  And for the reasons you stated?

 5        A.     Yes.

 6        Q.     Or are there additional reasons as

 7   well?

 8        A.     No.

 9        Q.     So would this be basically the same idea

10   that Mr. Castellano voiced, which was that there

11   had to have been something that happened to this

12   fridge during the manufacturing process that

13   damaged the conductor and/or the insulation?

14        A.     Yes.

15        Q.     Is it your opinion that there's any kind

16   of design defect here, the way that the

17   refrigerator was designed?

18        A.     I have no idea on design.

19        Q.     You have no opinion on that specific --

20        A.     Correct.

21        Q.     Do you contend that there was any kind

22   of warning that a manufacturer or a seller should

23   have put on this refrigerator?

24        A.     I don't have an opinion on warning or
```

Kenneth Ashcraft

```
 1    labels.

 2        Q.    Is it your opinion or that -- would this

 3    fire had occurred if there had been no foam in the

 4    back of the refrigerator?

 5        A.    A fire could have occurred without the

 6    foam in the refrigerator because you have other

 7    combustible materials, plastics, components.

 8        Q.    In the theory that you've offered today,

 9    would a fire -- would this fire have occurred

10    without that foam?

11        A.    Not in the exact same manner.  But it

12    could still have occurred without the foam.

13        Q.    Okay.  Now you attended the live

14    inspections at Donan, right, March 2014?

15        A.    Yes.

16        Q.    And then you attended the lab inspection

17    at Vista Engineering in Birmingham?

18        A.    Yes.

19        Q.    And were you present when the stovetop

20    was -- the stove was taken apart and inspected?

21        A.    Yes.

22        Q.    Okay.  And you're aware that electrical

23    arc was found in the stove, right?

24        A.    Yes.
```

Kenneth Ashcraft

1      Q.    And are you aware that that specific arc

2  was then inspected a little more closely in the lab

3  inspection at Vista?

4      A.    Yes.

5      Q.    Okay.  And do you have an opinion

6  whether that is an electrical arc or not?

7      A.    No.

8      Q.    Okay.  Do you have an opinion on how

9  that arc occurred?

10     A.    According to Paul it could be -- you

11 could have a control knob in an "on" position which

12 is showing an energized element, or it could be

13 during the fire the wire came in contact with

14 another energized wire and grounded it at that

15 point.

16     Q.    Okay.  And do you have any physical

17 evidence that you're aware of that would indicate

18 that two conductors came in contact with one

19 another?

20     A.    I would have to defer to Paul on that.

21     Q.    Okay.  Do you place any significance on

22 that electrical arc?

23     A.    Yes, it is part of -- you have to

24 consider it.  But I believe that it's still not at

Kenneth Ashcraft

1    the point of origin.  I believe it's an effect of

2    the fire just like you mentioned earlier.

3        Q.    Okay.  So did y'all discover any arcing

4    in the microwave?

5        A.    I don't believe so.  I'm not sure.

6        Q.    Did you discover any arcing in the vent

7    hood?

8        A.    I don't believe so.

9        Q.    Did you encounter any arcing in the

10   light fixtures above?

11       A.    I believe there may have been an arc

12   found in one of the fixtures.

13       Q.    Okay.

14       A.    I'm not sure.

15       Q.    Lacking any physical evidence to

16   indicate that there were two conductors touching,

17   would you agree that the evidence indicates that

18   the range was on at the time of this fire?

19            MR. TALMADGE:  Object to the form.

20       A.    Repeat that.

21       Q.    You deferred to Mr. Castellano as to

22   whether there was physical evidence of conductors

23   touching one another, right?

24       A.    Right.

Kenneth Ashcraft

1      Q.    Mr. Castellano told us he had no

2  physical evidence to that degree.

3      A.    Okay.

4      Q.    So Mr. Castellano seemed to tacitly

5  agree that means that the conductor was energized

6  at the time of the fire.

7            MR. TALMADGE:  Object to the form.

8      A.    I don't think he can -- you would have

9  to show me where he came to that conclusion in the

10  record.

11     Q.    You just said it that --

12     A.    The absence of evidence that there's

13  wires that's been consumed, there's a whole piece

14  of the stove control that's been melted away.  The

15  absence of evidence is inherent to this type of

16  investigation.

17     Q.    Do you have any evidence that the stove

18  was not energized at the time?

19     A.    No.

20     Q.    I see in your file that you reviewed the

21  deposition -- let me make sure about this.  I see

22  you've got the deposition of Gary Laroux from last

23  December.  Do you remember that?

24     A.    Yes.

Kenneth Ashcraft

1       Q.     And in that deposition he testified that

2   Ms. McCuistian kept a pot of oil on the stove.  Do

3   you remember that?

4       A.     I believe so, yes.

5       Q.     And do you remember reading that she

6   placed it on the right side of the stove?

7       A.     I believe so.

8       Q.     And do you recall -- by the way, did

9   Mr. Morris ever provide you with Mr. Laroux's

10  previous statement that he provided to Mr. Morris

11  directly in this case?

12      A.     I believe it's in there.

13      Q.     And you know that in that he also

14  testified or stated under oath that Ms. McCuistian

15  kept a pot of oil on the stove?

16      A.     Yes.

17      Q.     In his deposition do you know that

18  Mr. Laroux said that he -- that Ms. McCuistian

19  covered that pot of oil with, like, a piece of

20  tinfoil, right?

21      A.     Okay.

22      Q.     Do you remember that?

23      A.     Vaguely.

24             (Defendant's Exhibit Number 36

Kenneth Ashcraft

1                     was marked for identification.)

2        Q.    I'm showing you what I've marked as

3    Defendant's Exhibit 36.  I represent to you that

4    this is a photograph produced to us by the Dothan

5    Fire Department.  That's a scene of the stove.

6    What do you see on the top of the stove?

7        A.    Looks like it may be the vent hood and a

8    small pot.

9        Q.    Okay.  And -- well, do you see the vent

10   itself, too?

11       A.    Yeah, I was looking at that.  I don't

12   know exactly what that is.

13       Q.    Okay.  But you do see the pot, right?

14       A.    Yes.

15                 (Defendant's Exhibit Number 37

16                   was marked for identification.)

17       Q.    Okay.  And then showing you what I've

18   marked as Defendant's Exhibit 37.  Once the vent

19   hood and the vent were removed, do you see the pot

20   again?

21       A.    Yes.

22       Q.    And it's got a strainer in it?

23       A.    Yes.

24       Q.    Okay.  So you -- do you agree that there

Kenneth Ashcraft

1   was a pot on that stovetop at the time of the fire?

2       A.    From the picture it appears to be, yes.

3       Q.    Now, I think I've asked you this.  Did

4   you consider the possibility that this might be a

5   cooking fire?

6       A.    It was, yes, entered into my mind during

7   my process of investigation.

8       Q.    In conjunction with that -- so that was

9   at one time a hypothesis, correct?

10      A.    No, it was not a hypothesis.  It was

11  part of my consideration as a potential.

12      Q.    Fair enough.  And in conjunction with

13  that potential you looked at the burn pattern,

14  right?

15      A.    Yes.

16      Q.    And you saw that they had a conical V

17  shape, classic cooking oil, cooking fire pattern,

18  right?

19      A.    If it were not for the other more

20  intense surrounding, yes, it would be classic

21  cooking burn pattern.

22      Q.    Okay.  And in conjunction as you were

23  evaluating this, you looked at the damage, the fire

24  damage, right?

Kenneth Ashcraft

```
1        A.    Yes.

2        Q.    Okay.  And did you consider the melted

3   stove portions?

4        A.    Yes, that's part of the damage in the

5   room.  Yes.

6        Q.    And the consumed cabinets up above?

7        A.    Yes.

8        Q.    And the wood literally burned away from

9   the wall?

10       A.    Yes.

11       Q.    And you do agree that at least the burn

12  pattern is consistent with that which you would see

13  with a cooking fire, do you not?

14             MR. TALMADGE:  Object to the form.

15       A.    If there was not other more intense

16  damage surrounding and approaching this, yes, it

17  would look like a typical stovetop kitchen fire.

18       Q.    Okay.

19       A.    But that's -- you have to consider the

20  whole picture, not just one piece.

21       Q.    Okay.

22             MR. HOOKS:  Let's take a break for a

23       minute.

24                    (Off the record.)
```

```
 1    BY MR. HOOKS:

 2        Q.    I was noticing in some of your e-mails

 3    there was a mention of a Mr. Munger.  Who is that?

 4    And why was he at the site?

 5        A.    I believe he was one of the original

 6    experts with the smoke alarm.  I don't know exactly

 7    who he represented.

 8        Q.    Okay.  Was that before all the rest of

 9    us got involved, or was that on some other later

10    examination?

11        A.    I believe it was after the recovery of

12    the smoke alarm.

13        Q.    Which I think you said was April of

14    2014?

15        A.    I believe so.

16        Q.    Let's do this.  Let's use Defendant's

17    Exhibit 30 because there's only one mark on it so

18    far which is the area of fire damage.  So here is

19    what I would like you to do.  You know the

20    orientation of which the fridge was sitting in this

21    room, correct?

22        A.    Yes.

23        Q.    And what was it facing?

24        A.    The front of the refrigerator -- the
```

Kenneth Ashcraft

1    door was to the north.

2         Q.    The left?

3         A.    Left of what?

4         Q.    I'm asking you.  There's a door on both

5    sides of it.  Oh, I see what you're saying.  I see

6    what you're saying.  The door was facing towards

7    the sink and the window?

8         A.    Yes, the refrigerator door.

9         Q.    All right.  So its back was to the

10   hallway behind it, right?

11        A.    Correct.

12        Q.    Okay.  If you would, I'm going to ask

13   you to use the black marker so we don't get our

14   markings confused.  I'd like you to show me on the

15   wall -- in other words, let me show you.

16             You had marked this hole right here,

17   this cutout in the fridge as being where the fire

18   was, where it first exited.  Can you mark on that

19   --

20        A.    That it may have first exited.  I mean,

21   I think it may have first exited so it --

22        Q.    Well, wait a minute.  So I thought that

23   was where your opinion was that it did first exit.

24   Is it your opinion that you don't know?

Kenneth Ashcraft

```
 1        A.    The first exit point I believe would

 2   have been on the back at that point, correct.

