**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| RICHARD WARREN McCUISTIAN, | ) | |
| as Administrator for the Estate of ANNE | ) | |
| McCUISTIAN, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:15-cv-00279-JA-GMB |
| LG ELECTRONICS U.S.A., INC., BRK | ) | |
| BRANDS, INC.; SEARS ROEBUCK & CO.; | ) | |
| UNDERWRITERS LABORATORIES INC., | ) | |
| PITTWAY CORPORATION; AND | ) | JURY DEMAND |
| HONEYWELL INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT BRK BRANDS, INC.'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT B. DON RUSSELL

### STATEMENT OF RELIEF REQUESTED

Defendant, BRK Brands, Inc. ("BRK"), moves to exclude the testimony of B. Don Russell, Ph.D. ("Russell") - - the sole expert plaintiff, Richard Warren, as Administrator of the Estate of Anne McCuistian, proffered as to liability and causation. Alternatively, BRK seeks to limit Russell him from opining about fire protection engineering, otherwise narrow his testimony and/or exclude any evidence of testing he conducted.

### STATEMENT OF BASIS FOR THE REQUESTED RELIEF

Russell lacks the expertise to opine as to the matters he attempts to address. Although disclaiming any attempt to testify as a "fire expert," Russell offers opinions only a "fire expert" is qualified to address. He opines that single ionization sensor alarms are inadequate, that BRK failed to warn of their inadequacies and was grossly negligent in marketing them, that ceasing to market ionization alarms would result in increased sales of alarms with photoelectric sensors

which would lower their production costs through increased economies of scale, that the ionization smoke alarm allegedly installed in Ms. McCuistian's residence (the "Residence") failed to sound in a fire at the Residence because of its insensitivity to smoldering and slow growth fires and that a properly operating smoke alarm would have sounded in time to rescue Ms. McCuistian. Whether a smoke alarm fulfills its intended purpose of warning occupants of a fire is a complex issue of fire science requiring the judgment of experts in that field. That assessment cannot be made without a sophisticated understanding of the state-of-the art, fire dynamics, and humans' ability to hear and react to alarms and escape a burning structure. Moreover, a reliable opinion that a smoke alarm could have provided adequate notice of a specific fire for an occupant to escape safely cannot be rendered without determining the fire's cause and origin, modeling its progression, calculating when enough smoke reached the alarm to cause it to sound, when escape routes became untenable, and whether escape would have been possible in the interim. These are all pure issues of fire science.

Aside from his lack of qualifications, or more likely because he is unqualified in the relevant disciplines, Russell's opinions are not based upon commonly accepted principles or otherwise reliable. He proposes an unfeasible standard of performance and then assesses ionization alarms against an even stricter standard. While claiming his opinions are supported by his extensive testing, Russell provides no evidence that the tests were properly designed or that the results are statistically significant. He failed to apply any objective scientific rigor to analyzing those results and offers only a biased, subjective characterization of his testing. The jury must take Russell's word for what the results supposedly are. That is nothing more than the unsupported *ipse dixit* of a "want to be" expert.

Russell's opinion that an adequate smoke alarm would have sounded in time for Ms. McCuistian to escape is based upon the theory that a substantial quantity of smoke escaped the

kitchen refrigerator where the fire supposedly ignited and surrounded a smoke alarm allegedly installed in the hallway in sufficient volume to cause it to sound before conditions at the adjacent doorway to Ms. McCuistian's bedroom became untenable.  This theory is untested and unverifiable.  Russell admittedly has not studied the circumstances of the fire or modelled its progression.  He also fails to offer any experiential evidence of fires occurring as he theorizes. Russell's causation opinion is pure speculation and entirely unreliable.   He also ignores that Ms. McCuistian was an eighty year old woman who suffered hearing loss, had taken therapeutic doses of Oxycodone and fell during the fire, fracturing seven ribs.

Russell strays well beyond his field of expertise to offer opinions lacking even a scintilla of scientific acceptance or methodologies necessary to establish its reliability.  He should be precluded from testifying, or alternatively, his testimony should be dramatically curtailed and evidence of his testing excluded.

## MEMORANDUM OF LEGAL AUTHORITY

### A.    Factual Background Relevant to the Russell's Testimony

In the early morning hours of October 27, 2013, a fire ignited in the Residence.  The Residence was a single story structure in which Lonnie Loyd and Anne McCuistian resided since 1998.  Plaintiff claims that a Family Gard ionization smoke alarm was installed in the hallway (leading to bedrooms, an office and the bathroom) above the doorway to the kitchen when the McCuistians purchased the Residence.  (The alarm's alleged location is noted by an "X" on a floor diagram, which appears as Exhibit A to the Joint Appendix in Support of BRK's Motion to Excludeand Second Motion for Summary Judgment ["Jt. App."])  (Jt. App. Ex. B, 106:6-107:20; Jt. App. Ex. C, 89:21-91:20)

As is set forth in BRK's initial Motion for Summary Judgment (Dkt. 94), the McCuistians never cleaned or tested the smoke alarm in the fifteen years they lived in the

Residence, except for shortly before the fire when Mr. McCuistian claims to have tested it after changing the battery.  He repeatedly testified, however, that the smoke alarm did not sound when tested.  (Jt. App. Ex. B, 113:7-12; Jt. App. Ex. C, 92:4-8; 92:19-93:11; 108:2-109:3)   The lack of response means its circuitry or horn components failed or were damaged before the fire.

