## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD WARREN McCUISTIAN** | ) | |
| **as Administrator for the Estate of** | ) | |
| **ANNE McCUISTIAN, Deceased** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 1:15-cv-00279** |
| | ) | |
| **LG ELECTRONICS U.S.A., INC., BRK** | ) | |
| **BRANDS, INC., SEARS ROEBUCK &** | ) | |
| **CO., and UNDERWRITERS** | ) | |
| **LABORATORIES INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERTS

**COME NOW** Defendants, LG Electronics USA, Inc. ("LGEUS"), and Sears Roebuck & Co. ("Sears") (collectively "Defendants"), and reply in support of their motion to exclude the testimony of Plaintiff's retained experts, Kenneth Ashcraft and Paul Castellano.

## I. PLAINTIFF'S CAUSATION OPINIONS ARE MERITLESS

While the proper method for determining the cause of a fire is to first locate the point of origin, (Doc. 142-3, 18.1 & 19.1), the Court's analysis may safely begin with causation. If Plaintiff's causation opinion is inadmissible, there is simply no need to proceed to an analysis of Plaintiff's opinion on the fire's origin.

## A.    Downstream Arcs <u>**ARE**</u> Dispositive

As Defendants explained in their *Daubert* motion, Plaintiff's causation opinion is unreliable because it posits a fundamentally impossible scenario. According to Plaintiff, the fire was caused by a defect inside the refrigerator which began at an electrical arc on either the line in or the neutral conductor on the refrigerator's main power circuit.  Defendants have pointed out that either such arc would instantly kill power to the refrigerator, and particularly to the circuits powering downstream components such as the icemaker and door lamp.  **Plaintiff does not dispute this basic principle of electricity.**  Rather, he says that a "scientifically known phenomenon" "**can**" cause downstream electrical arcing during a fire.  Plaintiff's argument is meritless for two reasons.

First, this argument depends entirely upon assertions found in the Declaration of Paul Castellano, (*see* Doc. 162-9), which is subject to Defendants' Motion to Strike.  (*See* Doc. 178.)  If the Motion to Strike is granted, the declaration provides no support for Plaintiff's argument, which is due to be rejected on that basis alone.

Second, putting aside Plaintiff's impermissible efforts to try to salvage their case through self-serving testimony, Castellano's declaration further demonstrates the complete absence of any scientific methodology in his opinion.  Consider Castellano's proposed ignition sequence.  He asserts that "*[d]uring the fire*,"

2

insulation burned away from the conductors in the wiring harness, revealing bare copper. (Doc. 162-9, at ¶ 2, emphasis added.) He contends that the "energized line conductor made contact with an adjacent conductor, [which] then became energized." (*Id.*) If this case concerned arcing on a single circuit, Castellano's theory might be at least plausible. However, this case involves arcing on at least two separate downstream circuits. The most that Castellano's declaration does is propose the possibility of a single energized conductor. This Court should not simply infer that if one energized conductor is possible, then so are two, or three, or four. Castellano's ignition sequence is unsupported, even by his newly-embraced pilot light theory. Castellano cannot, nor has he tried to, account for multiple circuits still having power during the fire.

### B.    Castellano Failed to Test His <u>Hypothesis</u>

NFPA 921 *requires* a fire investigator to test his various hypotheses to determine the cause of a fire, (Doc. 142-3, 19.6), and any hypothesis should account for the ignition sequence. (*Id.* at 19.4.4.1-.3.) Had Castellano tested his purported ignition sequence, he would have discovered that even a disastrously damaged electrical conductor with only four of 41 functioning wire strands could

bear the entire current of the refrigerator (fluctuations and all) without any meaningful increase in temperature.[1]

Plaintiff bizarrely responds to an allegation no one has asserted.  He argues that Defendants criticized Castellano "for failing to test an *exemplar*."  (Doc. 162, at 19, emphasis added.)  It is true, of course, that testing a hypothesis may involve the use of an exemplar, and that failing to test the hypothesis may result in exclusion.  *See United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1340-41 (11th Cir. 2013).  Other than a single parenthetical reference to an exemplar in Defendants' citation to this case, however, Defendants never so much as said the word "exemplar" in the body of their argument.  To the extent Defendants' argument can be interpreted to demand testing of an exemplar, the argument would be that testing an exemplar is simply one way among many that Castellano could have, but didn't, test his hypothesis.