 3        Q.    So that's your opinion?

 4        A.    Yes.

 5        Q.    So when you say it "may have," that's

 6   your opinion that it did, right?

 7        A.    Correct.

 8              MR. TALMADGE:  Object to the form.

 9        Q.    Is that your opinion that it did exit

10   there or are you not sure?

11        A.    I don't know that it was -- it exited to

12   the interior or to the back first.  You asked if I

13   thought --

14        Q.    Well, your opinion was that it exited

15   out here first and then eventually it came out the

16   front.  So if you're changing that, I need to know.

17        A.    Okay.  Not --

18              MR. TALMADGE:  Object to the form.

19        A.    I'm not changing that.  The interior of

20   the freezer compartment is about that level.  I'm

21   not sure if it exited the back or into the

22   refrigerator compartment, exited the front of the

23   freezer through the doorway.  I believe that it

24   would have escaped through the back first, correct.
```

Kenneth Ashcraft

1      Q.     Okay.  So you do believe that it exited

2   outside of the refrigerator at that point?

3      A.     Yes.

4      Q.     Okay.  Can you show me on that wall

5   where that would have been?

6      A.     Somewhere in this area.

7      Q.     Try to keep me a tight, relatively tight

8   area.

9             MR. TALMADGE:  Object to the form.

10     A.     There's no way to do it on this picture.

11  I mean, it's somewhere in this area.  I don't know

12  exactly.

13     Q.     Okay.  You've used the black marker.  So

14  that --

15     A.     Actually, no, that's not it because

16  that's the corner so it would be further this

17  direction so it's --

18     Q.     Okay.  Wait, wait, let's do this.  I

19  don't want to mess up our photos.

20            Yeah, use a square.  We've been doing

21  this kind of oval thing.  I want you to use a

22  square to show your revised estimation of where it

23  would go.

24     A.     (Indicating.)  That's a large area.

Kenneth Ashcraft

```
 1        Q.     That's fine.

 2        A.     Within that square.

 3        Q.     That's the area you think the fire first

 4   exited the refrigerator?

 5        A.     Somewhere in there.  That's a general

 6   representation.  I don't have exact measurements to

 7   line up with that.

 8             MR. HOOKS:  I reserve the right to ask

 9        further questions.  Otherwise, I'm done.  No

10        further questions.

11             MR. KING:  What number are we on as far

12        as exhibits?

13             MR. HOOKS:  38.

14             MR. KING:  Correct me if I'm wrong, you

15        did not attach the expert disclosure?

16             MR. HOOKS:  I did not.  Please do,

17        though.

18                  (Defendant's Exhibit Number 38

19                    was marked for identification.)

20                       EXAMINATION

21   BY MR. KING:

22        Q.     Mr. Ashcraft, I think we met -- we've

23   met before.  But I'm not sure if it was formal.  My

24   name is Chris King.  I'm one of the attorneys
```

Kenneth Ashcraft

```
 1   representing BRK.  I'm going to ask a few

 2   questions.  I just want to start with the document

 3   I marked as Defendant's Exhibit Number 38.  Have

 4   you actually seen these expert disclosures?

 5        A.    Yes.

 6        Q.    Okay.  And you understand that that is a

 7   disclosure that was provided by Joey Morris

 8   regarding what you were expected to testify to?

 9        A.    Yes.

10        Q.    Very brief but let me ask you -- and I

11   actually -- actually, let me see it a second.  I'm

12   going to direct you to your portion.

13              MR. OLINDE:  This is on the date of

14        March 11, 2016?

15              MR. KING:  No, this is August 10, 2015.

16        This was the original one.

17   BY MR. KING:

18        Q.    And paragraph one talks about you.  And

19   what I want to ask you specifically about is it

20   describes in here that you will give some opinions

21   regarding the smoke alarm.  What's reflected in

22   there, are those your opinions or some opinions

23   you've reached regarding the smoke alarm?

24        A.    Yes.
```

Kenneth Ashcraft

```
1        Q.     Can you tell me what those opinions are?

2        A.     Just the fact that I recovered the smoke

3    alarm from the residence.  I identified it

4    tentatively from the label as a Family Gard brand

5    and that it didn't have any hard wire capability,

6    that it was just a battery operated unit.

7        Q.     Okay.  Not trying to be argumentative in

8    any way, but are those actually opinions of yours

9    or just things you observed?

10       A.     Statements of fact.

11       Q.     I mean, did you actually reach any

12   opinions regarding the smoke alarm?

13       A.     No.

14       Q.     Okay.

15              MR. OLINDE:  Is that a no?

16              THE WITNESS:  No.

17       Q.     And do you have any background,

18   training, or qualifications to render any type of

19   actual expert opinions regarding smoke alarms?

20       A.     No.

21       Q.     Okay.  Have you been asked separate from

22   that to try to reach any opinions regarding smoke

23   alarms or this smoke alarm in particular?

24       A.     No.
```

Kenneth Ashcraft

```
 1        Q.     And so do I understand that you will not

 2   be expected at trial to render or attempt to render

 3   any expert opinions regarding smoke alarms?

 4        A.     Not that -- no.

 5        Q.     I mean --

 6        A.     Not that I plan to.

 7        Q.     We agree that those are just kind of

 8   factual statements of what you saw so I'm excluding

 9   those things.

10        A.     Right.

11        Q.     Okay.  I'm going to mark -- try to take

12   this a little bit in order.  I'm going to mark -- I

13   -- actually before I mark those.  You made multiple

14   what we're calling site inspections at the home

15   where this fire occurred, correct?

16        A.     Yes.

17        Q.     And is it my understanding that you took

18   photographs each time that you went?

19        A.     Yes.

20               MR. TALMADGE:  Object to the form.

21        Q.     And that the photographs actually

22   have -- let me see how to say this.  You produced

23   to us some documents today in electronic form?

24        A.     Yes.
```

Kenneth Ashcraft

```
1        Q.    And some of them we have printed out.

2   But that contains your entire file regarding this

3   case?

4        A.    Yes.

5        Q.    And the documents include a folder

6   that's called Photo Files?

7        A.    Yes.

8        Q.    And it had separate folders that have

9   dates and the names?

10       A.    Yes.

11       Q.    And are those the dates -- all of the

12  dates that you went to the home where this fire

13  occurred?

14       A.    No.  That includes lab exams.  It

15  includes any time we performed an activity.

16       Q.    Anything that you were involved in?

17       A.    Yes.

18       Q.    So let's talk about them individually.

19  There is a -- the earliest date is December 1st of

20  '13 and it's called -- and I think it has a folder

21  inside December 2nd of '13, and it's called

22  McCuistian Site Pics with E-X-T.  I guess that's

23  exterior?

24       A.    Yes.
```

Kenneth Ashcraft

```
1        Q.     So that would be a date on which you

2   went to the home where the fire occurred and took

3   photographs?

4        A.     Yes.

5        Q.     And maybe -- what else did you do on

6   that date?  Do you remember?

7        A.     I don't recall.

8        Q.     Okay.  But you did go on that date and

9   go into the home and inspect the home and take

10  pictures?

11       A.     Yes.

12       Q.     Okay.  Then there is a -- the next date

13  is December 11th of 2013, folder entitled

14  McCuistian Site Photos.  Do you remember what you

15  did on that day?

16       A.     It was a joint exam, our first joint

17  exam with interested parties.

18       Q.     And do you remember offhand who was

19  present for that examination?

20       A.     I would have to look at the sign-in

21  logs.

22       Q.     You do have a separate file, and we can

23  ask about the sign-in logs.  But that was a joint

24  inspection with some interested party besides the
```

Kenneth Ashcraft

1   plaintiffs?

2        A.    Yes.

3        Q.    Then there is a -- the next date is

4   January 28 of 2014, another folder entitled

5   McCuistian Joint Site Pics.

6        A.    Okay.

7        Q.    Would that be the next date that you

8   went to the home?

9        A.    If it's the sequence, yes.

10       Q.    Okay.  And there wouldn't be any in

11  between these that you went and took pictures?

12       A.    No.

13       Q.    And, again, there was a joint site pic

14  so there would have been other parties present.

15  Your sign-in sheet would show who was there?

16       A.    Yes.

17       Q.    The next date I see is a three -- well,

18  actually there's a 3/24/14, but it says Joint Exam

19  Pics.  So would that be not the in-home examination

20  but something else?

21       A.    Well, probably -- I think it's one of

22  the lab exams.

23       Q.    Okay.  Looks like it may have been on

24  the stove.  There's pictures of the stove it looks

Kenneth Ashcraft

```
1    like.

2         A.    Was that the Vista exam?

3         Q.    I'm not sure.

4         A.    Okay.

5         Q.    I wasn't there so I'm just asking.

6    There's another 3/25/14 Joint Exam Pics would not

7    be the home also.  Those would be the lab exam?

8         A.    Those were in Birmingham.  That was at

9    the Donan lab -- Donan work office.

10        Q.    Okay.

11        A.    And then the sifting debris.

12        Q.    There is an April 5th 2014 Site Pics,

13   and so that would just be something that -- and it

14   actually has two separate sets, one Pentax and I

15   think one was taken with a Cannon.

16        A.    Yes.

17        Q.    Would those be just you present or

18   someone with your company?

19        A.    If that is the recovery of the smoke

20   alarm, I was the only one there.

21        Q.    I'm not saying it's not.  But I'm kind

22   of getting at you're -- do you know what date you

23   recovered the smoke alarm?

24        A.    It's on my Evidence Recovery list.
```

```
 1        Q.     Okay.

 2        A.     April.

 3        Q.     There's an ECOC you called it that shows

 4   April 24th?

 5        A.     Okay.

 6        Q.     One item, smoke alarm.

 7        A.     Okay.

 8        Q.     So this April 5th, that would not be the

 9   date you recovered it?