Gary LaRue (a border with the McCuistians) returned to the Residence late in the evening prior to the fire.  (Jt. App. Ex. D, 99:5-20)  Mr. McCuisitan had already gone to sleep in the south bedroom (labeled "LMC BR" on Jt. App. Ex. A).  LaRue claims Ms. McCuistian was reading in the bedroom she maintained separate from her husband (labeled "AMC BR" on Jt. App. Ex. A), and to have spoken with her for about twenty minutes and then retired for the evening. (Jt. App. Ex. D, 104:9-107:18; 112:11-113:12)  He supposedly had difficulty sleeping and went to an enclosed porch to smoke cigarettes.  (*Id*., 115:15-119:3)  While on the porch, LaRue supposedly observed through a window flashing lights in the kitchen.  (*Id*., 124:12-127:2)  He ultimately reentered the house to investigate and saw flames lapping out of the doorway from the kitchen to the dining area and reaching the ceiling.  (*Id*., 127:3-132:7)  He retreated out the back door because of the intense heat.  (*Id*., 129:21-130:20)  As he retreated, LaRue heard Ms. McCuistian yelling for help.  (*Id*., 133:8-134:24)

LaRue ran across the street to a neighbor's house and yelled to call the Fire Department.  (*Id*., 135:9-136:1)  He returned to the house, pounded on Mr. McCuistian's bedroom window and yelled for him to get out.  (Jt. App. Ex. D, 136:9-13)  Mr. McCuistian awakened and was able to escape out the front door.  As he exited his bedroom, Mr. McCuistian looked down the hallway towards the kitchen and saw smoke and flames rolling across the hallway ceiling.  (*Id*., 83:22-85:11)  The neighbors also tried to assist and pounded on Ms. McCuistian's bedroom window.  (Jt. App. Ex. D, 141:18-142:6)  She did not respond and burglar bars prevented them from climbing into the bedroom.  (*Id*., 142:2-17; 159:2-14)  Ms. McCuistian perished in the fire and

was found face down just inside the doorway between her bedroom and the hallway. (*Id.*, 142:18-21; Jt. App. Ex. C, 136:22-137:9; Jt. App. Ex. A)  During autopsy, therapeutic levels of Oxycodone were found in Ms. McCuistian's blood stream.  (Jt. App. Ex. F)  It was also determined that Ms. McCuistian suffered seven fractured ribs in the fire before perishing from carbon monoxide poisoning.  (Jt. App. Ex. F)

**B.      Relevant Procedural History**

Plaintiff asserts wrongful death claims against BRK based upon the failure of the smoke alarm allegedly installed in the Residence to sound.  He claims that all smoke alarms utilizing ionization sensors, regardless of manufacturer or model, are defective because they are inherently insensitive to smoke from smoldering combustion or to so-called "slow growth fires." Plaintiff contends that a smoke alarm with a photoelectric sensor would have sounded in response to the fire in time for Ms. McCuistian to escape safely.

Plaintiff disclosed Russell as a retained testifying expert.  Russell is an electrical engineer who serves as the Regents Professor in the Department of Electrical and Computer Engineering of Texas A&M University.  His teaching and industry experience is focused upon electrical distribution systems.  (*See*, Russell *Curriculum Vitae*, Jt. App. Ex. U)  Russell has never worked in the smoke alarm industry, designed a smoke alarm sensor, taught fire protection engineering or any related courses or published any peer reviewed papers on fire protection engineering or the combustion sciences.  (*Id.*; Russell Deposition, 38:16-23, Jt. App. Ex. L)

Nevertheless, Russell has become the expert of choice for plaintiffs' lawyers asserting claims against smoke alarm manufacturers.  He submitted a primary (Jt. App. Ex. H) and a supplemental (*id.*, Ex. I) report opining that all smoke alarms utilizing a single ionization sensor suffer from an inherent defect that renders them "not suitable for the purposes for which they are sold as safety, life saving devices."  (Jt. App. Ex. H, p. 4)  Russell contends that smoke alarms

must sound at least "2 to 3 minutes before <u>any</u> untenable condition occurs in a residence" to be fit for their intended purposes.  (*Id*., p. 5; emphasis added)   He claims that single sensor ionization smoke alarms fail this standard because they do not respond as quickly as alarms containing photoelectric sensors to smoldering combustion or a "slow developing" fire.  (*Id*., pp. 9-10; 12-13)  He also claims that ionization sensors do not respond in a predictable and reliable manner and "[w]ide variation[s] in time to sound are observed from identical model detectors tested simultaneously in full-scale fires."  (*Id*.)

Russell furthermore opines that BRK "has failed to properly educate and warn the public as to the deficiencies and limitations of its ionization smoke detectors."  (*Id*., p. 7)  According to Russell, the "warning(s) that accompanied the subject BRK ionization alarms did not alert consumers that BRK ionization smoke detectors would not sound or would delay in sounding in the presence of smoke in certain fires." (*Id*.)

In support of these opinions, Russell synopsizes the development of fire notification devices, noting that ionization and photoelectric sensors were developed approximately fifty years ago after the invention of integrated circuits and microprocessors in the 1970s facilitated the cost effective production of residential smoke alarms. (*Id*., p. 9)  Citing only to a general bibliography, and without reference to any specific findings, Russell claims that testing conducted in the 1970s documented performance differences between ionization and photoelectric smoke alarms.  (*Id*.)

> By the end of the decade, it was clearly understood that ionization detectors demonstrated a marked slow response to the smoke products generated from slowly developing fires including, but not limited to, slow smoldering fires with flameless combustion. These differences were extensively studied through the 1980s and 1990s and were well documented in the literature.

(*Id*.)