Lastly, even the case cited by Plaintiff is inapposite.  In *Occidental Fire & Cas. of N.C. v. Intermatic, Inc.*, 2013 U.S. Dist. LEXIS 116303, *1, 2013 WL 4458769, *3 (D. Nev. 2013), a defendant moved to exclude a causation expert because he did not conduct tests on an exemplar.  This was the defendant's only

---

[1] In fact, after submission of his expert report, Nemeth even reduced the conductor down to just one strand.  (Doc. 178-1, at 123-125.)  Even with one strand, the most extreme worst case scenario, the conductor still only heated up to 104 degrees, (*id.* at 125), about that of a person's high fever.  By contrast, the wiring insulation was rated to withstand temperatures of 105 degrees *Celsius*, (Exhibit 1, Transcript from Deposition of David H. Smith, at 238-239), which would translate to a Fahrenheit temperature well above 200 degrees.  Even with just one strand conducting all of the current of the refrigerator, the conductor was still within the wiring insulation by 100 degrees or more.

argument in support of exclusion.  The case had nothing to do with testing a hypothesis, nor with testing the ignition sequence aspect of a hypothesis.  The defendant's argument in that case also did not include any specific results of the defendant's testing of the exemplar.  *Intermatic* **does not** support admission of Plaintiff's causation opinions, which were reached in stark violation of the scientific method.

### C.   Plaintiff Has Waived the Opportunity to Challenge Defendants' Experts and their Testing

Plaintiff has not filed a *Daubert* challenge against any of Defendants' experts.  Yet, inexplicably, belatedly, and through the backdoor, he appears to be trying to lodge such a challenge.  Specifically, Plaintiff criticizes Defendants' experts' tests as "oversimplified and not a valid model for the subject event." (Doc. 162, at 19; Doc. 162-9.)   Plaintiff's untimely criticisms should be disregarded in their entirety.  To the extent Plaintiff relies upon the Declaration of Paul Castellano to lodge such a challenge, it is subject to Defendants' Motion to Strike, and should be rejected on that basis.  (See Doc. 178.)

Plaintiff cites *Allstate Ins. Co. v. Hugh Cole Builder, Inc.*, 137 F. Supp. 2d 1283 (M.D. Ala. 2001), as justifying the presentation of Castellano's opinions to the jury.  In *Allstate*, however, the expert's opinion was found to rest on both principles and methods that were reliable.  The only strike against that expert was that the test he performed did not lend any support to his specific causation

opinion, but the rest of the evidence he presented was otherwise such that a jury could reasonably agree with his causation opinion.

Castellano's opinions, by contrast, rely upon wholly unreliable principles and unreliable methods.  Castellano asks this Court to admit, and at trial would ask a jury to consider, testimony that ignores the scientific method required by NFPA 921.  Unlike the expert in *Allstate*, Castellano has not identified any principle of electricity that clearly accounts for the otherwise impossible critical mass of downstream arcing.  To the extent he has attempted to explain it at all, it comes from an article that he specifically disclaimed during his deposition, and which still fails when applied to this case.  (*See*, *e.g.*, I.A., *supra*.)  Also, unlike the expert in *Allstate*, Castellano did not simply perform tests which failed to lend direct support for his hypothesis, he performed ***no tests whatsoever***.  Castellano is not entitled to the deference afforded by the trial court in *Allstate*, because he is not relying upon sound science in rendering his opinions.

### D.    Castellano's Opinions Even Fail the Circumstantial Evidence Test

Finally, recognizing the unreliable and unscientific mess that Castellano has offered as his opinion, Plaintiff essentially begs the Court to admit it anyway. Plaintiff cites *Rudd v. General Motors Corp.*, 127 F. Supp. 2d 1330, 1342 (M.D. Ala. 2001) for the proposition that an expert may reach his opinion by considering

circumstantial evidence to make certain fact determinations. This is, of course, largely true. It is also irrelevant in this case.