10        A.     No.

11        Q.     But you went to the scene for some

12   reason on April 5th and took some photographs?

13        A.     Yeah.

14        Q.     And then April 13, 2015 there is a

15   folder entitled McCuistian Joint Site photos.  So

16   there was another group of interested parties that

17   went with you and you took photographs?

18        A.     Yes.

19        Q.     Then on April 24th there are what's

20   called McCuistian site pics, and those have

21   pictures of the smoke alarm.

22        A.     Okay.

23        Q.     And your evidence sheet shows that

24   date.
```

Kenneth Ashcraft

1        A.     Okay.

2        Q.     Were you alone there that day?

3        A.     The best -- yes.

4        Q.     I'm going to go through these real

5    quick.  There's also a July 3rd 2014 that's called

6    McCuistian Site Exam FB pics and Munger Site

7    Photos.  That's when Mr. Munger went and you went

8    with him?

9        A.     Yes.

10       Q.     And I think that's all of them.  Yeah,

11   there's some lab exam photos from July 22nd.

12              You mentioned in your earlier testimony

13   that at some point -- when did you first -- let me

14   withdraw that.

15              When did you first get involved with

16   this investigation?

17       A.     November or December, I believe, 2013.

18       Q.     Okay.  And you testified earlier if I'm

19   correct that at some point after -- well, after

20   that date there was a reason you were asked to go

21   and look for a smoke alarm?

22       A.     Correct.

23       Q.     How did that come about?

24       A.     I received a call from Joey Morris to

Kenneth Ashcraft

```
 1   see if there was a smoke alarm.  He had gotten

 2   information that there was a smoke alarm in the

 3   hallway near the kitchen and bedroom to

 4   Ms. McCuistian's door.

 5       Q.    Now, up until that point you had already

 6   interviewed people, gone in the home and looked at

 7   things.  But there had been no mention of the smoke

 8   alarm at that point?

 9       A.    I believe the fire report when I first

10   read it -- when I read it, there was none present.

11   So I didn't -- I was under the assumption in the

12   beginning at least that there was no alarm present.

13       Q.    Okay.  And how long prior to April 24th

14   would you have gotten the call to see if you could

15   locate a smoke alarm?

16       A.    I don't know how long.  I don't recall.

17       Q.    Would it have been before the April 5th

18   and April 13th site inspections?

19       A.    We probably would have looked then.

20       Q.    So you do think you could narrow it down

21   to sometime between April 13 and April 24th?

22       A.    Yes.

23               (Defendant's Exhibit Numbers 39 - 42

24                 were marked for identification.)
```

Kenneth Ashcraft

1      Q.    Now, I'm going to mark a set of photos

2   and let you look at these.  There's only five of

3   them.  I'm going to show you photos I've marked as

4   Defendant's Exhibits 39 through 42.  Can you

5   identify those photographs?

6      A.    Yes, it appears to be the photos I took

7   during the search and recovery of the smoke alarm.

8      Q.    Let me ask you a question.  You had gone

9   and investigated the fire earlier, I mean,

10   regarding its cause and its origin, correct?

11      A.    Yes.

12      Q.    During that time had you had reason or

13   taken the time to do any grid analysis or grid

14   search of the contents of the home?

15      A.    We did a -- we recovered the debris in a

16   grid pattern from the kitchen but not the hallway.

17      Q.    Okay.  So you -- because you kind of

18   from the visual inspection thought the fire

19   originated in the kitchen and I guess talking with

20   some witnesses, you did a grid pattern search of

21   the debris in the kitchen?

22      A.    Yes.

23      Q.    Did you or anyone else remove or do any

24   type of debris search between that kitchen search

1   and when you went on April 24th to try to recover

2   the smoke alarm?

3       A.    I don't believe so.

4       Q.    Okay.  Was the home secure during that

5   time frame?

6       A.    Yes.

7       Q.    What had been done to secure the home?

8       A.    I had to have a key holder let me in

9   each time.  We were entering through the -- where

10  the front door is, is boarded up and there's a

11  board on the back door.  I was entering from the

12  carport door.

13      Q.    Okay.  So the openings that may have

14  been caused by the fire, the windows that were

15  broken and the doors --

16      A.    Were boarded up.

17      Q.    -- were boarded up?

18      A.    Yes.

19      Q.    And you would go in and out with the

20  key, and I think you would enter from the carport?

21      A.    Yes.

22      Q.    And I think you took some pictures.  Did

23  you start doing a grid search of the hallway?

24      A.    Yes, I started -- I'm not exactly sure

Kenneth Ashcraft

```
1    how far -- there will be some more pictures that
2    show basically the length of the hallway that was
3    excavated.  I didn't lay a grid out, but I did
4    start on one end and started working past the
5    doorway towards the back door.
6         Q.    Which end of the hallway did you start
7    searching the debris?
8         A.    I believe I started on the south end
9    towards the living room.
10        Q.    And progressed towards the door to the
11   kitchen and what's I think referred to as bedroom
12   two?
13        A.    Yes.
14        Q.    Okay.  Do these photographs show where
15   you found the remnants of the smoke alarm that you
16   found in the home?
17        A.    Yes.
18        Q.    Where are -- it's kind of hard to tell
19   because it's kind of close.  Explain where that is
20   in the home.
21        A.    This is from the kitchen.
22        Q.    Okay.  Hold on.  Let's identify which
23   one you're looking at.
24        A.    40.
```

```
 1        Q.     You're looking at --

 2        A.     This photo 40 is taken from the kitchen.

 3        Q.     Okay.  Taken from the kitchen looking

 4   into the hallway?

 5        A.     Across the hallway would be the doorway

 6   to bedroom number two.

 7        Q.     Okay.  So both doorways are reflected in

 8   that picture and the blue marker, is that where it

 9   was located?

10        A.     Yes.

11        Q.     Do you know if any of that debris had

12   been disturbed during the fire fighting attempts,

13   the people coming in and out of the home to

14   inspect, any of those time frames?

15        A.     It was walked.  It wasn't excavated or

16   turned over or searched.

17        Q.     Okay.  In the picture it appears that up

18   to the point where the alarm was found had actually

19   been -- in the hallway had been excavated or

20   cleaned up?

21        A.     I'm sorry?

22        Q.     It looks like you had excavated up to

23   this point in the hallway; is that correct?

24        A.     We would have to look at the pictures in
```

Kenneth Ashcraft

1   sequence in the file and see because I took

2   pictures throughout the progression of the search.

3        Q.    I mean, you -- I think that's what you

4   described.  You started at one end of the hallway,

5   you were sifting and clearing the debris as you

6   went?

7        A.    I started more in the middle.

8        Q.    In the middle?

9        A.    In the middle, not at one end.  But I

10  would have to look at the pictures to -- I believe

11  when we recovered debris from the kitchen we kind

12  of just went to the threshold.  If we had went

13  another six inches we would have found it, but I

14  didn't get into the hallway.

15            (Defendant's Exhibit Number 43

16             was marked for identification.)

17       Q.    Understood.  Would you mark on -- let me

18  mark this Defendant's 43.  Would you mark on --

19  first, can you identify Defendant's 43?  Is that

20  the diagram?

21       A.    That's the diagram from my report.

22       Q.    Your diagram of the home from your

23  report.  Can you mark on there where the alarm was

24  found?  It doesn't matter which color.  You can use

Kenneth Ashcraft

```
 1   a pen.

 2        A.    (Indicating.)

 3        Q.    Okay.  And all those photos that have a

 4   blue marker, some of them are just different

 5   angles, they all just show where the alarm was

 6   located?

 7        A.    Yes.

 8        Q.    Did you conduct any type of examination

 9   or testing of the smoke alarm when you recovered

10   it?

11        A.    I took photos of the remaining portion

12   of the label.

13        Q.    Did you do anything to the alarm?  Did

14   you have to clean it, scrape it off, anything when

15   you were doing that?

16        A.    I may have brushed some loose debris

17   from the label but nothing invasive, nothing to

18   alter the integrity of the alarm.

19        Q.    And you took custody of the alarm?

20        A.    Yes.

21        Q.    And after you took custody of it has

22   anyone done any examination or testing of that

23   alarm?

24        A.    Yes.
```

Kenneth Ashcraft

```
1        Q.     Who would have done that examination or

2   testing?

3        A.     There was an exam at the -- at a lab

4   Acuren Lab in Birmingham with -- I don't recall her

5   name.

6        Q.     Lori Street?

7        A.     Short hair.  And just the other week

8   when we were there.

9        Q.     So those two -- Lori was the lead

10  examiner?

11       A.     On both, yes.

12       Q.     And no one else has examined --

13       A.     The only thing we did is took it to

14  McSwain Engineering for an X-ray.

15       Q.     Those were separate X-rays from the

16  X-rays that were done in Acuren?

17       A.     Yes, those were the original X-rays of

18  the smoke alarm.

19       Q.     When were those done?

20       A.     I would have to look at the invoice.

21       Q.     And have you provided those to us?

22       A.     Yes.

23       Q.     Okay.

24       A.     It would be on --
```

Kenneth Ashcraft

```
 1        Q.      They're in your documents?

 2        A.      It should be a line item for an X-ray.

 3        Q.      Again, you said you're not giving or

 4   rendering any opinions regarding smoke alarms,

 5   correct?

 6        A.      No.  Just what I witnessed at the exam

 7   the other day documenting --

 8        Q.      What happened?

 9        A.      -- as I went.

10        Q.      Okay.  Have you provided any of the

11   information from the examinations regarding the

12   smoke alarms to anyone else who's going to be

13   rendering opinions?

14        A.      A photo sheet I sent to Ed.

15        Q.      A photo sheet sent to Ed Rowan?

16        A.      Yes.

17        Q.      You have not yourself met with or

18   discussed with any other expert that you understand

19   is going to be rendering an opinion regarding smoke

20   alarms?