Russell also asserts that testing he oversaw in residential structures at Texas A&M's fire suppression school substantiates these conclusions. (*Id.*, pp. 12-14) Russell conducted a number of different tests, including studies purportedly comparing the response time of smoke alarms with different sensors and the same model smoke alarms to varying fires. Arrays of varying numbers of smoke alarms were generally tested at one time. In some instances, smoke alarms were placed in different rooms of the structure. Russell has not published the results of any of his tests. He also fails to offer any objective analysis of his test data. For instance, he does not calculate any average differential in the comparative response time of smoke alarms, or determinate the standard deviations in the data or otherwise attempt to determine whether the results of his testing are statistically significant. (*See generally*, Jt. App. Ex. H)

Russell contends that BRK could and, in fact does, produce more reliable smoke alarms – single sensor photoelectric and dual sensor (combination) smoke alarms containing both photoelectric and ionization sensors. (*Id.*, p. 7) Russell opines that BRK could produce and sell combination alarms at prices competitive with smoke alarms utilizing a single ionization sensor if it sold comparable quantities of these products. (*Id.*, p. 14) Russell concludes that the "manufactured cost of a combination detector would not be a barrier to the successful marketing and sale of such detectors." (*Id.*, p. 15)

Russell accuses BRK of acting negligently in continuing to sell single ionization sensor smoke alarms. (*Id.*, pp. 6-7) He contends that BRK was aware of the published reports of ionization alarms' delayed response to smoldering combustion and slow growth fires and that consumer complaints and litigation commenced against it provided BRK with "real world" notice of ionization smoke alarms' inadequacies. (*Id.*, p. 9)

Russell concludes that the smoke alarm allegedly installed in the Residence failed to sound because of ionization smoke alarms' insensitivity to smoldering combustion and that had

the alarm sounded in a timely manner, "the escape or rescue of occupants would have been possible without injury, or more certainly, with far less injuries than those suffered." (*Id*., p. 5) In a 16-page, single space report, the only support Russell offers for these opinions is to reiterate that ionization smoke alarms do not adequately respond to smoldering combustion and assert that the smoke conditions Mr. McCuistian observed as he escaped the house were sufficient to trigger an alarm. (*Id*., pp. 5-6) Russell does not calculate when in the course of the fire the alarm should have sounded or what the conditions were at the doorway to Ms. McCuistian's bedroom at that point.

Each of these opinions involve matters of fire protection engineering, fire modeling and cost analysis beyond the purview of an academic electrical engineer and are fatally unreliable. BRK's Motion to Exclude Russell from testifying should accordingly be granted.

## **ARGUMENT**

Federal Rule of Evidence 702 governs the admission of expert testimony and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Applying these principles, the Eleventh Circuit has established that expert testimony may only be admitted if three requirements are met. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir.1998)). First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the underlying methodology must be reliable as determined by an inquiry under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Third, the testimony

must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.

In *Daubert*, the Supreme Court required trial courts to act as gatekeepers to ensure that speculative, unreliable expert testimony does not reach the jury. 509 U.S. at 589. "The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Plaintiff cannot carry this burden as to any of the three requirements the Eleventh Circuit articulated in *Kilpatrick*.

### A.     Russell Is Unqualified In The Fields In Which He Purports To Opine

#### 1.     An Electrical Engineer Lacks the Qualifications To Opine As To The Adequacy Of Fire Notification Devices

An expert must be qualified in the field he purports to address. *See e.g., Harvey v. Novartis Pharmaceutical Corp.*, 895 F. Supp. 2d 1206, 1211 (N.D. Ala. 2012) (maxillofacial surgeon could address standard of care but was unqualified to opine as to cause of osteonecrosis of the jaw). While Russell has impressive credentials, they are in electrical engineering. None of the subject matters he addresses involves that field and he is unqualified to opine as to subject matters beyond his specialty. *See, Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mgf. Co.*, 958 F.2d 1169, 1173-74 (1st Cir. 1992) (a licensed civil engineer was properly excluded from testifying about crane defects as his opinion involved issues of mechanical engineering and he had no work experience with the design or manufacture of cranes and no publication or in-depth study on the subject of cranes); *Higginbotham v. KCS Intern., Inc.*, 85 F. App'x 911, 917 (4th Cir. 2004) (naval architectural marine engineer was not qualified to opine that the metal used in a yacht swim ladder was inadequate as he was not a metallurgist and had no special training as materials engineer, was not trained in ladder design and was unfamiliar with ladder)

Russell's primary liability opinion is that ionization smoke alarms are inadequate for their intended purpose, which is to enhance the chances of occupants safely escaping a fire.  Providing a reliable opinion on that issue accordingly requires an assessment of whether the amount of notice the alarm provides is adequate to sufficiently enhance occupants' chances for safe escape. (Declaration of Stephen M. Olenick in Support of Motion to Exclude and Motion for Summary Judgment ["Olenick Decl."], ¶¶ 12-14)   Government agencies, including the federal National Institute for Standards and Technology ("NIST"), independent standards organizations, such as the National Fire Protection Association ("NFPA") (a nonprofit organization that develops codes and standards and conducts broad research into the fire sciences), and other independent scientists have utilized this standard to evaluate smoke alarms.  These entities have consistently evaluated smoke alarms based upon full scale fire tests in which they have compared the amount of available escape time a smoke alarm provides ("ASET") to the amount of time required for safe escape  ("RSET").  (*Id*.)