Plaintiff's citation to *Rudd* comes from a portion of that opinion addressing the ***sufficiency of the facts*** presented by an expert, and saying that certain facts could be established through circumstantial evidence. Even in *Rudd*, however, the court treated as a separate question the ***reliability*** of the expert's methods and principles. *Rudd*, 127 F. Supp. 2d at 1342-44.

The issue before this Court is not Castellano's ability to make certain circumstantial inferences of fact. The question raised by Defendants concerns Castellano's principles and methods, which have been shown to be unreliable. *Rudd* does not provide cover for Castellano to introduce unscientific principles and methods.

## II.     Plaintiff's Origin Opinions Are Also Unreliable and Unscientific

### A.     Ashcraft's Fire Pattern Analysis Contradicts His Opinion

Plaintiff's efforts to rebut Defendants' motion takes a different tack when it comes to Ashcraft's opinions. Plaintiff simply repeats *ad nauseum* the notion that Ashcraft reached his conclusions in accordance with NFPA 921 and the scientific method, in hopes of establishing this as a fact by its sheer repetition. Thus, Plaintiff describes in a sterile, matter-of-fact tone the supposed extent of Ashcraft's fire pattern analysis. According to Plaintiff, Ashcraft (1) determined the kitchen to

be the room of origin, at which point (2) a "closer examination" of damage and patterns narrowed the origin to the southwest corner.  After this, Plaintiff asserts, (3) a "more detailed" examination of burn patterns "further narrowed the point of fire origin" to the area where the refrigerator was located. (Doc. 162, at 5-6.)  Then (4) char depth analysis was used to "refine" this hypothesis.  (*Id.* at 6.)  In fact, Ashcraft did nothing of the sort.

Ashcraft says he saw two meaningful fire patterns in the kitchen.  One, located directly over the stove, was a traditional plume-generated V-shaped pattern typically indicative of a point of origin at the base of the V.  Had he not conveniently ruled it out, he agrees it would have pointed to the stove as the point of origin. (Doc. 142-4, at 176-77.)  Ashcraft testified that he also saw another V pattern.  That pattern, however, placed the fire at some strange place in the center of the kitchen, probably closer to the stove than to the refrigerator.  In any event, both fire patterns Ashcraft identified placed the origin of the fire at a location ***other than*** the corner where the refrigerator was located.  Ashcraft saw no other fire patterns anywhere in the kitchen.  Plaintiff's response tacitly admits as much.

Plaintiff, having offered nothing more than a clinical recitation of Ashcraft's testimony without emphasis or argument, simply abandons the effort to defend Ashcraft's pattern analysis on its merits.  Instead, Plaintiff engages in the logical fallacy known as the appeal to authority, pointing to the testimony of

"disinterested" state and local fire officials.  First, even if those officials' investigations and conclusions were proper—they were not—those opinions do not justify admitting Ashcraft to testify to unscientific opinions, which were premised on his faulty and unreliable principles and methods.  Second, to the extent Castellano relied upon the opinions of those officials, his reliance would go to the weight, not the admissibility of his opinion.  *Cincinnati Ins. Co. v. Cochran*, 2005 WL 2179799, at *6 (S.D. Ala. 2005).

## B.   Ashcraft's Char Measurements Fail to Support his Opinions

Lacking even a single fire pattern to support Ashcraft's opinion, Plaintiff argues that the measured depth of char—a fire effect, not a fire pattern—"further support[s] the area of origin being at the southwest corner of the kitchen."  (Doc. 162, 13.)  Quite the statement, given the numerous cautions NFPA 921 offers to investigators.  Plaintiff paints Defendants as somehow misleading the Court as to these cautions, so some exploration is due.

As Defendants have pointed out, char depth measurements come with certain handicaps.  Their value may be in determining spread, but not establishing the intensity of heat. (Doc. 142-3, 6.2.4.5; 18.4.3.)[2]  Even then, the measurements are subjective, because, as Plaintiff agrees in his response, "consistent pressure is

---

[2] Plaintiff accuses Defendants of misquoting 921 by calling char depth a "poor measurement," a claim they can only seriously make by (a) implying Defendants were quoting 921, which we were not, and (b) omitting key words from Defendants' argument that char measurements are a "poor measurement *of intensity*."  (Doc. 142, at 20, emphasis added.)  NFPA 921 supports Defendants' characterization of char depth as a poor measurement of intensity.  (Doc. 142-3, 6.2.4.5 & 18.4.3.)

key" to reliable data.[3]  (*Id.*, 18.4.3.2.)  Moreover, measurements must be taken in the correct place in a char blister, (*id.*, 18.4.3.3), and must account for missing wood.  (*Id.*, 18.4.3.4.)