21        A.      No.

22        Q.      I think Mr. Castellano said so, but it

23   is your understanding that he's not rendering any

24   --
```

1      A.     No.

2      Q.     -- opinions regarding smoke alarms?  And

3   there's nobody else at GHD that's been asked to

4   examine or look at the smoke alarm or render any

5   opinions?

6      A.     No.

7             (Defendant's Exhibit Numbers 44 & 45

8              were marked for identification.)

9      Q.     Kind of switching gears a little bit.

10  But I want to go over two documents and mark them

11  as Exhibits 44 and 45.  These were documents you

12  produced electronically to us.  Can you identify

13  what those documents are?

14     A.     These were initial notes I took on 12/1

15  and 12/11 when I talked to Darren Mason on 12/1 and

16  Gary Laroux on 12/11.

17     Q.     Okay.  And I hate to ask this, but can

18  you go through those and tell us what they say --

19  in other words --

20             Well, let me ask you this way first.

21  You took notes of what those gentlemen told you?

22     A.     Yes.

23     Q.     And can you tell us from those notes

24  what -- let's start with Mr. Mason on December

1    1st.  That's the sheet labeled Defendant's 44,

2    correct?

3        A.    Yes.

4        Q.    Can you tell us what Mr. Mason told you?

5        A.    Basically he was telling me that Gary --

6    and I put question mark "Rory."  I didn't

7    understand --

8        Q.    Hold on and let me interrupt you a

9    second.  If you would, start by just reading what

10   words you've written on the document.  And then if

11   there's anything that you didn't write that you

12   remember you can kind of ad lib it.  But just kind

13   of read, in other words -- I think this starts by

14   -- like, 45 starts with Gary Laroux and then it

15   says, One --

16       A.    Do you want me to read verbatim what's

17   written?

18       Q.    Yes, verbatim what is written.

19       A.    Okay.  The date says 12/1 3 P-O-O, I'm

20   not sure what that means.  It may be this guy's

21   nickname.  I can't remember.  I have no idea what

22   that --

23       Q.    P-O-O-G.

24       A.    Looks like P-O-O-G, yeah.

Kenneth Ashcraft

```
1        Q.    Okay.

2        A.    It says, "House help," referring to

3   Gary, I have Rory, but it was later determined to

4   be Laroux.  Says, "On back porch."  It says, "On

5   carport smoking, look up, saw fire."

6        Q.    Okay.

7        A.    "Husband" --

8        Q.    Hold on just one second right there.

9              Now, is that describing what Mr. Mason

10  told you that Mr. Laroux told him?

11       A.    Yes.  I assume.

12       Q.    Mr. Mason wasn't saying he was on the

13  back porch?

14       A.    No, no.  He was describing what -- I'm

15  assuming what Laroux told him.

16       Q.    Okay.  Keep going.

17       A.    It says, "Husband, Mr. Lloyd

18  McCuistian."  Gives me another name, "James across

19  street.  James Jackson across street," gives me a

20  phone number, has video phone something, with an

21  arrow to James Jackson.

22       Q.    Okay.  Let's stop there.  Mr. Mason told

23  you that Mr. Jackson has video of what?

24       A.    I assume the fire at some point in time.
```

Kenneth Ashcraft

```
1        Q.    Okay.  Have you talked to Mr. Jackson?

2        A.    I asked about him several times.  I

3   believe I even tried the number a couple times.  I

4   never got in touch with him and found the location.

5        Q.    As far as you --

6        A.    So I never talked to him.

7        Q.    You don't know of or you haven't seen

8   any video?

9        A.    No.

10        Q.    Okay.  Keep going.

11        A.    And then -- I get a little more -- now I

12   write, "He lives at 822.  Darren Mason," his phone

13   number.  "He tried to enter a window through

14   security bars.  Mr. Lloyd, out front door, slept

15   near front door.  Ran to side window.  Ms. Joan's

16   window.  Ran to door, tried to kick.  Ran back

17   around and saw Mr." -- I guess Mr. McCuistian "at

18   front door.  Tried to enter front door, smoke at

19   knee level."  And last line, "Snatched bars off, PD

20   told back up."  I'm going to have to -- I'm not

21   sure exactly.

22        Q.    That's okay.

23        A.    The PD told him to get out.

24        Q.    Okay.  Now, is that the entirety of your
```

Kenneth Ashcraft

```
 1   notes regarding Mr. Mason?

 2       A.    Yes.

 3       Q.    Is there anything that you remember

 4   about your conversation with Mr. Mason that you

 5   didn't exactly write down?

 6       A.    No, not that I can think of.

 7       Q.    Okay.  So as far as you know that's

 8   everything Mr. Mason told you about what he knew

 9   regarding this fire?

10       A.    Uh-huh.

11       Q.    Now if you'll look at Defendant's

12   Exhibit 45, which if I understand correctly is your

13   notes of a Gary Laroux interview.

14       A.    Yes.

15       Q.    Is that correct?  Can you read those

16   verbatim?

17       A.    12/11/13 Gary Laroux, "Approximately one

18   year in house.  Front room is bedroom.  No previous

19   fire," I believe.  "Aids as a tenant.  Problem with

20   dishwasher, possible bug spray shorted appliance

21   out.  Sears repairman" -- I'm not -- "Sears

22   repairman.  No idea on brands of appliances.

23   Switch behind refrigerator, not sure what it

24   operated.  No rumors he knows of, no one cooking at
```

Kenneth Ashcraft

1    house evening of fire."  This is a question I

2    intended to ask, "What was normal routine for

3    Saturday cooking wise."

4        Q.    That's a question you meant to ask, not

5    something he told you?

6        A.    Right.  That was something I was going

7    to ask, and he later told me that generally they

8    would cook an afternoon meal and they would eat

9    leftovers.  They didn't typically cook dinner.

10       Q.    Okay.

11       A.    "Not typical to cook or make coffee at

12   night.  Electric heater, laundry room for cats.  He

13   to bed," referring to Mr. McCuistian "about

14   8:00 p.m.  Her to bed and read about 8:00 p.m.

15   Last saw her approximately 10:00 and talked to

16   her.  Typically the lights were on in the office at

17   night.  Dishwasher light on that night.  10:30 to

18   bed.  11:30 to smoke.  Through family room to

19   sliding glass door.  Smelled a galvanized burning

20   smell.  Possibly fell asleep on porch.  Saw light,

21   heard pops.  Walk in glass door and saw fire from

22   kitchen door at ceiling, heard her yell.  Back out

23   glass door, across street, back to his window

24   referring to Mr. McCuistian and banging on the

1    door."  Last page is "Mr. Possibly went to bedroom

2    before leaving house."

3         Q.    Okay.  Explain that to me.  What was --

4         A.    I think he was referring to

5    Mr. McCuistian he thought may have went and tried

6    to go to her bedroom.

7         Q.    Okay.

8         A.    Before leaving the house because I guess

9    it took a few minutes for him to get up and out.

10   The last line below that is trying to get bars off,

11   possibly broke her bedroom window.

12        Q.    Okay.  Is that everything that

13   Mr. Laroux told you when you interviewed him?

14        A.    That's what I recall from the

15   interview.  It's been --

16        Q.    You don't remember anything separate

17   from that?

18        A.    Not from the interview.

19        Q.    Okay.  From the interview with him?

20        A.    Correct.

21        Q.    Did you -- do you remember any other

22   conversations with either Mr. Mason or Mr. Laroux

23   that you didn't take notes on?

24        A.    Mr. Mason, no.  Laroux was there around

```
1    a couple times.  We had an interview with him at a

2    joint exam.  I didn't take notes of that session.

3    So I don't recall specifics right now.

4        Q.    Is there anything from either one of

5    those interviews that you felt was significant in

6    your investigation?

7        A.    Yes.  The light in the kitchen window,

8    the smelling of the galvanized, no one cooking,

9    lights on.  The dishwasher, problems with the

10   dishwasher.  There's a lot of significant

11   information here.

12       Q.    Is there anything in either one of those

13   statements that you actually ultimately relied upon

14   in making any determinations regarding cause and

15   origin?

16       A.    The galvanized burn smell is not

17   something -- it got me curious as to when he left

18   -- we've got a large period of time we need to --

19   and that's why I put time on here, I believe.  I've

20   got an asterisk for time.

21       Q.    When you put the asterisk with time what

22   were you questioning there?

23       A.    The time line, if there was any way to

24   specify the time, did he text, did he make a phone
```

Kenneth Ashcraft

1   call, did he see a clock.

2       Q.    Did he ever describe to you any way that

3   he could be reasonably certain regarding what the

4   time was?

5       A.    Just the -- he was pretty specific, last

6   saw her 10:00 p.m., 10:30 to bed, 11:30 to smoke.

7       Q.    Did he specify --

8       A.    About --

9       Q.    I was going to say, with the 11:30 to

10  smoke do you know whether that was an

11  approximation, whether he said he saw a clock or

12  looked at his watch, checked his phone?

13      A.    Sounds like he had a pretty routine,

14  sounds like he had a fairly routine, go to bed,

15  smoke, go to bed, smoke.  So I -- these are the

16  numbers he gave me.

17      Q.    So you don't know if those numbers are

18  accurate as far as the time line?

19      A.    I don't have a video or he doesn't have

20  any proof of the specific time.  That's just what

21  he told me.

22      Q.    The galvanized smell, you said that

23  interested you.  What did that indicate to you?

24      A.    That there was something out of the

Kennedh Ashcraft

```
 1   ordinary well before the fire department was

 2   called.

 3       Q.    Okay.  Mr. Castellano has rendered an

 4   opinion that there was an electrical arc which

 5   started this fire?

 6       A.    Correct.

 7       Q.    Okay.

 8       A.    That's part of the failure, was an

 9   arcing.  It's not ...

10       Q.    Right.  Well, I mean, I'm not trying to

11   misstate what he said.  He said that the electrical

12   -- an electrical or series of electrical arcs

13   caused the ignition?

14       A.    An electrical failure.

15       Q.    Okay.  That's what you understand?

16       A.    Right.

17       Q.    Okay.  Would that result in the smell of

18   galvanized metal?