For instance, in 2008, NIST issued Technical Note 1455-1 reporting upon full scale fire tests it conducted with several other government agencies.   It concluded that "[s]moke alarms of either type installed on every level generally provided the necessary escape time for different fire types and locations." (Olenick Decl., Ex. 6, p. xxv).  This conclusion was based upon detailed recordings of the temperature and poisonous gas levels when the alarms activated and when those levels became untenable thresholds and numerous studies of how long occupants require to hear and react to smoke alarms and escape.   (*Id*., pp. xxiii-xxiv)

Moreover, the testing Russell performed and upon which he purports to base his opinions are fire tests.  He extrapolates from his characterization of those tests as to how ionization alarms would perform in the innumerable circumstances under which fires occur.  He can properly do so only if the smoke alarms, fuels and ambient conditions in the tests are representative of all

ionization smoke alarms, fuel sources and ambient conditions.  (Olenick Decl., ¶¶ 15-17)  For instance, NIST, *inter alia*, conducted the testing for Technical Note 1455-1 in "actual homes with representative sizes and floorplans, utilized a fire emulator/detector evaluator that "allow[ed] for the control of the flow velocity, air temperature, gas species, and aerosol concentrations at a test section wherein detectors and sensors are exposed to these environmental conditions" and conducted an analysis of residential fire statistics "to identify the important fire scenarios that were included in the study." (*Id.*, Ex. 6, pp. xxiii-xxv)  Further, in testing of comparative smoke alarm response times, the arrays must be organized to assure that all alarms are equally exposed to the smoke.  (*Id.*, ¶ 16)  Placing too many smoke alarms in an array or grouping them too closely will cause smoke to reach the alarms at different times.  (*Id.*)

The professionals educated, experienced and skilled in smoke alarms, fire dynamics, tenability, necessary escape time and fire tests are fire protection engineers, combustion scientists and fire modelers. (*Id.*, ¶¶ 2-3)  There are unique university and majors in this field and fire protection engineering is a distinct engineering discipline with its own licensure.  (*Id.*, ¶¶ 2-3; Ex. 2)  These professionals design and develop fire detection devices and systems and research and analyze the physical properties of fires (including how quickly tenability limits are reached in a fire as it spreads through a structure) and human factors issues (including how long it typically takes for individuals to react to and escape a fire).  (*Id.*)

Only professionals with this educational background and experience can reliably balance the competing factors of technical feasibility, affordability and potential adverse consequences to assess whether the escape time a smoke alarm provides is adequate.  They are also the only professionals with the expertise to generate the underlying data, including determining technical feasibility, calculating tenability levels and determining RSET and ASET, essential to

performing this evaluation. There is certainly nothing in the training and experience of an electrical engineer that qualifies Russell to opine reliably on these issues.

Russell claims to be qualified to opine about the adequacy of smoke alarms because key components of these devices are electronic. Russell is not, however, opining that there was any defect in the electronic components of the smoke alarm. (Russell Dep., Jt. App. Ex. L, 38:24-40:12) Instead, he claims that an entire class of smoke alarms fails to meet minimum performance standards. That has nothing to do with electrical engineering. An electrical engineer is no more qualified to opine on this issue than he would be to opine on whether a class of pacemakers are inadequate internal defibrillators - - an issue that only a medical doctor may address.

Russell's qualifications as an electrical engineer and testing of smoke alarms simply do not qualify him as a fire scientist. His liability opinions should be excluded.

### 2.    There Is No Basis for Russell To Guess As To Production Costs

Russell's testimony that BRK could lower the production costs of photoelectric and combination sensor smoke alarms if it produced them in greater volumes attempts to address plaintiff's burden of showing a cost effective alternative and the necessity that even Russell recognizes for smoke alarms to be priced so that consumers can afford to purchase an adequate number. In rendering this opinion, Russell essentially claims that BRK would pay less for raw materials, incur reduced labor and administrative costs per product and generate other savings if it took advantage of the economies of scale of producing photoelectric and combination alarms in greater numbers.

As Russell recognizes, however, BRK already produces millions of photoelectric and combination smoke alarms a year. While economies of scale may reduce production costs, there is a point beyond which increasing production volume yields any more savings. Russell must

have experience in manufacturing, supply chain costing and retail sales and specific knowledge of, *inter alia*, the costs BRK's suppliers incur to produce the raw materials BRK purchases from them, BRK's labor utilization rates and other manufacturing costs to determine whether BRK could achieve any additional economies of scale. He would also need to have this information and experience to predict what any additional savings BRK would achieve and how those savings would translate into retail pricing (which the retailers control).

Russell has none of this training or experience. As is set forth previously, he lacks experience in manufacturing, supply chain or inventory management and in retailing. He has never worked in the smoke alarm industry and cannot claim any experience in the costing of the materials utilized in smoke alarms, most notably the sensors. Russell once again strays beyond his expertise in attempting to opine about BRK's production costs. For this reason as well, Russell should be excluded.

> **3.      Russell Is Unqualified To Speculate As To The Reasons The Smoke Alarm Allegedly Failed To Sound And As To Whether A Photoelectric Sensor Would Have Sounded In Time For The Decedent To Escape Safely**

No opinion that the smoke alarm allegedly installed in the Residence should have sounded in time to allow an occupant in Ms. McCuistian's bedroom to escape and that an alarm equipped with a photoelectric sensor would have done so can be made without determining when a sufficient volume of smoke reached the smoke alarm to cause it to sound. No smoke alarm will sound until a sufficient volume of smoke enters the sensing chamber to cause the preset limit to be exceeded. (Olenick Decl., ¶¶ 6-8) Any expert opining on this issue must also determine when, in relation to when the smoke alarm would have sounded, the escape route from Ms. McCuistian's bedroom became untenable and whether escape could have been effectuated before that occurred.