How did Ashcraft handle those cautions?  The evidence is unclear whether he used consistent pressure and properly used his gauge.  But, Ashcraft clearly misunderstood the meaning of the charring.  He linked char to the extent of damage, (Doc. 142-4, at 84, 103-04, 126, & 128-29), which by itself might be reasonable.  However, he opined that the area of greatest damage would be the point of origin, (*id.*, 162-63), an opinion wholly rejected by NFPA 921.  (Doc. 142-3, 18.4.1.3, 18.4.1.3.2 & 18.4.1.4.).  Ashcraft's working assumptions demonstrate a fundamental misunderstanding of fire science.

Ashcraft's deficiencies did not end with his incorrect principles, but manifested in faulty application as well.  First, he failed to account for the area over the stove.  In this area, precisely where a V pattern rose from the stove, Ashcraft omitted the upper level value for char depth.  Plaintiff argues that "there was no char to measure" because that area remained "protected by cabinetry and the vent duct."  (Doc. 162, 13.)  All of Plaintiff's citations for this proposition are taken from the deposition of Dothan's assistant fire marshal, Garrett Crow, whose testimony on this subject is replete with expressions of doubt, (Doc. 162-6, 19

---

[3] Plaintiff again charges Defendant with misquoting 921. Defendant did not purport to quote the language, but offered a characterization which is certainly fair and accurate. (*See id.*, 18.4.3.2.)

("This here—and I'm not sure.  I cannot say what this is")), and subjective belief.  (*Id.* at 20 ("It appears to me, … what this appears to be here, … it looks like …."))  Captain Crow's maybe-it-is, maybe-it-isn't speculation is factually insufficient.  A more accurate understanding was offered by Defendants' expert David H. Smith, who explained that the entire top layer of wood had completely burned away, exposing a layer of the kitchen's construction that elsewhere in the kitchen remained covered by charred, but existing, wood.  (Ex. 1, at 124-25.)  Ashcraft should have accounted for the missing wood above the stove.  He did not, which makes his char depth analysis essentially worthless.

Second, Ashcraft only measured the depth of char in a tiny portion of the kitchen.  His measurements were drawn from two areas (near the stove, just one), within a range of 6 inches, in just 35 locations.  The approximate available wall space for Ashcraft to analyze was 25,147 square inches.[4]  (Exhibit 2, Diagram Produced by David Smith as part of Exhibit 4 to his deposition.)  Even counting the entire 6-inch area from which Ashcraft measured, Ashcraft only considered 2,814 square inches.[5]  Thus, even assuming Ashcraft took numerous consistent measurements within that 6-inch area, Ashcraft still only measured a meager 11.2% of the wall space which he considered.  This is hardly representative.

---

[4] East Wall: 103" H x 114" W = 11742"; South Wall: 103" H x 113" W – Doorway (79" H x 35" W) = 8,874"; West Wall: 103" H x "67" W – Doorway (79" H x 30" W) = 4,531".  Total area: 25,147 square inches.
[5] Upper Level Measurements: 6" x (60" East Wall + 113" South Wall + 67" West Wall) = 1,440".  Lower Level Measurements: East Wall: 6" H x 114"W = 684"; South Wall: 6" H x 78" W = 468"; West Wall: 6" H x 37" W = 222" for a total lower level area of : 1,374".  Combined measurements: 2814 square inches.

Finally, even assuming Ashcraft's char measurements were accurate, his data still fails to support his opinion.  In NFPA 921's discussion of fire patterns, the investigator is told that if fire patterns are "not visually obvious," it "may" be helpful to measure char depth.  (Doc. 142-3, 18.4.2.3.)  The **whole point** of those measurements is to then create "lines … connecting points of equal, or near equal, char … depths.  *The resulting lines may reveal identifiable patterns.*"  (*Id.*, 18.4.2.3, emphasis added.)  This is in keeping with 921's guidance elsewhere that fire patterns can be discerned from fire effects, such as char.  (*Id.*, 6.1.1.).  Figure 16.4.2(f) within NFPA 921 illustrates the "isochars" that a char depth analysis is intended to yield:



For SI units, 1 in. = 25.4 mm.