19       A.    Could.  I mean, it depends on a person's

20   interpretation of smell.  I can't really say.  It

21   was just an odd smell, something out of the

22   ordinary.  It is not something he smelled in the

23   house before.

24       Q.    Now, you said that you did have some
```

Kenneth Ashcraft

1    opinions regarding how the fire propagated or

2    progressed?

3        A.    Yes.

4        Q.    Okay.  Have you done any type of

5    evaluation to determine how long or how quickly the

6    fire would have progressed?

7        A.    Calculations, no, but just general

8    impression I believe that the fire started or the

9    event started well before the flaming ignition was

10   observed.

11       Q.    Okay.  What makes you believe that?

12       A.    The smell, the smell that Gary Laroux

13   describes.

14       Q.    Well, it's my understanding Mr. Laroux

15   says he smelled that when he was leaving.  He

16   smoked a cigarette.  And while he was smoking a

17   cigarette, he saw flames in the window, correct?

18            MR. TALMADGE:  Object to the form.

19       A.    At some point after arriving on the

20   patio he saw the light.

21       Q.    And when you say it had been going on

22   for a long time --

23       A.    I'm --

24       Q.    I mean, there wouldn't be a lot of time

Kenneth Ashcraft

```
1    between walking through, going outside, and you

2    start -- don't finish smoking a cigarette and you

3    see flames, correct?

4              MR. TALMADGE:  Object to the form.

5         A.   His time -- his statement to me leaves

6    about an hour.  I know the fire department call was

7    around 12:30.  And he arrived -- he went out to

8    smoke about 11:30.  We are talking ballpark an

9    hour.

10        Q.   Again, you said you don't know if he's

11   right about that 11:30 time frame?

12        A.   I had no physical evidence, correct.

13        Q.   And what he actually described to you

14   was walking through to the sliding doors, smelling

15   galvanized metal, not seeing any smoke or flames at

16   that point, getting on the porch, starting to smoke

17   a cigarette, correct?

18        A.   I understood from -- he smoked a couple

19   cigarettes.  He was out there for -- in my

20   statement says he may have dozed off.  I have no

21   physical evidence.  Just what he told me.

22        Q.   Besides what he told you, do you have

23   any evidence or basis for any determination how

24   long it took for there to become a flaming fire in
```

Kenneth Ashcraft

1    this instance?

2        A.    Repeat the question.

3        Q.    You mentioned you said you felt like or

4    thought that this event -- I think you used the

5    term -- had been going on for a while?

6        A.    Yes.

7        Q.    Okay.  What event are you referring to?

8        A.    The failure of the components within the

9    refrigerator which started to overheat and

10   eventually caused a flaming fire.

11       Q.    Okay.  Do you understand that

12   Mr. Castellano said that overheating of the

13   conductors did not cause the fire?  You understand

14   that?

15           MR. TALMADGE:  Object to the form.

16       A.    It's a --

17       Q.    Let me ask it a different way.  Have you

18   and Mr. Castellano discussed his opinions?

19       A.    Yes.

20       Q.    Okay.  And would you defer to him on how

21   the fire actually started as far as ignition?

22       A.    Well, what I understand is that there

23   was a failure, a heating of the circuitry which led

24   to a total failure and arc, which you've got

1  heating prior to the arc but we don't know how

2  long.

3        Q.    Okay.

4        A.    And my time line is based on the odd

5  smell which fire, things heating up and giving off

6  vapors can produce odd smells.

7        Q.    The odd smell that was described was a

8  galvanized metal, correct?

9        A.    Yes.

10       Q.    Heating of the PVC or the rigid foam

11  insulation would not cause a galvanized metal

12  smell, correct?

13       A.    That's relational, I mean, based on his

14  interpretation.  I've never seen anybody weld

15  galvanized -- so I don't know -- I can't compare

16  that.  It's an abnormal condition is what I

17  register in my mind.

18       Q.    Okay.

19       A.    I don't know what --

20       Q.    Do you have any training or -- well, let

21  me ask you this first.  Do you expect to render an

22  opinion regarding what that smell may have been?

23       A.    Repeat the question.

24       Q.    Do you -- I guess it's a bad question.

1    Do you have any expectations to render an opinion

2    about what caused the smell Mr. Laroux described?

3        A.    I believe that it is, in fact, part of

4    the failure which led to the fire.

5        Q.    Okay.  Are you expecting to testify to

6    that?

7        A.    I'm not sure.

8        Q.    Okay.  Do you have any basis for that

9    belief?

10       A.    The fact that he has a -- he observes

11   with his senses an abnormal condition.  To his mind

12   he's been living there for a year and he's never

13   smelled this in the house before and then a short

14   period of time later there's a fire leads me to

15   believe that those two things are related.

16       Q.    Okay.  But you're just solely basing

17   that on what he told you, not on any scientific

18   principles or expertise that you have?

19       A.    The understanding of heated materials

20   will give off odors, vapors.  And there is some

21   scientific thought process behind that.  Like I

22   said, anything being heated can give off an odd

23   smell of vapors.

24       Q.    Do you know if PVC -- Mr. Castellano

1    testified that the insulation on the wiring was PVC

2    and there's a semi-rigid foam around the wiring

3    that he says failed.  Do you know if they give off

4    a smell when they're heated or not?

5        A.    It gives off an odor, yes.

6        Q.    What kind of odor does it give off?

7        A.    I don't know how to describe it.  I

8    don't have anything to associate it with.  I don't

9    -- it's not part of my practice to odor test.

10       Q.    You did in your documentation produce to

11   us some information you had looked up regarding

12   cyclopentane and the rigid -- semi-rigid insulating

13   material, correct?

14       A.    Correct.

15       Q.    And both of those items were considered

16   to be highly flammable, correct?

17       A.    Some of the documentation and -- there's

18   one test from overseas that calls it highly

19   flammable.  Pentane is a blowing agent, and this is

20   what actually propels the material from the

21   dispenser to the shell.  So it is a hydrocarbon

22   blowing agent, and I believe that's flammable.

23       Q.    Do you have any education or training in

24   the properties of these two chemical substances?

Kenneth Ashcraft

1        A.    Not specific training in those two

2   chemical substances.

3        Q.    Do you have any education or training in

4   the temperature at which they will ignite?

5        A.    Just the research that I've pulled up.

6   I would have to go back and look at that.

7        Q.    You don't have any education or training

8   but you did look it up?

9        A.    Yeah, I don't have specific training on

10   that chemical.  I have an understanding of the --

11   yes.

12        Q.    Okay.  And if the information that you

13   included showed an ignition temperature of between

14   300 and 800 degrees; is that correct?

15        A.    I would have to go back and look.

16        Q.    You don't remember?

17        A.    I don't recall.

18        Q.    Do you know what temperature an

19   electrical arc causes?

20        A.    It could be in the thousands of degrees.

21        Q.    It will be well above the ignition

22   temperature of both of those items?

23        A.    Correct.

24        Q.    Once the fire started you indicated that

Kenneth Ashcraft

1    it progressed or propagated out and up, general

2    fire principle?

3        A.    Right.

4        Q.    Do you have any opinions that you expect

5    to offer regarding how quickly the fire propagated?

6        A.    Once ignited to a flaming ignition and

7    sufficient oxygen was supplied, it was fast.  It

8    was from the time of his abnormal smell to that

9    approximate -- they called the fire department at

10   12:30.  So that smell to me -- and I -- I don't

11   have any proof what smell was what, but that seems

12   to be related to me.

13       Q.    Okay.

14       A.    I have no proof.

15       Q.    That's my question.  You're being

16   offered as an expert witness in the cause and

17   origin of the fire.  Are you expecting to give or

18   are you qualified to give any opinions about how

19   quickly the fire progressed?

20       A.    Yes, I believe that the -- I believe

21   that this fire started as a heating event which

22   progressed to a total failure of the electrical

23   conductor, which produced an arc and flame and

24   ignition.

1      Q.     And once there was flame and ignition

2    how long did it take for the fire, for example, to

3    enter the hallway?

4      A.     Minutes.

5      Q.     And what is your basis for that opinion?

6      A.     The plastics and materials involved in a

7    refrigerator will degrade rapidly and burn

8    intensely and it's going to be pulled into the

9    hallway quickly through the two entryways into the

10   dining room and hallway.

11     Q.     Okay.

12     A.     With the oxygen, pulled toward the

13   oxygen.

14     Q.     But, again, I know they burn quickly.

15   Do you have any basis for determining how quickly?

16   In other words, let's assume for the purposes of

17   this question that the fire started at 12:30.  That

18   was ignition.

19     A.     Uh-huh.

20     Q.     In your opinion and Mr. Castellano's in

21   the refrigerator.  How many minutes would have gone

22   by before there was flame in the hallway?

23     A.     I can't give you an exact minute.  I can

24   tell you that it was just a few, less than three.

Kenneth Ashcraft

```
 1        Q.    Less than three?

 2        A.    Less than three.

 3        Q.    That's your opinion.  And how long would

 4   it have been before the flame or other -- when

 5   you're talking about the fire you get to the point

 6   of what we call tenability?

 7        A.    Yes.

 8        Q.    And you get to the point of when

 9   someone, for example, I think Mr. McCuistian or

10   Mr. Laroux described trying to go into the hallway

11   and not being able to.

12        A.    Right.

13        Q.    How long would it have been before the

14   flames, smoke, or other products, carbon monoxide,

15   other products from the fire would have prevented

16   Ms. McCuistian from exiting her room?

17        A.    From the time of flaming ignition.

18        Q.    From the time of flame --

19        A.    Three to five minutes.

20        Q.    Okay.  And you mentioned that there were

21   burglar bars on Ms. McCuistian's window?