This is evident simply from the analysis Russell offers in support of his proffered opinions.  Russell claims that the "level of smoke and combustion products from the subject fire reached the subject BRK ionization smoke detector and of sufficient quantity and energy level to cause" an adequate smoke alarm to sound.  (Jt. App. Ex. H, p. 5)  Additionally, Russell claims to rely upon the conclusions of plaintiff's cause and origin expert that the fire ignited in the kitchen refrigerator.  He theorized during his deposition that a substantial quantity of smoke was generated while the fire burned in the refrigerator, which flowed to the smoke alarm when the fire broke out of the refrigerator and would have caused an adequate alarm to sound before the escape route from Ms. McCuistian's bedroom became untenable.  (Russell Dep., Jt. App. Ex. L, 71:12-72:19)

Determining the "quantity and energy" level of smoke is an issue of fire cause and origin, combustion science and fire modeling.  One must furthermore determine how the fire transitioned out of the refrigerator and ignited other materials in the kitchen, model the pace of the fire's progression and the rate of temperature and toxic gas level increases, and calculate how long it would have taken to escape the fire to evaluate whether a smoke alarm should or would have sounded in time for a safe escape to be made out of Ms. McCuistian's bedroom.  These are all issues of fire dynamics, modeling and human factors having nothing to do with electrical engineering.  *Crouch v. Teledyne Continental Motors, Inc.*, 2011 WL 2600450, * 4-5 (S.D. Ala. Jun. 29, 2011) (while qualified to address cause of an aircraft crash, aviation mechanic and forensic investigator could not opine as to cause and timing of fire where he was lacked education and experience in cause and origin investigation and in calculating fire progression).

Courts have repeatedly excluded Russell from testifying as to the adequacy of ionization smoke alarms without reaching the issue of his qualifications.  *See e.g., Johnson v. Kidde*, 2006 WL 269938, at *3 (E.D. Ky. 2006); *Garcia v. BRK Brands, Inc*., 266 F.Supp.2d 566, 577 (S.D.

Tex. 2003); *Werner v. Pittway Corp.*, 90 F.Supp.2d 1018, 1031-32 (W.D. Wis. 2000).  While other courts have allowed Russell - - BRK submits erroneously - - to address whether ionization smoke alarms are defective, BRK is unaware of any court ever finding Russell qualified to address whether a smoke alarm would have sounded in time for an occupant to escape a fire safely.  To the contrary, in *Hosford v. BRK Brands, Inc.*, the Court accepted Russell as an expert in "electrical engineering," but repeatedly refused to allow him to opine as to when in the course of the fire the smoke alarms should have sounded.  (Civil Action No. CV-2011-900059, Circuit Court of Conecuh County, Alabama, Trial Transcript, App. Ex., pp. 14, 92:10-93:25; 96:11-25; 297:10-25)  The Court should, at the very least, preclude Russell from doing so in this case.

    **B.**    **Russell's Opinions Are Not Reliable**

        **1.**    **Russell's Liability Opinions Are Based On A Fatally Flawed Methodology**

A court should not accept opinion testimony supported only by the *ipse dixit* of even a qualified expert.  *Cooper v. Marten Transport, Ltd.*, 539 F. App'x 963, 966 (11th Cir. 2013).  *See also*, *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1316–17 (11th Cir.1999) ("a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").  A court must preliminarily assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue."  *Hendrix ex rel G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010).  In *Daubert*, the Supreme Court articulated a non-exhaustive list of factors to consider in making this assessment: (i) whether the expert's theory can be and has been tested; (ii) whether the theory has been subjected to peer review and publication; (iii) the known or potential rate of error of the particular scientific technique; and (iv) whether the technique is generally accepted in the scientific community.  509 U.S. at 593–94, 113.

Russell's conclusions and methodologies have been peer reviewed and rejected.  (Olenick Decl., ¶¶ 19(a)-(c)).  Two separate Task Groups appointed by the NFPA evaluated and rejected his claims that ionization smoke alarms are inadequate because they do not respond as quickly as photoelectric alarms to smoldering combustion.  For example, the final conclusion of a Task Group appointed in 2008 was that "stand-alone ionization and photoelectric smoke detector technologies are generally providing acceptable response to smoldering fires . . ." (*Id*., Ex. 5) Task Groups appointed by the State Fire Marshals of Ohio, California and Maryland also concluded that ionization alarms provide adequate escape time in smoldering combustion.  (*Id*., ¶ 19(c))  Researchers have also determined that the reported data does not provide a basis to predict whether an ionization or photoelectric smoke alarm will sound first in any given fire. (*Id*., ¶ 21)  Every government agency with jurisdiction over Alabama product safety, including NIST and the CPSC, independent standards organization and fire service organization, including the International Fire Chiefs Association ("IFCA"), recognize ionization alarms to be adequate fire notification devices.

Moreover, in claiming that smoke alarms must sound two to three minutes before "**any** untenable condition occurs in a residence," Russell proposes a stricter standard than applied by any regulatory agency, standards organization or fire service.  (Russell Report, Jt. App. Ex H, p. 5; emphasis added)  As set forth previously, these entities assess smoke alarms upon how frequently they sound before escape routes become untenable if there is adequate coverage,. (Olenick Decl., ¶ 14)  The standard Russell proposes would require smoke alarms to sound within 3 minutes of when conditions anywhere in a residence become untenable regardless of their proximity to the fire.  Russell fails to identify any technology that meets this standard.