**FIGURE 16.4.2(f)   An Isochar Diagram Showing Lines of Equal Char Depth on Exposed Ceiling Joists.**

12

As can be seen, the point of char depth analysis is not to simply write down a host of numbers and look for the big ones, but to create a possible fire pattern from them.  Isochars are lines connecting these points of equal char depth.  (Doc. 142-3, 3.3.113.)  So what happens when an isochar diagram is created using Ashcraft's data?  With respect, it yields what the 20-somethings call a "hot mess":



Unlike the helpful diagram in 921, an isochar diagram based on Ashcraft's data looks like a set of modern gerrymandered political districts. It serpentines

through the kitchen walls with no apparent aim. The numbers themselves do not even seem to correlate to the kitchen walls. Consider, for instance, the huge "overhang" at the top right hand of the chart.  In the top left corner, measured values end at the corner drawn on the page, but at the top right, Ashcraft's values keep going, with a "15" and a "16" seemingly drifting off into another room. Moreover, while the sloppy handwriting leaves some uncertainty in the numbers written, the single largest value—18—appears to be some distance from the corner, being the third value from the bottom on the right side of the diagram. Depending on just how not-to-scale the drawing is, that value might represent the char depth over the doorframe, or it might represent a measurement directly across the room from the stove. In either event, the largest char value is not at Ashcraft's designated point of origin, or even all that close to it. All of this is without revisiting the complete absence of upper-level data values over the stove or the cabinets flanking it. Whatever Ashcraft's measurements show, it isn't a fridge fire.

Considering the subjectivity of Ashcraft's char depth measurements, his ignorance of the natural limits of such measurements, the discrepancies caused both by ventilation and the corner, Ashcraft's omission of key data, and the jumbled amoebae into which Ashcraft's data translates, his char depth measurements are best understood as hopelessly unreliable, just like the rest of his opinions.

## C. Ashcraft's Origin Opinions Are Purely Subjective and Undermined by Sound Science

Defendants' motion criticized Ashcraft's opinions as purely subjective. (Doc. 142, 23-25.)  Plaintiff labels this criticism a "catch-all, kitchen sink type argument," (Doc. 162, 13), and promptly closes his response without elaborating upon this argument.  In view of the absence of valid bases on which Ashcraft could predicate his opinion, Defendants stand firm with their criticisms.  Ashcraft's opinions amount to *ipse dixit* conclusions, unmoored to NFPA 921, science in general, or any other reliable principle.

## CONCLUSION

The opinions of Paul Castellano and Ken Ashcraft as to the cause of the fire are due to be excluded.  Castellano has proposed an electrical failure that is impossible in the face of available evidence, he advances a flawed theory of ignition that he has not tested, and his theory has been proven false.  The opinions of Ken Ashcraft as to the place of origin of the fire within the kitchen are likewise unreliable.  Ashcraft has no scientific basis undergirding his opinions, but instead has offered self-contradictory opinions that ignore NFPA 921's guidance.  There is no connection between sound science and Ashcraft's opinions save for his own *ipse dixit* declarations that he is correct.  Their opinions are due to be excluded in their entirety as unreliable.

Respectfully submitted, this the 28th day of September, 2016,

*s/ Jonathan M. Hooks*
JAMES B. CARLSON (ASB-7129-S78J)
JONATHAN M. HOOKS (ASB-0866-36H)
*Attorneys for LG Electronics USA, Inc. and*
*Sears, Roebuck and Co.*

**OF COUNSEL:**
CHRISTIAN & SMALL LLP
505 North 20th Street, Suite 1800
Birmingham, Alabama  35203
205-795-6588-Main
205-328-7234-fax
jbcarlson@csattorneys.com
jmhooks@csattorneys.com

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on this 28th day of September, 2016, served a copy of the foregoing by via electronic service and/or U.S. Mail upon all counsel of record.

*s/ Jonathan M. Hooks*
OF COUNSEL