22        A.    Yes.

23        Q.    And on the home in general, correct?

24        A.    Yes.
```

Kenneth Ashcraft

1       Q.      Is that a code violation?

2       A.      I can't tell you what code was in effect

3    when those were installed.  Basically it goes back

4    to what -- you would have to know what year they

5    were installed and what the code was in the county

6    or city.

7       Q.      I understand.  They may be grandfathered

8    in under some old code.  But under current codes

9    would it be a code violation?

10      A.      I would have to look up the code.

11      Q.      You don't know?

12      A.      I'm not -- I don't put myself out as a

13   code expert.  There's a lot of them.

14      Q.      I understand.  Were there any other

15   exits from Ms. McCuistian's bedroom besides the

16   doorway to the hall and the window?

17      A.      From what I understand and I believe

18   this is just in conversation, the doors -- I

19   believe there was a door into a closet or what used

20   to be a sun room turned into a closet, and that

21   door was not used or blocked.  So my understanding

22   is the only two exit points were the hallway door

23   and the window with bars on it.

24      Q.      There was a window in her bedroom, but

Kenneth Ashcraft

1    it was blocked by burglar bars.  There was a

2    doorway that went into what was used as a closet.

3    And actually would you mark -- show it on the

4    diagram where we're talking about.  I think you've

5    got it labeled.

6        A.    Yeah, I've actually got a door to the

7    hallway in the drawings.

8        Q.    Okay.  In the drawing you show a doorway

9    from Ms. McCuistian's bedroom into a room that had

10   been converted into a closet and then a doorway

11   into the hall that would open up right by the back

12   door or the exit door?

13       A.    In conversations afterwards, yes.  That

14   I --

15       Q.    That's in the diagram, correct?

16       A.    Yes.  The door is on the diagram.

17       Q.    But you understand from talking to who

18   that that doorway and you said that -- let me

19   rephrase that.

20            The doorway from the closet or the old

21   sun room to the hallway, that would have been an

22   exit, was blocked or closed off in some way?

23       A.    That was my understanding.  I don't

24   recall who told me that.  I remember one of our

1    many visits I asked the question in my mind why

2    didn't she just go out this way.  Well, the logical

3    explanation is she was either overcome and couldn't

4    make it or it was blocked and not available just

5    like the window.

6         Q.    Do you have any information regarding

7    how much time would have gone by before she was

8    overcome by the effects of either the fire or the

9    smoke or the carbon monoxide?

10        A.    Can you repeat that?

11        Q.    At some point Ms. McCuistian died

12   according to the autopsy from a combination of

13   fire, smoke inhalation, other results of the fire,

14   correct?

15        A.    Correct.

16              MR. TALMADGE:  Object to the form.

17        A.    Correct.

18        Q.    Do you have any opinions about how long

19   it would have been for the fire to progress to the

20   point where either the flames, the smoke, carbon

21   monoxide or other products of the fire overcame her

22   to the point where she could not move?

23        A.    Again, back in the three to five minute

24   range from flaming ignition.  That's once you have

Kenneth Ashcraft

```
1    flames and degrading plastic and foams and more

2    rapid development of the fire.

3        Q.    Okay.

4        A.    Her door being directly across from one

5    of the ventilation points of the kitchen to make

6    that time even shorter.

7        Q.    Do you know if her bedroom door was

8    closed when she -- when the fire started or not?

9        A.    I've read in depositions that she slept

10   with it open, but I don't have an opinion from --

11   whether it was open or closed.

12       Q.    Okay.  So your opinion is that the fire

13   would have progressed so rapidly that within three

14   to five minutes she would have been overcome by the

15   products of the fire?

16            MR. TALMADGE:  Object to the form.

17       A.    Yes.

18       Q.    Okay.

19       A.    And that's assuming that the door is

20   open based on the depositions.

21       Q.    In the three to five minute window is it

22   your understanding that she was awake at any point?

23       A.    We have Gary Laroux's statement he heard

24   her yelling.  We have the firefighter's statement
```

Kenneth Ashcraft

1    of where the body was found which also indicates

2    she moved from the bed.

3        Q.    So at least according to Gary Laroux and

4    the fact that she moved from the bed there is

5    indication that she was awake and aware of a fire?

6        A.    There's indication she was awake.

7        Q.    Okay.  Indication she was awake.  And

8    during that three to five minute window would there

9    have been -- if there had not been burglar bars on

10   the window and if that doorway to the closet had

11   not been blocked, would there have been anything

12   that prevented her from exiting the home in those

13   egress points?

14       A.    The heat and smoke emanating from the

15   kitchen would be a deterrent, whether she knew to

16   get on the ground and crawl out or if she was

17   overcome so quickly she didn't have time to think

18   or if she just didn't think and retreated and ran,

19   there's just no understanding a person's thought

20   process when they're faced with a fire.

21       Q.    Okay.  I'm not asking you to say what

22   she would have done.  I'm asking would she have had

23   time to egress the home from one of those exit

24   points?

Kenneth Ashcraft

```
 1        A.      With proper warning and notification.

 2        Q.      Okay.  Let's go over there.  You said it

 3   would take about three minutes for the fire to

 4   progress to a point where she couldn't come out of

 5   her bedroom door, correct?

 6        A.      Three to five.

 7        Q.      And at some point in the three to five

 8   minute range in your opinion she would have been

 9   overcome by the smoke, or smoke, carbon monoxide or

10   flame?

11        A.      Could have been based on her -- yes.

12        Q.      I mean, that's what your opinion is,

13   that's what you think?

14        A.      We're estimating time frames.  I don't

15   know time frames specifically.

16        Q.      Okay.

17        A.      So my opinion is -- are estimates of

18   time based on --

19        Q.      They're general estimates?

20        A.      Right.

21        Q.      Would the exit further down the hall

22   from the old sun room in the closet, would it have

23   been untenable or would you have been unable to

24   leave it as quickly as you were unable to leave the
```

Kenneth Ashcraft

1    bedroom?

2        A.    You have to repeat that one.

3              MR. TALMADGE:  Object to the form.

4        Q.    You mentioned that just based on your

5    opinion that within three to five minutes you felt

6    Ms. McCuistian would have been unable to leave

7    bedroom two, by the door of the bedroom to the

8    hall, correct?

9        A.    Correct.

10       Q.    How much longer would it have taken for

11   the fire to progress to a point where you would be

12   unable -- if that door wasn't locked, to leave that

13   door from the bedroom to the closet into the

14   hallway?

15       A.    Just a ballpark estimate, a couple

16   minutes.

17       Q.    Couple more minutes?

18       A.    Yes

19       Q.    So ballpark estimate three to five

20   minutes in the bedroom and an additional couple

21   minutes if that exit had not been --

22       A.    If that was a true accessible room and

23   doorway, another couple minutes ballpark.

24       Q.    And how long before the bedroom filled

1    to the point where you would be unable to leave by

2    the window if it didn't have burglar bars on it?

3         A.    It depends on what point somebody

4    breached the window because when they breached the

5    window they made another ventilation point for the

6    fire, which pulled the fire through the room.

7         Q.    Okay.  So whoever breached the window

8    actually caused the conditions in her bedroom to

9    worsen, correct?

10        A.    Correct.

11        Q.    And we don't know what the condition was

12   before they breached the window or -- at that

13   point?

14        A.    We know it was -- no.

15        Q.    Now, those time estimates that you've

16   just given about progression and tenability and

17   those issues, is there any scientific basis for

18   those or are those just kind of your opinions?

19        A.    There are scientific smoke travel

20   models.  There are propagation measurements and

21   estimates and research and things like that.  I

22   can't quote anything specific.

23        Q.    Okay.  Well, do you have any education

24   or training in smoke or fire propagation models?

```
 1        A.    I'm not a -- an expert.  I'm aware that

 2   they are available, yes.  And I'm aware of the

 3   principles they work on, but I'm not an expert.

 4        Q.    You're not an expert in those fields?

 5        A.    I don't create models.

 6        Q.    And you don't claim to have the

 7   education or training to give those type of models

 8   as far as exact times for tenability or propagation

 9   of the fire?

10        A.    Correct.

11        Q.    And you're not expecting to give

12   opinions regarding those things, even though you

13   may have them?

14        A.    No.

15        Q.    Okay.  There were some descriptions from

16   the witnesses of the fire coming out of the roof

17   into the hallway, if I'm correct.  Do you remember

18   any testimony like that?

19        A.    I believe one of Mr. McCuistian's

20   depositions talks about fire coming out of the

21   hallway ceiling.

22        Q.    Okay.  What would cause that?

23        A.    I think that's just a misinterpretation

24   of the fire exiting the kitchen traveling across
```

Kenneth Ashcraft

1    the ceiling toward the open living room area.

2        Q.    Okay.  Now, you mentioned that there was

3    a lot of fuel for the fire in the kitchen?

4        A.    Yes.  Yes, it's all wood construction.

5        Q.    And it was older construction that would

6    have burned faster than certain new types of

7    construction I think you said if it had had

8    wallboard, for example?

9        A.    Sheetrock.

10       Q.    Sheetrock?

11       A.    Yes.

12       Q.    Right.  Do you know or have any opinions

13   regarding what type amount or time frame that those

14   products in the kitchen -- what type of products

15   there would be from them burning?  In other words,

16   how much carbon monoxide they would produce and the

17   smoke they would produce and the type of smoke they

18   would produce?

19             MR. TALMADGE:  Object to the form.

20       A.    There's three parts to the question.

21       Q.    I understand.  Do you know any of that?

22       A.    Give them to me one more time.

23       Q.    Okay.  I'll withdraw it.  You've already

24   said you don't have that kind of training.

Kenneth Ashcraft

```
 1              Besides your training as a firefighter,

 2    your experience as a fireman, and your training in

 3    cause and investigation origin that you described,

 4    have you had any other type of scientific or

 5    educational training?

 6         A.    Other than what's in my CV or fire

 7    related, not scientific specific training.

 8         Q.    I understand.

 9              MR. KING:  I think that's all the

10         questions I have.

11              MR. OLINDE:  I have some questions for

12         you.

13              THE WITNESS:  Can we take --

14                    EXAMINATION

15    BY MR. OLINDE:

16         Q.    My name is John Olinde.

17              THE WITNESS:  Have we got time for a

18         break?

19              MR. OLINDE:  Sure.

20              (Off the record.)