Even if Russell's proposed standard were reasonable, he fails to assess ionization smoke alarms against that standard.  No effort is made to assess tenability when single ionization sensor

alarms respond to smoldering or slow growth fires.  Rather, Russell relies upon the purported results of his independent testing and literature review that supposedly establishes that ionization alarms respond slower on average than photoelectric alarms to those forms of combustion.  (Jt. App. Ex. H, pp. 9-11)  An alarm may well sound in sufficient time to allow safe escape before conditions become untenable even if it does not respond as quickly as another technology.

Moreover, regardless of the validity of an expert's methodology, a district court must determine whether the data or analysis upon which he relies supports his conclusions.  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329 (11th Cir. 2010).  In *Kilpatrick*, the court rejected the argument that a district court may only consider qualifications and methodology in ruling on the admissibility of expert testimony as inconsistent with "the law of this Circuit, which has reversed trial courts who abdicate their gatekeeper role and refuse to assess reliability." *Id*., at 1336.  While a district court should not address an opinion's persuasiveness, it must determine whether the opinion is logically supported by the data upon which the expert relies.  *Id*.; *see also*, *General Elec. Co. v Joiner*, 522 U.S. 136, 146 (1997) (expert should be excluded where "there is simply too great an analytical gasp between the data and the opinion proffered"); *Cooper v. Marten Transport*, 539 F. App'x at 967 (causation experts excluded for failing to apply differential etiology adequately and relying upon temporal relationship between collision and injuries).  Even if a smoke alarm were defective simply because it does not respond as quickly as another alarm, the sources upon which Russell relies simply do not support his assertion that there is an actual performance difference between photoelectric and ionization smoke alarms.

Russell has not identified the scientific literature supposedly documenting "the broad knowledge of the substantially different response of ionization versus photoelectric detectors." (Jt. App. Ex. H, p. 9)  He broadly cites to thirteen articles, but does not specifically identify any source supporting his conclusions.  (*Id*.)  None of those citations reference variability among the

same model ionization smoke alarms or any differential in the response of photoelectric and

ionization smoke alarms to so-called slow growth fires.  While photoelectric smoke alarms have

been found on average to respond before ionization alarms in smoldering combustion and

conversely ionization alarms have been found on average to sound before photoelectric smoke

alarms in flaming combustion, that differential has been found in the very studies Russell cites to

be of no significance.  For instance, in reporting upon full scale fire tests conducted in the late

1970s, NIST (then named the National Bureau of Standards) concluded that:

> As in the first year study, there is no apparent difference in life
> saving potential between ionization and photoelectric detectors
> under the fire conditions tested during this series.  Although the
> photoelectric detectors in general respond better in a smoldering
> fire, and the ionization type detectors in general respond better to a
> flaming fire, the time difference between these devices are minimal
> when compared on an escape time and life-saving potential basis.

(Olenick Decl., ¶¶ 12-13; and Ex. 4)  *See Kilpatrick*, 613 F.3d at 1337-40 (district court correctly

excluded expert where the medical literature upon which he relied did not support opinion that

use of intra-articular pain pump can cause glenohumeral chondrolysis).

As the reported average differential in response times was deemed insignificant, the

entities conducting the studies made no effort to determine whether it was representative of

photoelectric and ionization alarms' response to actual fires.  Although validly conducted, the

testing of ionization and photoelectric alarms was still experimental and represents a limited

amount of data in comparison to the number of fires that occur throughout the country.  To

conclude that the testing results are representative of "real world" experience, the results must be

statistically significant.  There must a sufficient consistency in the results for the number of tests

conducted or other data points obtained.  (Olenick Decl., ¶ 18)  None of the entities conducting

the testing in which an average differential in response time was noted sought to determine

whether those results were statistically significant.  As noted previously, in 2014, researchers

undertook an extensive analysis of the data from numerous studies and concluded that the

reported average differences in the response times of photoelectric and ionization alarms were not statistically significant.  Regardless of the validity of those conclusions, without affirmative evidence that the reported average response time differential was statistically significant, there is no basis to extrapolate from those results to smoke alarms' responses in actual fires and any opinion based on those results should not be admitted.  *See Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002) (statistically insignificant results of epidemiological studies inadmissible).

Russell's testing also fails to substantiate his opinions.  He has not presented any qualitative or other scientific analysis demonstrating a response time differential between photoelectric and ionization smoke alarms in his testing or any unacceptable variability in the responses of ionization alarms.  Russell offers only his subjective assessment of his purported "cumulative experience over twenty-five years."  (Russell Dep., Jt. App. Ex. L, 94:13-95:13) Russell actually confessed that his sworn testimony in another litigation that there is a twenty-four minute differential in the response of photoelectric and ionization alarms was based upon cherry picking *two* of the, at least, 73 tests conducted.  (*Id.*, 78:10-80:7)  Subjective assessments and misleadingly incomplete presentations of data are not science.  *See Rider*, 295 F.3d at 1197 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("The key consideration is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").  Russell's entire analysis is subjective.  The test results are what he says they are.  Even though Russell tries to give his opinions the patina of scientific analysis, he offers nothing more than the *ipse dixit* of the expert.