21    BY MR. OLINDE:

22         Q.    Mr. Ashcraft, may name is John Olinde.

23    I represent Underwriters Laboratories.  You and

24    I have met before.
```

1          A.      Correct.

2          Q.      First of all, with respect to your

3    opinions in this case -- and I know we've already

4    talked about the disclosures that you made in this

5    case and your expert report.  As I understand it,

6    you've given one expert report, correct?

7          A.      Correct.

8          Q.      And I'm also correct in understanding

9    that you're not going to give any opinions at trial

10   concerning the Underwriters Laboratory standard

11   217?

12         A.      I'm not familiar with the standard.

13         Q.      So you're not an expert obviously in

14   that standard, correct?

15         A.      Correct.

16         Q.      You have been present at two different

17   inspections of the remnant of the smoke alarm that

18   was recovered from the McCuistian home?

19         A.      Yes.

20         Q.      And the purpose of you being there was

21   simply to photograph the smoke alarm?

22         A.      Correct.

23         Q.      You did not do any testing of the alarm

24   yourself; is that correct?

Kenneth Ashcraft

```
1        A.     Correct.

2        Q.     From the information that you have

3   gathered from photographs, am I correct in

4   understanding that you cannot determine the

5   manufacturer of the battery of that smoke alarm?

6        A.     Correct.

7        Q.     And you're not able to determine or

8   identify the model number of that smoke alarm?

9        A.     Correct.  I don't know the specific

10  model of the smoke alarm.  Just that we compared it

11  to two similar models, that it looks more like this

12  one than the other.

13       Q.     And you're not an expert in smoke

14  alarms.  And so you don't know what the model of

15  that smoke alarm is, right?

16       A.     Correct.

17       Q.     You also do not know the year of the

18  manufacture of that smoke alarm, do you?

19       A.     No.

20       Q.     Did -- in the -- when you went to the

21  home and you found the remnant of the smoke alarm,

22  did you also look for the user's manual for the

23  smoke alarm?

24       A.     No.
```

1       Q.     Were you given any instruction to go

2    ahead and look for the user's manual of the smoke

3    alarm?

4       A.     No.

5       Q.     You have made no attempt to model the

6    fire; is that correct?

7       A.     Correct.

8       Q.     In fact, you don't have any expertise to

9    model a fire?

10      A.     Correct.

11      Q.     And when we talk about and you talked to

12   counsel for BRK about the time elements of the

13   fire, that what -- that information that you have

14   provided one way to determine how a fire propagates

15   is to do -- and how long it takes is to do a fire

16   model; is that correct?

17      A.     I'm sorry.  Repeat that.

18      Q.     And with respect to determining how a

19   fire propagates, one way to look at that is by a

20   fire modeling; is that correct?

21      A.     One way is, yes.

22      Q.     And when -- let me ask you -- about the

23   wood that's in the home, what type of wood is that

24   that's in that McCuistian home?

Kenneth Ashcraft

1        A.    I didn't identify the specific wood.  My

2   thoughts are deep pine.

3        Q.    And the door, was that -- that's to

4   Ms. McCuistian's bedroom, is that a hollow or solid

5   door?

6        A.    I believe that's a solid wood door.  I

7   would have to look at the pictures to verify.

8        Q.    You have done some testing or you lit

9   with what sounded like a Bic lighter or something,

10  you lit the foam?

11       A.    Yes.

12       Q.    Okay.  And when you -- did you take any

13  photograph or any videotape of that when you

14  actually lit the foam?

15       A.    No.

16       Q.    Did you do any sort of looking at your

17  watch or to set forth how long it took for you when

18  you put your flame to that foam, how long it took

19  for it to ignite?

20       A.    No.

21       Q.    Do you remember?

22       A.    It was instant.

23       Q.    That it did create a flame, meaning did

24  it create a plume or some sort of flame itself when

Kenneth Ashcraft

1    you put the lighter to it?

2        A.    Yes, the open flame in the lighter did

3    ignite the foam material.

4        Q.    And it burned?

5        A.    Yes.  Sustained, yes.

6        Q.    When you -- you said that there had been

7    some inspections of the -- that you had been to the

8    McCuistian home.  And every time you've gone to an

9    inspection you would have had a sign-up sheet?

10       A.    Any time there was a joint -- a joint

11   exam then, yes, I typically have a sign-up sheet.

12   If I don't have a site sign-up sheet, I try to get

13   people's names on paper.

14       Q.    In the file material that you presented

15   to us today, I see where there's sign-in logs as

16   one of the pieces of information that you provided

17   to us?

18       A.    Yes.

19       Q.    And I'm going to show this to you.  Is

20   this all of the sign-up sheets that you have --

21   that you would have had for those times that would

22   have been an inspection which involved more than

23   yourself?

24       A.    I believe so.

1    Q.    Okay.  So we have eight different ones,

2  eight different sign-in log-outs, or logs, correct?

3    A.    Yes.

4    Q.    Okay.  Were you involved in notifying

5  other third-parties about coming to a particular

6  inspection?

7    A.    No.

8    Q.    As part of your job as a -- or part of

9  your responsibilities and duties under NFPA 921, is

10 part of it to give advice that third-parties who

11 may have some involvement in the fire need to give

12 notice, need to be provided notice?

13   A.    That's part of the -- yes.

14   Q.    So part of your responsibility as a

15 cause-and-origin fire investigator is to provide

16 whoever hired you the advice that they need to give

17 third-parties who may have some involvement in the

18 case notice, correct?

19   A.    It depends on the scope as presented by

20 my client.  I don't include every portion of 921 in

21 every situation.  But, yes, if asked I can offer my

22 advice on who should or shouldn't be involved.

23   Q.    So are you reading NFPA 921 to say that

24 you have to be asked --

Kenneth Ashcraft

1        A.     That a --

2        Q.     -- as a cause-and-origin fire

3    investigator as to who should be or whether a party

4    should be placed on notice before an inspection?

5        A.     I'm saying that 921 is a guideline in

6    performing a fire explosion investigation.  It's

7    not the letter of the law I have to follow.  It has

8    recommendations and if I see an interested party

9    who is not on notice who should be or even a party

10   who is on notice and shouldn't be and I'm asked, I

11   will present my opinion to a client.  And if it's

12   blatantly obvious or if I feel strongly enough I'll

13   speak my mind without being asked.  This is all

14   contextual to the situation.

15       Q.     Well, did you -- were you ever asked

16   about whether or not third-parties or interested

17   parties should be placed on notice of the

18   investigation that you were conducting?

19       A.     I'm sure there were conversations.  I

20   remember in particular the dishwasher.

21       Q.     How about with respect to the smoke

22   alarm?

23       A.     No.

24       Q.     Can you tell me why it is that

Kenneth Ashcraft

1    Underwriters Laboratories was never notified of the

2    inspections that were occurring at the McCuistian

3    home?

4        A.    I have no idea.

5        Q.    But you did -- when you did see the

6    smoke alarm, you saw on the smoke alarm, was there

7    an UL mark on the smoke alarm?

8        A.    I would have to look at the photos to

9    see if it's visible.  I don't recall specifically.

10       Q.    That's something you would have

11   photographed when you first saw the smoke alarm?

12       A.    Yes.

13       Q.    And from the time you found the smoke

14   alarm until the next inspection it was about two

15   and a half months?

16       A.    Whatever the --

17       Q.    So from about April 24th I think you

18   said of 2014 and the next inspection was in July of

19   2014?

20       A.    Sounds right.

21       Q.    And some time during that period of time

22   this smoke alarm manufacturer was notified that

23   there was going to be an inspection?

24       A.    I don't recall exactly the sequence of

Kenneth Ashcraft

1   the events, and I wasn't party to the notification.

2       Q.    Well, were you a party to conversations

3   about who should be notified of the inspection

4   which ultimately took place in July of 2014?

5       A.    They asked me who -- from the label who

6   manufactured it, and all I could say is I recognize

7   the labeling of the Family Guard from Internet

8   research comparison.

9       Q.    You've told us about your notes that

10  you've had with the two witnesses, Mr. Mason and

11  also a Mr. Laroux.  Did you ever take any recorded

12  statement of Mr. Laroux?

13      A.    I tried to take one during the joint

14  exam.  We were all on the patio taking his

15  interview.  And I tried to do a recorded statement

16  like everybody else and mine didn't work.

17      Q.    Okay.

18      A.    I had a bad --

19      Q.    You don't have one?

20      A.    I had a bad app.  I don't have a

21  recorded statement.

22      Q.    How about Mr. Mason, did you get a

23  recorded statement of Mr. Mason?

24      A.    No.

1      Q.    That's not your practice to get a

2   recorded statement?

3      A.    No.

4      Q.    Did you take any or speak to any other

5   persons that you believe were witnesses or

6   potential witnesses with respect to the fire?

7      A.    The -- I tried to find this fellow that

8   reportedly had a video but he was never around.  I

9   couldn't locate him.

10     Q.    So there's -- besides Mr. Mason and

11   besides Mr. Laroux, anyone else that you would have

12   spoken with concerning the fire that was a

13   potential witness?

14     A.    I had just a couple of interactions from

15   Mr. McCuistian, but I didn't interview him.  He let

16   me in the house one time, I believe.  One time we

17   were there, and he was there feeding the cats or

18   something and he was leaving, but not a formal

19   interview.

20     Q.    So nothing recorded for Mr. McCuistian?

21     A.    No.

22     Q.    Anyone else?

23     A.    No.

24           MR. OLINDE:  I believe that's all the

Kenneth Ashcraft

 1      questions I have for now.  Thank you.

 2                      EXAMINATION

 3   BY MS. LEE:

 4      Q.    Mr. Ashcraft, hello, my name is Jeannine

 5   Lee.  I just have probably one.  But lawyers should

 6   never say that.

 7            We saw the notes that you had of your

 8   interviews with Mr. Mason and Mr. Laroux.  Do you

 9   have any other notes in your file?

10      A.    Just whatever is in there is drawings

11   and things like that.

12      Q.    So just those sketches and, for

13   instance, the char sketch, that sort of thing?

14      A.    Yeah.

15      Q.    Is it your practice to take notes when

16   you take a phone call or do something of the like?

17      A.    No, not -- I don't have a phone log or

18   anything.

19      Q.    Okay.  When Mr. Morris asked you to go

20   and look for a smoke alarm at the property, did he

21   do that in person or did he do that over the

22   phone?

23      A.    I don't recall.  I wasn't in person.  I

24   don't live in Dothan so it would have been phone or

Kenneth Ashcraft

```
 1    e-mail.