An objective analysis of Russell's tests reveals why he has done so.  In that testing, ionization alarms repeatedly responded before photoelectric alarms.  (Jt. App. Ex. V) Additionally, BRK's retained expert, Stephen Olenick, calculated the average difference in the

response time in Russell's smoldering tests among equal numbers of similarly-situated photoelectric and ionization alarms in Russell's smoldering combustion tests.  He determined that the average differential in the response of photoelectric and ionization alarms to smoldering combustion is **nine** seconds - - an absolutely meaningless difference.  (Olenick Decl., ¶ 30) Russell also consistently terminated his testing when flaming combustion ignited.  Other testing demonstrates just nine and 12 second differentials in the responses of six different units of the same model BRK smoke alarm in smoldering combustion tests. (Jt. App. Ex. W)

Russell has also failed to validate his tests.  He provides no basis - - none whatsoever - - to conclude that the test fires he has conducted are representative of actual residential fires and the conditions in which they occur.   Russell must deliberately set the test fires, and he does not attempt to establish that the manner of ignition is representative of naturally occurring accidental fires.  He has also failed to demonstrate that his testing is representative of all the fuels that may burn.  As noted previously, placing alarms in an array may affect smoke entry into one or more alarms, so there is no assurance that the test results accurately predict how a single alarm attached to a wall or ceiling in someone's residence will respond in an actual fire.

Moreover, regardless of the appropriateness of his methodologies, Russell has not attempted to demonstrate that his test results are statistically significant.  Olenick (BRK's expert) has done so and determined that averaging the response time of all photoelectric and ionization smoke alarms in every test for which Russell has provided results is not statistically significant. (*Id*., ¶ 30)   As with the literature references, even if there were any basis to quarrel with Olenick's conclusions, Russell's failure to offer any analysis demonstrating the statistical significance of his test results mandates that any opinion based on those results be excluded.

Russell sets a wholly unrealistic standard for smoke alarms, then fails even to measure ionization smoke alarms against this standard and relies upon inherently flawed data that does

20

not logically support his opinions.  Russell's proposed testimony would provide no assistance to the jury and should be excluded.

### 2.      Russell's Cost Analysis Is Without Factual Basis

Plaintiff has the burden of proving that photoelectric and/or dual sensing smoke alarms constitute a safer, practical, alternative design available to the manufacturer at the time it manufactured the product.  *Borum v. Werner Co.*, No. 5:11–cv–997–AKK, 2012 WL 2047678, *10 (N.D. Ala. Jun. 6, 2012).  One of the factors that must be considered is the cost of the alleged alternative design.  *Id*.  Plaintiff attempts to use Russell's testimony to meet this burden, but Russell's testimony on costs of production is speculative.  Russell opines that BRK could lower the production costs of photoelectric and combination sensor smoke alarms if it produced them in greater volumes.  (Jt. App. Ex. L, 159:17-160:14)  However, Russell admitted in his report that the manufacturing cost data he possesses is "not sufficient or specific enough as to quantity price sensitivity to make a precise calculation for the subject smoke detector."  (Jt. App. Ex. H, p. 14)  Russell confirmed at his deposition that he would not testify that BRK's cost to produce a combination alarm in greater quantities would decrease by a specific percentage or dollar amount due to economies of scale.  (*Id*. 174:9-175:22)  Accordingly, Russell's testimony on this issue is unreliable speculation and should be excluded.

### 3.      Russell's Causation Opinions Are Wholly Speculative

Russell's attempt to base his causation opinion upon ionization smoke alarms' purported failure to respond to smoldering or slow growth fires after photoelectric alarms should be excluded simply on the basis of his failure to provide a reliable basis for that underlying assertion.  In any event, proving ionization alarms do not respond as quickly as photoelectric alarms to smoldering or slow growth fires does not prove *a fortiori* that this purported deficiency was the reason that the smoke alarm allegedly installed in the Residence failed to sound in this

specific fire or that any such failure is the reason Ms. McCuistian perished.  A product defect may have nothing to do with the plaintiff's injuries.  Holding that proof of a defect establishes causation would nullify the legal requirement that a plaintiff separately prove causation.

In this instance, plaintiff must first prove that the conditions under which ionization alarms do not respond as quickly as photoelectric smoke alarms occurred in this fire.  If those conditions did not occur, then this alleged performance deficiency could not have been the reason for the smoke alarm's failure to sound.  To satisfy this element, plaintiff must prove that the fire was smoldering or in a slow growth mode when smoke reached the sensor in sufficient quantities to cause it to sound.  Russell claims to rely upon the opinions of plaintiff's cause and origin experts, which supposedly establish that the fire started as smoldering combustion in the kitchen refrigerator.  He conceded, however, that the fire was at that point enclosed within a sealed, insulated metal box.  (*Id*., 32:11-19; 61:8-21)  Plaintiff also claims that the smoke alarm was installed in the hallway, which is a room separate from the kitchen.  Russell presents no analysis and there is no other competent evidence offered by plaintiffs upon which he can rely to demonstrate how the fire escaped the refrigerator and progressed into what Russell concedes was high energy flaming combustion.  (*Id*., 52:22-53:23)  In fact, Russell also conceded that it is impossible to ascertain on this record whether smoke supposedly exiting the refrigerator reached the smoke alarm before there was transition to flaming combustion.  (*Id*., 68:4-15)  Russell's conclusion that the smoke alarm should have sounded by the time LaRue and Mr. McCuistian observed the fire does not support his causation opinion because the fire was already flaming stage at that point.  Indeed, Russell believes that ionization alarms generally respond quicker to flaming combustion than photoelectric alarms.  (Russell Dep., Jt. App. Ex. L, 54:3-19) Without reliable evidence of when a flaming fire began, it is pure speculation to assert that the fire

remained in a smoldering or slow growth stage at the time sufficient smoke entered the sensing chamber of a smoke alarm installed in the hallway to cause the alarm to sound.