 2        Q.    Okay.

 3              MS. LEE:  Thank you, sir.

 4              MR. TALMADGE:  I don't have anything.

 5              MR. HOOKS:  I have none.

 6              MR. KING:  Yeah, I just have two

 7        follow-ups.

 8                    RE-EXAMINATION

 9    BY MR. KING:

10        Q.    I understand you're not giving opinions

11    -- well, let me rephrase that.

12              The only opinions you are going to give

13    at trial and that you're qualified to give are

14    what's in your report, correct, the ones in your

15    report?

16        A.    That's all I've been asked to do, yes.

17    The disclosure and the report are what I -- my

18    understanding of the events.

19        Q.    Okay.  I do want to ask, though, because

20    you kind of -- we explored just some beliefs you

21    had about the fire and things like that.  The

22    kitchen where the fire originated -- and I think

23    you mentioned this when you were talking about --

24    had over the doorways and the area that some people
```

Kenneth Ashcraft

1   call lintel, some people call it transom.  Do you

2   understand what I'm referring to?

3        A.    Yes.

4        Q.    There's part of the wall that comes down

5   that stops at the top of the door frame?

6        A.    Yes.

7        Q.    How would that affect the time for

8   smoke, carbon monoxide, fire, any products of this

9   flaming ignition that's going on, getting into the

10  hallway?

11       A.    The higher the ceiling the more space

12  volume you have to occupy with smoke to bank down

13  to the exit point in the smoke propagation.  In a

14  fire situation then the oxygen level in the kitchen

15  will drop fairly quickly and will start moving

16  towards oxygen rich environments which would be

17  through the two entryways.  So smoke banking down

18  as a fire develops and then fire also goes to the

19  highest point and then banks across.  So the higher

20  the ceiling, the longer the time.

21       Q.    How high were the ceilings in the

22  kitchen?

23       A.    Nine foot, I believe.

24       Q.    How far down the top of the doorway to

Kenneth Ashcraft

```
 1    --

 2         A.    Two and a half, I believe.

 3         Q.    Okay.

 4         A.    So seven foot, two to three.  I don't

 5    recall the measurements.

 6         Q.    And in your three to five minutes to the

 7    blocking of -- or you said you believed three to

 8    five minutes would make it where Ms. McCuistian

 9    could not escape from her doorway, correct?

10         A.    I'm taking into account a little above

11    eight foot ceiling height.  The higher the ceiling

12    the longer the time.

13         Q.    But how long would it have taken in that

14    three to five minutes for the smoke and the flame

15    to -- either the smoke to fill the kitchen to the

16    area where it could escape in the doorway, or the

17    flame to get out of the doorway?  How long in that

18    three to five minutes would that take?

19         A.    That depends on the amount of smoke

20    production.  I don't -- I have -- I haven't an

21    estimate of the amount of smoke that's produced

22    except for what I've read in depositions and

23    statements.

24         Q.    But it would take some time, correct?
```

Kenneth Ashcraft

1        A.    It would take a length of time.  I don't
2   know if it's 30 seconds or two and a half minutes.
3        Q.    Okay.  So it could be as much as two and
4   a half minutes of the three to five minutes?
5        A.    Yes.
6        Q.    Once it escaped the doorway, it was
7   right there so basically the other doorway is
8   blocked anyway?
9        A.    Well, you -- you -- yes, the doorways
10  are just caddy corner from each other.  It wouldn't
11  take long to block that access.  But, again, it
12  depends on the level of smoke production.
13  Mr. McCuistian had a light haze of smoke in his
14  room.  There's been different -- I've read
15  different descriptions of the smoke level in
16  different areas.
17       Q.    Okay.  Would -- in the three to five
18  minute time frame that you gave, would the fact
19  that the initial ignition in yours and
20  Mr. Castellano's opinion was in -- or at least
21  partially contained by the refrigerator, in other
22  words, it was inside the refrigerator?
23       A.    That's in my mind when I'm making these
24  estimates.

Kenneth Ashcraft

```
 1        Q.     I understand.

 2        A.     In the one --

 3        Q.     In the three to five minute range.  But

 4    would that have inhibited the escape of smoke into

 5    the home for some period of time?

 6        A.     If -- repeat that one more time.

 7        Q.     In other words, you and Mr. Castellano

 8    are saying that the initial ignition of the flaming

 9    fire was inside or contained inside the

10    refrigerator, correct?

11        A.     The initial failures in the shell of the

12    refrigerator.

13        Q.     In the shell of the refrigerator?

14        A.     Between the plastic and the metal,

15    correct.

16        Q.     Right.  Would the fact that it's in the

17    shell of the refrigerator delay how long -- delay

18    smoke and other products of the fire from getting

19    out into the home?

20               MR. TALMADGE:  Object to the form.

21        Q.     For some time period?

22        A.     There's too many variables to say.  But,

23    yeah, there would be some delay if there was a

24    completely encapsulated -- yes.  I mean, it's
```

Kenneth Ashcraft

1  possible.  I can't say.

2       Q.    Okay.  It's possible, you just don't

3  know?

4       A.    Yeah, it's --

5       Q.    And don't know how long of that three to

6  five minutes you gave it would have kept it from

7  escaping into other parts of the home?

8            MR. TALMADGE:  Object to the form.

9       A.    I haven't worked on any kind of time

10  line as far as the smoke escaping the refrigerator.

11           MR. KING:  That's all.

12           MR. HOOKS:  I'm sorry.  One quick

13       question for you.  And also a housekeeping

14       matter.  In case this wasn't on the record,

15       you provided to us today and your lawyers made

16       copies of a flash drive which each lawyer has

17       a copy of it.  First of all, with everyone's

18       consent I would like to make that an exhibit

19       in itself.  And rather than print it all out,

20       does everybody consent that we just make it as

21       its own exhibit?

22           MR. TALMADGE:  That's fine for us.  We

23       prefer you not print it out.

24           MR. KING:  I prefer it too.

```
 1                     RE-EXAMINATION

 2   BY MR. HOOKS:

 3      Q.    That leaves me with one thing, which is,

 4   Mr. Ashcraft, the e-mail -- there's an e-mail

 5   folder on here that lists e-mails.  When I've

 6   opened them up, it looks like it's in Outlook.  And

 7   it appears to be the first line or so of the

 8   e-mail, and then the language trails off.  As long

 9   as there's no electronic way to fix that, would you

10   agree to print off and get to your lawyer copies of

11   these e-mails so we can review them in full?

12           MR. TALMADGE:  Let me speak to that

13       since it's a production that the lawyer is

14       going to be in charge of and coming through

15       us.  And I'll say the e-mails that were

16       produced I have not gone through with any

17       detail.  And I know there's been some -- not

18       recent changes anymore of the federal rules

19       about communications between the expert and

20       the attorney.  So, I mean, what I've already

21       produced, I've already produced.  If there's

22       some additional things you're wanting that may

23       be covered by that privilege, I will just have

24       to let you know.
```

```
 1            MR. HOOKS:  What we're -- what I'm

 2     asking for is the e-mails that are produced on

 3     here but the only thing that shows up on them

 4     is the first line or so, not the entirety of

 5     that e-mail which has been produced.

 6            MR. TALMADGE:  I'll look at -- I said

 7     I'll have to look at it and make sure there's

 8     nothing privileged.  If there's nothing

 9     privileged, they will be produced.  I didn't

10     look at them at all this morning.  He just

11     copied them.  So I didn't know -- I didn't

12     know that.  We will produce whatever is not

13     privileged.

14            MR. HOOKS:  Okay.

15            MR. OLINDE:  I just have a couple more

16     questions.

17                    RE-EXAMINATION

18  BY MR. OLINDE:

19     Q.    Mr. Ashcraft, I understand that you have

20  been to the scene of the McCuistian home three or

21  four times?

22     A.    At least.

23     Q.    Did you consider your on-site

24  inspections to be critical to your opinions in this
```

Kenneth Ashcraft

```
1    case?

2        A.    Yes.

3        Q.    Do you know when it was that the -- let

4    me ask you this.  Did you ever receive a -- this

5    letter, I'm going to show it to you.  It's dated

6    December 12, 2013, and it's from Mr. Hooks here to

7    the attorneys.  I just want to see if you've seen

8    it before.

9              And you can scroll down if you'd like.

10       A.    No, I don't recall that.

11       Q.    So you don't know whether it was shared

12   with you that there was a concern that not all of

13   the manufacturers had been notified of the December

14   2013 inspection?

15       A.    I don't believe so.  I don't recall it.

16             MR. OLINDE:  I think that's all I have.

17   Thank you.

18             MR. TALMADGE:  That's it.

19                (Defendant's Exhibit Number 46

20                  was marked for identification.)

21                (Defendant's Exhibit Number 47

22                  will be marked for identification

23                  upon receipt.)

24             (End of deposition, 4:01 p.m.)
```

Kenneth Ashcraft

```
 1                 C E R T I F I C A T E

 2

 3   STATE OF ALABAMA  )

 4   JEFFERSON COUNTY  )

 5

 6        I hereby certify that the above and

 7   foregoing deposition was taken down by me in

 8   stenotype, and the questions and answers thereto

 9   were reduced to computer print under my

10   Supervision, and that the foregoing represents a

11   true and correct transcript of the deposition

12   given by said witness upon said hearing.

13        I further certify that I am neither of

14   counsel nor of kin to the parties to the action,

15   nor am I in anywise interested in the result of

16   said cause.

17

18                      /s/Lisa Bailey

19                      Lisa Bailey, CCR #289

20                      CCR #289, Expires 9/30/16

21                      Commissioner for the

22                      State of Alabama at Large

23

24
```