During his deposition, Russell theorized that a smoldering or slow growth fire inside the refrigerator would have generated copious amounts of smoke that would have flowed to the smoke alarm when the fire breached that enclosure and caused the alarm to sound.  (*Id*., 71:12-72:19)  Even if that were true, if there were also flaming combustion at that point, then an ionization alarm would have reacted to that form of combustion.   In any event, Russell's theory of how the smoke progressed after it breached the refrigerator is pure conjecture.  He has not tested this theory, modelled the fire or provided any other objective evidence in support of his fire spread opinion.  *Roper v. Kawasaki Heavy Indus., Ltd.*, ---F. App'x---, 2016 WL 1085489, at *2 (11th Cir. Mar. 21, 2016), *cert. docketed* (July 11, 2016) (expert excluded because he relied on other expert's unreliable opinion, and it was not based on concrete data or testing); *Vickery v. Remington Arms Co. LLC*, No. 7:12-CV-3926-RDP, 2015 WL 1268013, at *10 (N.D. Ala. Mar. 19, 2015), appeal dismissed (Aug. 7, 2015) ("'Mere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony.'" (quoting *Borum*, 2012 WL 2047678, at *13 (quoting *Slay v. Keller Indus., Inc.*, 823 So.2d 623, 626 (Ala. 2001)).  This speculation is patently unreliable and should be excluded.

Moreover, an expert "must provide a reasonable explanation as to why 'he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause'" of the plaintiff's injury.  *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (quoting *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009).  As BRK set forth in its initial Motion for Summary Judgment, there is substantial evidence, including Mr. McCuistian's testimony that the alarm did not sound when tested, that the over seventeen year old alarm purportedly installed in the Residence wore out or was damaged before the fire.  Even

if this evidence could be disputed, component failure or damage is a possible cause for the lack of an alarm that Russell does not address.  Russell's failure to rule out other possible causes renders his causation opinion unreliable.  *Hendrix v. Evenflo*, 609 F.3d at 1195.

Even if Russell could establish that smoke exiting the refrigerator would have caused a smoke alarm to sound, he still must establish that the alarm would have sounded before the escape route from Ms. McCuistian's bedroom became untenable.  As burglar bars were installed on the bedroom windows, escape was possible only through the bedroom door.  Russell admits that no one will ever know when this location became untenable.  (Russell Dep., Jt. App. Ex. L, 63)  Further, Russell admits that the bedroom doorway was "close" to the kitchen doorway over which the smoke alarm was allegedly installed.  (*Id.*, 59)  As such, the smoke that caused the smoke alarm to sound certainly would have affected tenability conditions at the bedroom doorway.  Russell claims that the smoke would have preceded a rise in temperature, but that is just more speculation and, in any event, the smoke would have transported toxic gasses.  Further, as illustrated even by Russell's testing, photoelectric smoke alarms take on average up to an hour to respond to smoke from smoldering combustion.  (Jt. App. Ex. V; *see also*, Olenick Decl., ¶ 25)  No smoke alarm would have sounded immediately upon smoke from the refrigerator reaching it.  Without knowing how the fire progressed in the interim, it is impossible to determine what the tenability conditions would have been at the bedroom doorway when the smoke alarm sounded.

24

## CONCLUSION

Russell simply is unqualified to opine upon the subject matters he purports to address and offers nothing but unsubstantiated rank speculation.  He should accordingly should be excluded. Even if the Court were to determine that any of his opinions are admissible, the remainder of his analysis and the results of his testing should be exclude.   BRK's Motion to Exclude should be granted.


Dated:  August 15, 2016

                                            Respectfully submitted,


                                            /s/ Robert W. Hayes
                                            Robert W. Hayes
                                            Jillian Thornton Flax
                                            COZEN O'CONNOR
                                            One Liberty Place
                                            1650 Market Street, Suite 2800
                                            Philadelphia, PA 19103
                                            Telephone: (215) 665-2094
                                            Facsimile: (215) 665-2013
                                            Email: rhayes@cozen.com
                                                    jflax@cozen.com

                                            Robert C. King
                                            THE KING LAW FIRM, P.C.
                                            36 W. Claiborne St.
                                            Monroeville, AL 36460
                                            Telephone: (251) 575-3434
                                            Facsimile: (251) 575-3003
                                            Email: rcking@frontiernet.net


                                            Attorneys for Defendant, BRK Brands, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2016, Defendant BRK Brands, Inc.'s Motion To

Exclude Or Limit The Testimony Of Plaintiff's Expert B. Don Russell and The Declaration Of

Stephen Olenick In Support Of Same were served via the Court's ECF system upon:


John F. Olinde
Charles P. Blanchard
Peter J. Rotolo, III
CHAFFE McCALL, LLP
2300 Energy Centre | 1100 Poydras Street
New Orleans, Louisiana 70163-2300

James H. Pike
SHEALY, CRUM & PIKE, P.C.
P.O. Box 6346
Dothan, Alabama 36302-6346

Joseph A. Morris
Dan Talmadge
MORRIS CARY ANDREWS TALMADGE & DRIGGERS, LLC
P.O. Box 1649
Dothan, Alabama 36302-1649

Edward P. Rowan
TAYLOR MARTINO, P.C.
P.O. Box 894
Mobile, Alabama 36601-0264

James B. Carlson
Jonathan Michael Hooks
CHRISTIAN & SMALL, LLP
505 20th Street North, Suite 1800
Birmingham, Alabama 35203-4633

/s/ Jillian Thornton Flax
Jillian Thornton Flax